Eric Albert
Trial Attorney
Michael McNulty
Senior Counsel
U.S. Dept. of Justice
Environment & Natural Resources Div.
Environmental Enforcement Section
202-514-2800 (direct)
Attorneys for the United States

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
|     Plaintiff, ) | Civil Action No. 3:14-01772-ST |
| ) | |
| v. ) | **MOTION TO ENTER** |
| ) | **AMENDED CONSENT DECREE** |
| LINNTON PLYWOOD ) | |
| ASSOCIATION, ) | |
| ) | |
|     Defendant. ) | |
| _____) | |

UNITED STATES' MOTION TO ENTER AMENDED CONSENT DECREE

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

LIST OF ATTACHMENTS AND EXHIBITS ........................................................... vi

MOTION................................................................................................................... viii

MEMORANDUM IN SUPPORT................................................................................. 1

   STATUTORY AND FACTUAL BACKGROUND ................................................. 1

      A. CERCLA Statutory Background ......................................................... 1

      B. The Portland Harbor Superfund Site ................................................... 3

      C. Linnton Plywood Association ............................................................... 4

      D. The Proposed Amended Consent Decree .............................................. 7

   STANDARD OF REVIEW .................................................................................... 11

   ARGUMENT .......................................................................................................... 13

     I.   THE COURT SHOULD APPROVE THE DECREE BECAUSE IT IS FAIR, REASONABLE, AND CONSISTENT WITH CERCLA. ................................... 13

         A.   The Amended Consent Decree is Procedurally Fair. ..................... 13

         B.   The Amended Consent Decree is Substantively Fair and Reasonable. ......... 14

         C.   The Amended Consent Decree is Consistent With CERCLA...................... 16

     II.  THE PUBLIC COMMENTS PROVIDE NO BASIS FOR THE UNITED STATES TO WITHDRAW ITS CONSENT TO THE DECREE. ....................... 17

         A.   Comments of PRPs and PRP Groups ............................................ 17

            1.   The Insurance Trust Provisions Should Maximize Recovery.................... 17

2.  All Funds Recovered by the United States Should be Available Only for Future Response Actions Performed by the PRPs ..................................... 18

3.  The Portion of the Sale Proceeds to be Recovered Are Insufficient. ......... 24

4.  The United States Has Not Satisfactorily Explained How it Determined that LPA Has a Limited Ability to Pay. ............................................................. 27

5.  None of the Settlement Proceeds Should be Allocated to NRD. ............... 28

6.  The Consent Decree Unfairly Cuts Off the RI/FS Performing Parties' Contribution Claims for RI/FS Costs. ........................................................ 29

7.  The Trust Agreement Improperly Fails to Identify Future Grantors Or to Account for Unidentified and Currently Unknowable Circumstances. ..... 31

8.  The United States Should Defer to the Ongoing Mediation and Allocation Process and Should Only Undertake Early Settlements in Compelling Circumstances. ........................................................................................... 32

B.  Comments of the Confederated Tribes and Bands of the Yakama Nation.... 33

C.  Comment of Pamela Allee (Private Citizen) .................................................. 35

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

Arkema, Inc. v. Anderson Roofing Co., Civ. No. 3:09-453-PK ...................................................... 7

Chubb Custom Ins. Co. v. Space Systems/Loral, Inc., 710 F.3d 946 (9th Cir. 2013) .......... 2, 3, 30

Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074 (1st Cir. 1986) .................. 1

Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415 (8th Cir. 1990) ................ 1

Heckler v. Chaney, 470 U.S. 821 (1985) ................................................................................... 25

In re Bell Petroleum, 3 F.3d 889 (5th Cir. 1993) ............................................................ 2, 13, 16

In re: Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. Delaware) ........................... 19

Kelley v. Thomas Solvent Co., 717 F. Supp. 507 (W.D. Mich. 1989) ................................... 13, 16

Linnton Plywood Assoc. v. United States, 236 F. Supp. 227 (D. Or. 1964)

    ("LPA Tax Case I") ......................................................................................... 5, 6, 15

Linnton Plywood Assoc. v. United States, 410 F. Supp. 1100 (D. Or. 1976)

    ("LPA Tax Case II") ...................................................................................... 5, 15, 25

Morongo Band of Mission Indians v. FAA, 161 F.3d 569 (9th Cir. 1998) ................................. 33

United States v. Bay Area Battery, 895 F. Supp. 1524 (N.D. Fla. 1995) ........................ 12, 25, 26

Pakootas v. Teck Cominco Metals, Ltd., 452 F.3d 1066 (9th Cir. 2006) ...................................... 1

Puget Sound Plywood, Inc. v. Commissioner of Internal Revenue, 44 T.C. 305 (U.S. Tax Court,

    1965) ............................................................................................................. 6, 15

United States v. Aerojet General Corp., 606 F.3d 1142 (9th Cir. 2010) ..................................... 11

United States v. Akzo Coatings of America, Inc., 949 F.2d 1409 (6th Cir. 1991) ........................ 2

United States v. Armour & Co., 402 U.S. 673 (1971) ............................................................... 35

United States v. Bestfoods, 524 U.S. 51 (1998) ......................................................................... 2

United States v. Brook Village Assocs., 2006 WL 3227769  (D.R.I. Nov. 6, 2006) .................. 26

United States v. Burlington Northern & Santa Fe Rwy. Co., 556 U.S. 599 (2009) ...................... 1

United States v. Cannons Engineering Corp., 899 F.2d 79 (1st Cir. 1990) ................. 2, 11, 12, 13

United States v. Coeur d'Alenes Co., 767 F.3d 873 (9th Cir. 2014) ..................................... passim

United States v. Davis, 261 F.3d 1 (1st Cir. 2001) ...................................................... 11

United States v. Estate of Romani, 523 U.S. 517 (1998).................................................... 26

United States v. Hecla, Ltd., 2011 WL 3962227 (D. Idaho 2011) .............................................. 12

United States v. Montrose Chem. Corp., 50 F.3d 741 (9th Cir. 1996) ........................................ 11

United States v. Rohm & Haas Co., 721 F. Supp. 666 (D.N.J. 1989) .......................................... 11

United States v. Shoshone-Bannock Tribes, 229 F.3d 1161, 2000 WL 915398 (9th Cir. 2000) . 33

United States v. Wallace, 893 F. Supp. 627 (N.D. Tex. 1995).................................................... 16

## STATUTES

5 U.S.C. § 552........................................................................................................................ 18

26 U.S.C. § 9507(b) ......................................................................................................... 18, 22

31 U.S.C. § 3302(b) ................................................................................................................ 22

31 U.S.C. § 3713 .................................................................................................................... 26

42 U.S.C. § 9601 ................................................................................................................. 1, 35

42 U.S.C. § 9604(a) ................................................................................................................. 1

42 U.S.C. § 9607(a) ............................................................................................................. 3, 29

42 U.S.C. § 9607(b) ................................................................................................................. 1

42 U.S.C. § 9607(f)................................................................................................................. 29

42 U.S.C. § 9607(l) ................................................................................................................. 26

42 U.S.C. § 9607(q) ............................................................................................................... 35

42 U.S.C. § 9613(f)........................................................................................ 3, 20, 30

42 U.S.C. § 9622(a)................................................................................................ 2

42 U.S.C. § 9622(b)........................................................................... 20, 21, 22, 23

42 U.S.C. § 9622(d).............................................................................................. 21

42 U.S.C. § 9622(e)...................................................................................... 2, 14, 25

42 U.S.C. § 9622(f).............................................................................................. 14

42 U.S.C. § 9622(g)................................................................................................ 7

42 U.S.C. § 9622(j).............................................................................................. 28

O.R.S. § 18.150(2)(a).......................................................................................... 26

## RULES

79 Fed. Reg. 68484 (Nov. 17, 2014)............................................................. viii

79 Fed. Reg. 77037 (Dec. 23, 2014)............................................................. viii

## LEGISLATIVE DOCUMENTS

S. Rep. No. 96-848, 96th Cong. 2d Sess. 13, 98 (1980) ............................... 2

## LIST OF ATTACHMENTS AND EXHIBITS

Attachment A:        Amended Consent Decree and Revised Trust Agreement

Attachment B:        Redlines of Amended Consent Decree and Revised Trust Agreement

Attachment C:        Public Comments of PCI Group

Attachment D:        Public Comments of RI/FS Performing Parties

Attachment E:        Public Comments on Trust Agreement of RI/FS Performing Parties

Attachment F:        Public Comments of BAE/TMG

Attachment G:        Public Comments of the Confederated Tribes and Bands
                     of the Yakama Nation

Attachment H:        Public Comments of Pamela Allee

Exhibit 1:      Letter from B. Hutchison to L. Cora, 10/2/2009

Exhibit 2:      Letter from B. Hutchison to L. Cora, 10/30/2009

Exhibit 3:      Letter from P. George to L. Cora, 3/24/2010

Exhibit 4:      Forms W-2 and 1099-PATR of LPA Employee, Tax Year 1999

Exhibit 5:      LPA Bylaws (rev. August, 2002)

Exhibit 6:      Stipulated Corrected General Judgment (Money Award)

Exhibit 7:      Letter from B. Hutchison to D. Opalski, 5/29/2009

Exhibit 8:      Letter from L. Cora to B. Hutchison, 2/09/2010

Exhibit 9       LPA Net Proceeds Analysis, 7/30/2014

Exhibit 10:     LPA List of Current Liens to be Paid at Closing, 7/30/2014

Exhibit 11:     Natural Resource Trustee Memorandum of Understanding, August, 2002

Exhibit 12:     Email from L. Cora to Legal Coordinating Team, 2/11/2010

Exhibit 13:     Email from L. Cora to Legal Coordinating Team, 7/26/2010

Exhibit 14:    Email from L. Cora to Legal Coordinating Team, 8/6/2010

Exhibit 15:    EPA General Policy on Superfund Ability to Pay Determinations, 9/30/1997

Exhibit 16:    EPA Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals, 6/3/1996

Exhibit 17:    RI/FS Administrative Order on Consent

Exhibit 18:    Arkema, Inc. v. Anderson Roofing Co., Civ. No. 3:09-453-PK (D. Ore), Dkt. 337, Order of Stay, 5/18/2010

Exhibit 19:    Purchase and Sale Agreement, 9/10/2012

Exhibit 20:    In re: Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. Delaware), Dkt,. 8880, Order, 01/06/2011

Exhibit 21:    In re: Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr. Delaware), Dkt. 8858, Memorandum, 12/20/2010

## MOTION

The United States of America, hereby moves this Court for entry of the proposed Consent Decree lodged with the Court on November 7, 2014. Dkt. No. 2-1, as amended in the attached Amended Consent Decree (see Attachment A). The Amended Consent Decree would resolve the United States' claims on behalf of the Environmental Protection Agency ("EPA") against Linnton Plywood Association ("LPA") for recovery of past and future United States response costs incurred or to be incurred in connection with the in-water portion of the Portland Harbor Superfund Site, and on behalf of the Department of the Interior ("DOI") and Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA") for recovery of Natural Resource Damages ("NRD") at the Portland Harbor Superfund Site (the "Site").

The United States published a notice of the settlement in the Federal Register and opened a thirty day public comment period.  See 79 Fed. Reg. 68484 (Nov. 17, 2014).  At the request of several commenters, the United States extended the public comment period for an additional thirty days.  79 Fed. Reg. 77037 (Dec. 23, 2014).  The United States received comments from four groups of private corporations who are jointly and severally liable for response costs and NRD with LPA at the Site (including two sets of comments from the Intervenors), one Indian Tribe that has asserted co-trusteeship with DOI and NOAA over certain natural resources at the Site, and one individual private citizen.  All of the public comments the United States received are attached to this Motion as Attachments C-H.

As set forth in this Motion, the United States has carefully considered the written comments. Following its review, the United States has determined that certain modifications are warranted as set forth below.  An Amended Consent Decree is attached to this Motion as Attachment A, with a redline showing all changes attached as Attachment B.  The United States

maintains that the Amended Consent Decree is fair, reasonable and consistent with applicable law, and therefore respectfully requests that this Court enter it.

LPA consents to the entry of the Amended Consent Decree.  Amended Consent Decree ¶ 39.  Counsel for the United States has conferred with counsel for Intervenors in accordance with Local R. Civ. P. 7-1(a) and were unable to resolve the underlying dispute.

<u>MEMORANDUM IN SUPPORT</u>

**STATUTORY AND FACTUAL BACKGROUND**

**A.      CERCLA Statutory Background**

Congress enacted the Comprehensive Environmental Response, Compensation and

Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., often called the "Superfund" law, in 1980

in response to the severe environmental and public health problems posed by the disposal of

hazardous substances exemplified by such infamous sites as Love Canal and Valley of the

Drums.  Accord <u>Dedham Water Co. v. Cumberland Farms Dairy, Inc.</u>, 805 F.2d 1074, 1080 (1st

Cir. 1986).  "CERCLA sets forth a comprehensive scheme for the cleanup of hazardous waste

sites, and imposes liability for cleanup costs on the parties responsible for the release or potential

release of hazardous substances into the environment." <u>Pakootas v. Teck Cominco Metals, Ltd.</u>,

452 F.3d 1066, 1072 (9th Cir. 2006).  These "Potentially Responsible Parties " ("PRPs") include

owners and operators of Superfund sites at the time of the disposal of hazardous substances at the

sites, current owners and operators of Superfund sites, and generators and transporters of

hazardous substances sent to Superfund sites.  42 U.S.C. § 9607(a).  CERCLA liability is strict,

permitting only three statutory defenses, 42 U.S. § 9607(b), and presumptively joint and several,

<u>see</u> <u>United States v. Burlington Northern & Santa Fe Rwy. Co.</u>, 556 U.S. 599, 614-615 (2009).

The "two . . . main purposes of CERCLA [are] prompt cleanup of hazardous waste sites

and imposition of all cleanup costs on the responsible party." <u>Gen. Elec. Co. v. Litton Indus.</u>

<u>Automation Sys., Inc.</u>, 920 F.2d 1415, 1422 (8th Cir. 1990).  Although Congress established the

Superfund in order to help pay the government's costs of investigating and cleaning up

contaminated sites, 42 U.S.C. § 9604(a)(1), it decided that the parties that contributed to the

hazardous waste problem should bear all government costs of response:

> [S]ociety should not bear the costs of protecting the public from
> hazards produced in the past by a generator, transporter, consumer,
> or dumpsite owner or operator who has profited or otherwise
> benefited from commerce involving these substances and now
> wishes to be insulated from any continuing responsibilities from
> the present hazards to society that have been created.

S. Rep. No. 96-848, 96th Cong. 2d Sess. 13, 98 (1980); see United States v. Bestfoods,

524 U.S. 51, 56 n.1 (1998) ("The remedy that Congress felt it needed in CERCLA is sweeping:

everyone who is potentially responsible for hazardous-waste contamination may be forced to

contribute to the costs of cleanup.") (internal citations omitted); In re Bell Petroleum, 3 F.3d 889,

897 (5th Cir. 1993) (noting that key purpose of CERCLA is to shift burden of cleanup from

taxpayers to those who benefitted from the waste disposal that caused harm).

Congress expressed a strong preference that the United States settle with responsible

parties in order to avoid spending resources on litigation rather than on cleanup. See 42 U.S.C. §

9622(a); Chubb Custom Ins. Co. v. Space Systems/Loral, Inc., 710 F.3d 946, 971 (9th Cir. 2013)

("'[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives

and without unnecessarily further complicating already complicated litigation.'") (internal

citations omitted); United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1436 (6th

Cir. 1991) ("presumption in favor of voluntary settlement"); United States v. Cannons

Engineering Corp., 899 F.2d 79, 92 (1st Cir. 1990).  When it does so, the United States may

consider a wide variety of factors, including ability to pay, litigative risks, public interest

considerations, and other equities, in fashioning a settlement.  See, e.g., 42 U.S.C. §

9622(e)(3)(A).  CERCLA encourages settlements by providing the right to seek contribution

from other PRPs and protection from other PRPs' contribution claims for matters addressed to

2

parties who settle with the United States.  42 U.S.C. § 9613(f)(1), (2); see Chubb Custom Ins. Co., 710 F.3d at 956 (settlement encouraged "through specified contribution protection.").

 **B. The Portland Harbor Superfund Site**

 Since the late 1800s, industrial operations in Portland Harbor have led to substantial contamination of the waters, sediments, banks, and surrounding upland areas of the Harbor, including a large stretch of the lower Willamette River.  The Portland Harbor Superfund Site consists of the areal extent of contamination in the lower Willamette River and the upland sources of that contamination.  To date, EPA has identified more than 150 Potentially Responsible Parties who may be liable for response costs and NRD under 42 U.S.C. § 9607(a).

 Under a 2001 Memorandum of Understanding (MOU) between EPA and the Oregon Department of Environmental Quality (ODEQ), EPA is taking the lead for the in-water portion of the Site and ODEQ is leading source identification and control in the upland portions of the Site.  Other government stakeholders, including six tribal governments and several state and federal natural resource trustee agencies (including NOAA and DOI), also signed the MOU. They did so for the purposes of recognizing their individual roles at the Site and establishing a Technical Coordinating Team and a Legal Coordinating Team to coordinate activities among EPA, ODEQ and the Trustees.

 In September 2001, EPA and ten government and private entities (referred to as the "Lower Willamette Group" or "LWG") entered into a Settlement Agreement and Administrative Order on Consent to complete a Remedial Investigation and Feasibility Study ("RI/FS") of the Site ("RI/FS AOC").  The RI/FS AOC requires the LWG to conduct an RI/FS for a CERCLA Record of Decision ("ROD").  Under the RI/FS AOC, the LWG also agreed to reimburse EPA

and ODEQ for all costs incurred in connection with the RI/FS.  The members of the LWG are the Intervenors in this case.

EPA expects to publish a Proposed Plan setting forth the recommended cleanup alternative for public comment in 2016, after the LWG finalizes the RI/FS.  Following public comment, EPA anticipates issuing the ROD documenting the selected remedy for the Site in 2017.  LWG's 2011 draft FS estimates cleanup costs between $169 million and $1.7 billion.  The Federal Natural Resource Trustees have preliminarily estimated NRD of $291 million.

EPA has already incurred more than $9 Million in unreimbursed costs (i.e., costs over and above those being reimbursed pursuant to the RI/FS AOC) and will continue to incur response costs for Site-related response actions.  These future response actions will include, but are not limited to: further PRP search, investigation, and document collection; upland source review and coordination with ODEQ; pursuit of cost recovery from PRPs who petition for bankruptcy protection; settlement negotiations; and, most significantly, performance of cleanup work or oversight of future work performed by PRPs.  The most immediate response costs EPA will incur in the next few years are those in connection with completing the Proposed Plan for public comment, conducting the public participation activities for selecting a remedy for the Site, responding to public comments, and drafting and issuing the final ROD.  The Federal Natural Resource Trustees, for their part, have already incurred approximately $2 million in unreimbursed NRD assessment costs.

### C.        Linnton Plywood Association

LPA is a workers' cooperative that, from 1951 until 2001, owned and operated a plywood manufacturing plant (which LPA continues to own) on 26 acres of land adjacent to the Willamette River, which led to releases of hazardous substances on the property and into the

4

River.  LPA ceased all business activities approximately fourteen years ago, and exists solely to wrap up its assets and liabilities.  In 2009, LPA approached the United States to resolve its liabilities at the Site in order to permit its final dissolution, including the distribution of earned, but never paid, hourly wages to its aging former workers.

LPA has represented that its former workers were paid hourly wages, of which a portion was "retained" by the cooperative in order to capitalize operations.  See Ex. 1 at 3 (Letter from B. Hutchison to L. Cora, October 2 2009); Ex. 2 at 1-2 (Letter from B. Hutchison to L. Cora, October 30, 2009 with attachments); and Ex. 3 at 5-7 (Letter from P. George to L. Cora, March 24, 2010 with attachments).  These hourly wages were, in fact, paid on a bi-monthly basis with a further distribution at the end of the year in cash or credits against any retained amounts.  See Linnton Plywood Assoc. v. United States, 236 F. Supp. 227, 228 (D. Or. 1964) ("LPA Tax Case I"); Linnton Plywood Assoc. v. United States, 410 F. Supp. 1100, 1102-03 (D. Or. 1976) ("LPA Tax Case II").[1]  The amount paid or credited to each worker was proportional to the number of hours they worked ("patronage") in a manner such that each worker received the same amount per hour of patronage.  Id.  In addition, in order to become a member of the cooperative (required to work at the mill), each worker had to purchase a single share, with a par value of $5,000 (though often purchased from a previous owner for far more).  See Ex. 1 at 3; Ex. 3 at 5-6.

LPA's bylaws specified the manner in which wages that were retained for capitalization (called the "Retains") and share values would be distributed to workers upon dissolution of the

---

[1] The court's suggestion that "the advances by Linnton are not wages, but are an approximation of each member's interim share of the year-end patronage dividends," 410 F. Supp at 1103, is not relevant to how the Retains ought to be treated in this case.  As the court recognized, "for workers' cooperatives, the Section 1382 patronage dividend exclusion is based on the members' contribution in the form of work, not capital or entrepreneurial risk."  Id. at 1107 n.13.  In any event, however the court may have characterized the advances, LPA certainly treated them as wages.  See Holter Decl. ¶¶ 5-9.

cooperative, computed on the basis of patronage and the year in which the hours were worked. See Ex. 3 at 6-7. Individual workers were required to pay income tax on their earned wages, including those comprising the Retains. See Ex. 2 at 2; Ex. 5 at Art. VI, § E, ¶ 3 (LPA Bylaws (revised August 2, 2002)); Holter Decl. ¶¶ 5-9.

The member-based Retains were exempt from LPA's gross taxable income because of their status as patronage dividends. See LPA Tax Case I, 236 F. Supp. at 228. Indeed, in a workers' cooperative like LPA, "the fruits and increases which the worker-members produce through their joint efforts are vested in and retained by the workers themselves, rather than in and by the association. . . and are then allocated among the active workers as patronage dividends, in proportion to their participation in producing the same." Puget Sound Plywood, Inc. v. Commissioner of Internal Revenue, 44 T.C. 305, 309 (U.S. Tax Court, 1965).

When LPA finished winding down its operations in 2002, it altered the bylaws' formula for distribution of the Retains. Ex. 1 at 2-3. Former workers who alleged they would be harmed (to the benefit of other former workers) by the change commenced a civil action in state court to nullify it. Ex. 3 at 6. LPA ultimately settled that litigation via stipulated judgment in 2009 (the "Weiss Judgment"), which amended the formula for distribution of the Retains. See Ex. 1 at 3-4; Ex. 3 at 2, 6-7 (P. George letter to L. Cora, March 24, 2010). The Weiss Judgment requires LPA to pay the Retains (roughly $2.5 million) and par value of the shares ($630,000) out of the proceeds of the sale of its land. See Ex. 3 at 7 & Encl. 6. LPA has 199 former employees with Retains, see Ex. 1 at 3, so the payment to each individual will average approximately $15,700. Under Oregon law, the Weiss Judgment became a lien on LPA's real property upon issuance on October 28, 2009. See Ex. 3, Encl. 3; O.R.S. § 18.150(2)(a). The Weiss Judgment plaintiffs

obtained a further order, incorporating by reference the October 28, 2009 settlement stipulation, cementing its status as a lien of liquidated value on March 21, 2014.  Ex. 6 at 2:2-6.

At this point, LPA's sole remaining asset (other than insurance policies) is the plywood processing plant property itself.  Thus, the tangible means for LPA to pay its former workers their Retains (and satisfy the Weiss Judgment) is through the sale of that property.  When LPA initially approached EPA in 2009, it did so because it had a pending deal with BP Petroleum to sell the property and one of BP's conditions to buy it was that LPA resolve its liability to EPA.  See Ex. 7 at 1 (Letter from B. Hutchison to Dan Opalski, May 29, 2009).  Although the BP deal did not close, LPA has since entered into a purchase and sale agreement with Linnton Water Credits, LLC ("LWC") for the property.  See Appendix C to Amended Consent Decree.  The LWC sale is contingent upon the entry of the Amended Consent Decree.  See Ex. 19, § 8.1(g)

### D.    The Proposed Amended Consent Decree

When it approached EPA about resolving its CERCLA liability, LPA was a defendant in the larger contribution action initiated by the Intervenors before Judge Papak.  Arkema, Inc. v. Anderson Roofing Co., Civ. No. 3:09-453-PK.  The Intervenors agreed to dismiss LPA from that case while LPA attempted to negotiate a settlement with the United States and pursued settlement discussions with Intervenors.  See Dkt. 27, ¶¶ 3-7 (Declaration of P. George).

LPA initially argued for treatment as a de minimis party under Section 122(g) of CERCLA, 42 U.S.C. § 9622(g), see Ex. 7 at 1-5, and initially suggested a settlement sum of $100,000, see Ex. 2 at 5.  EPA rejected de minimis treatment for LPA, but acknowledged LPA's limited financial resources and, pending receipt of additional financial information, agreed to consider settlement based on LPA's limited ability to pay.  See Ex. 8 at 2-3 (Letter from L. Cora to B. Hutchinson, Feb. 9, 2010).

After receiving financial information requested from LPA, EPA tasked Lloyd Oatis, a qualified financial analyst, to review the company's financial information. See generally Decl. of Lloyd B. Oatis.  Over the past ten years, Mr. Oatis has conducted close to 200 similar reviews of a defendant's ability to pay amounts sought by the EPA. Oatis Decl. ¶ 2.  Mr. Oatis conducted his initial assessment in July 2010 and updated it in 2012 and 2014 based on updated financial and insurance information provided by LPA at EPA's request.  Id., ¶ 3.

Mr. Oatis determined that LPA was not an operating concern.  Id., ¶ 5.  In 2009 LPA was not manufacturing any products, receiving only rental income from a sand and gravel company sufficient to cover a portion of LPA's expenses, and had county real estate taxes in arrears by $337,405.  Id. ¶ 7. Thus, Mr. Oatis concluded in 2010 that there were no funds available from the on-going operational cash flow of LPA.  Id.  He concluded that LPA's principal asset and source of funds was the value of the real estate it owned.  Id., ¶ 9.  Mr. Oatis analyzed the value of the property in relation to the liabilities and debts that would likely need to be paid from any sale proceeds.  Id.  He found documentary support indicating that the company owed at least $600,000 to third party creditors, which included attorneys' fees, expected operating losses, and unpaid property taxes.  Id.  He also concluded that the $3.1 million distribution to LPA's workers of Retains and share redemption was a legitimate priority amount to be paid out of future sales proceeds because the members had been taxed on the amounts apportioned to them and their share ownership was not typical equity ownership by stock holders.  Id.  Also, in 2010, Mr. Oatis determined that LPA had insurance policies for the years 1966 to 1985 with coverage of $100,000 per year and concluded that insurance proceeds may be between $1.5 million and $1.9 million.  Id., ¶ 8.  Therefore, in 2010, assuming the property could be sold for $6.5 million, Mr. Oatis found that LPA could potentially pay up to $3.9 million towards the cleanup, but that there

were many risks and considerations for recovering that amount, such as finding a buyer that would pay $6.5 million in a timeframe such that additional unpaid expenses would not accrue. Id., ¶ 10. Mr. Oatis' updated evaluations in 2012 and 2014 found that LPA's unpaid property taxes and third party creditor liabilities were increasing while the proposed purchase price of the property had decreased. Id., ¶¶ 11-12. In 2013 the sand and gravel business terminated its lease and, as of 2014, LPA's rental income was only $2,000 a month. Id., ¶ 12.

The result of the financial analyst's careful review is the conclusion that, under EPA's Ability to Pay Policy, LPA has an inability to pay its share of response costs and is limited in its ability to make a substantial contribution to the Portland Harbor Superfund Site cleanup costs because it is not an operating concern and the only assets it has to pay response costs are: (1) 19 years of comprehensive liability insurance policies; and (2) the real property it owns, which is subject to significant liens and tax arrearage. Id., ¶ 5.

The proposed Amended Consent Decree contains five key elements:

**Cash Payment by LPA**. LPA has reached a policy-limits settlement for five of its years of insurance coverage, totaling $500,000. LPA will pay $450,000 of this amount to the United States within 30 days of entry, and the remaining $50,000 to the Portland Harbor Superfund Site Insurance Recovery Trust discussed below. Amended Consent Decree ¶¶ 6, 9. Seventy-five percent of the $450,000 payment will be paid to EPA, and 25% will be paid to DOI. Id. ¶ 8.a.

**Net Proceeds of the Sale of the Property**. LWC's purchase price is $5.75 Million, but it may reduce that to $5.5 Million if it pays in full at closing. LPA will pay to the United States the "Net Proceeds" of the sale, as defined in the Amended Consent Decree. Amended Consent Decree ¶ 3.p. If the contemplated transaction fails, then LPA must use best efforts to market the property and provide the net proceeds of any sale to the United States. Id. at ¶ 7.

**Proceeds from Insurance Insurance Recovery Trust**.  LPA will establish the Portland Harbor Superfund Site Insurance Recovery Trust within five days after the Effective Date by executing the Revised Portland Harbor Superfund Site Insurance Recovery Trust Trust Agreement attached as Appendix E to the Amended Consent Decree.  Amended Consent Decree, ¶ 9.  By executing the Trust Agreement, LPA will transfer, convey and assign to the Trust all of its rights to Environmental Claims as defined and more fully described in the Trust Agreement.  See Amended Consent Decree Appendix E, Trust Agreement, ¶¶ 1.d, 5.b.  EPA and the Federal Natural Resource Trustees are the sole beneficiaries and the Trustee will disburse to them all proceeds of insurance claims that it receives after deducting expenses and maintaining a $50,000 minimum balance.  Id.  ¶¶ 1.a, 3, 11-13, 20-22.

**EPA Special Account**.  All of EPA's proceeds from the settlement will be placed into the Portland Harbor Superfund Site Special Account to help fund or finance response actions after the effective date of the Amended Consent Decree.  Amended Consent Decree ¶10.  The revision to EPA's model special account language providing only for post-entry response actions is reasonable in light of the significant future costs anticipated at the Site.

**Covenants/Reservations**.  The Amended Consent Decree grants LPA covenants not to sue from the United States pursuant to Sections 106 and 107(a) of CERCLA for response costs incurred and to be incurred in connection with the in-water portion of the Site, and for NRD Site-wide.  Amended Consent Decree ¶ 16.  The covenants are conditioned upon execution of the Trust Agreement, payment of the cash and Net Proceeds of Sale, and the veracity of the financial information and certifications provided by LPA and are subject to standard reservations.  Id., ¶¶ 16, 17-18, 35.  LPA is also providing reciprocal covenants not to sue to the United States.  Id. ¶ 19.  LPA also covenants not to sue any PRP for the Portland Harbor Superfund Site.  Id. ¶ 22.

## STANDARD OF REVIEW

The well settled standard applied to review of the United States' proposed CERCLA settlements is whether a settlement is fair, reasonable and consistent with CERCLA.  United States v. Aerojet General Corp., 606 F.3d 1142, 1152 (9th Cir. 2010); Cannons Eng'g, 899 F.2d at 84.  Proposed CERCLA consent decrees are entitled to deference from the court reviewing the decree.  United States v. Montrose Chem. Corp., 50 F.3d 741, 746 (9th Cir. 1996).  Not only is it "the policy of the law to encourage settlements," Cannons Eng'g, 899 F.2d at 84, but that policy is "strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement,'" Montrose, 50 F.3d at 746 (quoting Cannons Eng'g, 899 F.2d at 84).  While "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, a district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'" Id. (quoting Cannons, 889 F.2d at 84).  "This is so, because considerable weight [is] accorded to [a federal] executive department's construction of a statutory scheme it is entrusted to administer...." United States v. Coeur d'Alenes Co., 767 F.3d 873, 876 (9th Cir. 2014).

Fairness in the CERCLA settlement context has both procedural and substantive components.  Cannons, 899 F.2d at 86.  A court should measure procedural fairness by gauging the candor, openness, and bargaining balance of the negotiation process.  Id. at 86.  Procedural fairness may "be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present."  United States v. Davis, 261 F.3d 1, 23 (1st Cir. 2001).

In reviewing substantive fairness, the court need only determine whether a proposed settlement is a reasonable compromise of the litigation.  United States v. Rohm & Haas Co., 721

F. Supp. 666, 685 (D.N.J. 1989). This ordinarily calls for the recovery of an amount "roughly correlated with some acceptable measure of comparative fault." Cannons, 899 F.2d at 87.

However, when a settlement is based on the defendant's limited ability to pay, neither the government nor the court need conduct such an inquiry. Couer d'Alenes Co., 767 F.3d at 877-78. Moreover, the mere fact that the remaining non-settling PRPs may ultimately be liable for a disproportionate share of liability does not render such an ability to pay settlement substantively unfair because the United States' statutory authority to settle CERCLA matters clearly contemplates such an outcome. Id. Indeed, "absent another reason that actually has some grounding in the statutory provision at issue here, there is no reason for the district court to spend its time quantifying precisely" how much less than an ability to pay defendant's fair share the government may settle for. Id. at 878.

The government's determination of how much to recover from an ability to pay defendant is due significant deference, in part because of the government's obligation to represent the public interest in these matters. See United States v. Hecla, Ltd., 2011 WL 3962227, *5 (D. Idaho 2011) (Lodge, J.). Indeed, intervenors objecting to CERCLA ability to pay settlements face an "extraordinarily high burden" when challenging the government's determination of a defendant's ability to pay because of the "tremendous deference the district court rightfully pays to the government's determination that a consent decree is fair and proper." Coeur d'Alenes Co., 767 F.3d at 879. Ultimately, a court should not "second guess" an ability to pay settlement under CERCLA so long as it "falls within a range of reasonable amounts." United States v. Bay Area Battery, 895 F. Supp. 1524, 1531 (N.D. Fla. 1995).

CERCLA authorizes the cleanup of hazardous waste sites using money from the Superfund, but the Superfund is limited and now funded only through general appropriations

from Congress and cannot finance cleanup of all the many hazardous waste sites across the

nation.  Congress knew when it enacted CERCLA that the costs of response activities would

greatly exceed the Superfund.  <u>Kelley v. Thomas Solvent Co.</u>, 717 F. Supp. 507, 518 (W.D.

Mich. 1989).  Thus, settlements of CERCLA cases in which defendants agree to pay the United

States' past or future costs are in the public interest.  Likewise, cost-effective settlement practices

also preserve resources of the Government in its efforts to clean up hazardous waste sites as

quickly as possible.  <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>Bell Petroleum</u>, 3 F.3d at 897.

**ARGUMENT**

**I.      THE COURT SHOULD APPROVE THE DECREE BECAUSE IT IS FAIR, REASONABLE, AND CONSISTENT WITH CERCLA.**

**A.      The Amended Consent Decree is Procedurally Fair.**

Generally, the requirement of procedural fairness is satisfied if the proposed settlement is

negotiated at arm's length and is conducted forthrightly and in good faith.  <u>See</u> <u>Cannons Eng'g</u>,

899 F.2d at 86-87.  The Amended Consent Decree is the result of arms-length negotiations

between the United States and LPA that started years ago.  The Parties to the settlement

represent that it has been negotiated in good faith and will avoid costly litigation.  Amended

Consent Decree ¶ I.  LPA has been represented by experienced counsel.  Moreover, to fully

evaluate the company's financial condition, the United States relied on a qualified financial

analyst who examined LPA' financial and insurance information.  The United States' Covenant

Not to Sue is "conditioned upon the veracity and completeness of the Financial Information"

provided to the United States and the "financial, insurance, and indemnity certification made by

Settling Defendant."  Amended Consent Decree ¶¶ 16, 35.

The other PRPs were aware of the settlement negotiations between the United States and

LPA.  Indeed, the Intervenors voluntarily dismissed LPA from their contribution action in order

to allow LPA to pursue settlement with the United States.  See Dkt. 24 at 7, Declaration of Paul

George, ¶¶ 2-6.  Intervenors were kept informed of settlement negotiations, including terms,

LPA's assets, and proposed distributions from the sale of LPA's property.  Id., ¶¶ 9-11.

The Amended Consent Decree is the product of several years of arms-length negotiation

between experienced counsel on both sides, conducted with the knowledge and acquiescence of

other interested parties, and therefore is procedurally fair.

**B.**    **The Amended Consent Decree is Substantively Fair and Reasonable.**

The Amended Consent Decree is substantively fair and reasonable because it resolves the

LPA's liability based on its ability to pay.  A party's ability to pay is an appropriate

consideration when resolving a defendant's liability.  42 U.S.C. §§ 9622(e)(3)(A) &

9622(f)(6)(B); see Coeur d'Alenes Co., 767 F.3d at 877.  Here, the United States has determined,

after review by a qualified financial analyst, that LPA's ability to pay its share of response costs

and NRD at the Site is limited to the payments (including net sale proceeds) and assignments of

insurance rights required by the Amended Consent Decree.  Amended Consent Decree ¶ I.

While the United States has not determined LPA's comparative share of response costs at the

Site, there is no doubt that it dwarfs LPA's available assets.

As described above, LPA receives minimal rental income that does not cover its

expenses.  It has reached a proposed settlement with one of its insurers to pay the policy limits

for five of the nineteen years of identified coverage, while leaving the remaining fourteen years

of coverage intact to be resolved later.  LPA has represented that it expects to consummate this

insurance settlement following entry of the Amended Consent Decree.  LPA will then pay all of

the anticipated proceeds to the United States, see Amended Consent Decree ¶ 6, and the Portland

Harbor Superfund Site Insurance Recovery Trust, see id., ¶ 9.  The proposed settlement also

captures the value of LPA's remaining insurance policies by requiring LPA to execute the Trust Agreement, thereby assigning its remaining insurance rights for the United States' benefit.  Id.

LPA's only other asset is its real property, which is proposed to be sold for $5.75 million. However, as of July 30, 2014 LPA had over $4 million in debts, including $480,000 in overdue real estate taxes, $800,000 in unpaid attorneys' fees, and $3.1 million in unpaid wages and share redemptions due to its workers pursuant to the Weiss Judgment.  See Ex. 10 (LPA Financial Information List of Current Liens to be Paid at Closing, July 30, 2014). The United States elected not to step ahead of these creditors based on the public interests involved.

First, preventing the attorneys who have represented LPA in negotiating the Amended Consent Decree, including negotiating multiple land sale transactions to generate funds for settlement, from getting paid would seriously threaten the United States' ability to enter into future settlements.  It would make it difficult for financially precarious PRPs to obtain competent counsel, and give such counsel little incentive to maximize such PRPs' limited assets for settlement purposes.  Neither outcome is consistent with the public interest.

Second, the Retains are hourly wages earned by LPA's former workers that they paid taxes on but never received.  See supra p. 5-7. The retained patronage of a worker's cooperative is "vested in and retained by the workers themselves, rather than in and by the association." Puget Sound Plywood, 44 T.C. at 309.  LPA has properly deducted the member-based Retains from its gross taxable income.  LPA Tax Case I, 236 F. Supp. at 228; LPA Tax Case II, 410 F. Supp. at 1108.  In turn, its workers were required to pay taxes on the Retains, even though they never received them.  See Ex. 5 at Art. VI, § E, ¶ 3.  And, in fact, the workers reported as wages and paid income taxes on the Retains when they were retained (even though not yet paid).  See

Holter Decl. ¶¶ 7-9.  Thus, the Retains belong to LPA's workers and should be returned to them pursuant to the Bylaws and the Weiss Judgment.

Even if not legally required, compassion for LPA's former workers, principles of equity, and the public interest demand that LPA be able to pay these workers what they have earned, and to repay (at par value) the shares that they had to purchase in order to work.  In 2009, these former workers averaged 65 years in age. See Ex. 7 at 8.  The government's decision to allow LPA to pay what they are owed out of the proceeds of the property sale is fully consistent with EPA's General Policy on Superfund Ability to Pay Determinations, which cautions that EPA consider the effects of any settlement in a way that "demonstrates compassion for individuals and their unique circumstances" and to avoid "reduc[ing] or eliminat[ing] important benefits that the PRP provides to the community."  Ex. 15 at 2, 3.

Because the Amended Consent Decree recovers the full amount of LPA's ability to pay, while also allowing LPA to pay its attorneys and former workers their long-awaited wages consistent with EPA's policy on ability to pay settlements, it is substantively fair.

### C.    The Amended Consent Decree is Consistent With CERCLA.

The Amended Consent Decree is consistent with CERCLA because it conserves resources for cleanup rather than for litigation and appropriately places the burden of cleanup costs on one of the parties that contributed to the hazardous waste problem rather than on the tax-paying public.  See United States v. Wallace, 893 F. Supp. 627, 636 (N.D. Tex. 1995); Kelley, 717 F. Supp. at 518; Bell Petroleum, 3 F.3d at 897.  Given the mounting debts accruing on both the real property and the company, in this circumstance, it is also in the public interest for the United States to reach settlement now while there still is money to get from the sale of the property.

16

The Amended Consent Decree was negotiated in a procedurally fair manner and is substantively fair, reasonable and consistent with applicable law. For those reasons, and guided by the deferential standard of review for settlements negotiated by the United States under CERCLA, the United States respectfully asks the Court to enter the Amended Consent Decree.

## II.    THE PUBLIC COMMENTS PROVIDE NO BASIS FOR THE UNITED STATES TO WITHDRAW ITS CONSENT TO THE DECREE.

The United States received six sets of public comments, including four from various PRPs, one from an American Indian Tribe that has asserted co-trusteeship over certain injured natural resources at the Site, and one from a private citizen.  See Attachments C-H.

### A.    Comments of PRPs and PRP Groups

The United States received comments from the Portland Harbor Superfund Site Participation and Common Interest Group ("PCI Group") (Attachment C),[2]  the RI/FS performing parties (who are also the Intervenors in this case) (Attachments D and E), and BAE Systems San Diego Ship Repair, Inc. and the Marine Group LLC ("BAE/TMG") (Attachment F), a member of the PCI Group.  While there are some differences between them, the comments from these PRPs fall into several general categories.

1.    The Insurance Trust Provisions Should Maximize Recovery.

The Intervenors submitted comments proposing edits to the Consent Decree and Trust Agreement intended to strengthen the Trust's ability to prosecute insurance claims.  See Att. E. The PCI Group also asked the United States to consider these comments.  See Att. C at 10.

The United States has fully reviewed all of the proposed edits and agrees that they will improve the Trust's position with respect to the assigned insurance rights.  Therefore, the United

---

[2] The PCI Group consists of about 100 private and public entities, many of which are identified PRPs, that have joined together to allocate cleanup cost liability among themselves.

States has adopted each of the proposed changes in the Amended Consent Decree and Revised Trust Agreement. The changes are shown in the redline versions of these documents attached as Attachment B to this Motion.

The PCI Group also asks the United States to modify the Consent Decree to require the United States to make information about payments into and out of the Trust and into and out of EPA's Special Account for the Site available in real time. See Att. C at 10. The United States understands the PRPs' desire to keep track of moneys received and spent by EPA, but respectfully submits that inserting such a requirement into the Amended Consent Decree is burdensome and neither necessary nor appropriate. It is burdensome because EPA would have to incur expenses and devote additional resources to create and maintain a system which does not now exist.[3] It is unnecessary because information about payments into and out of the Special Account (including disbursements from the Trust) is already publicly available via the Freedom of Information Act, 5 U.S.C. § 552. And it is inappropriate because it could conflict with the fact that the settlement does not create rights in third parties. Amended Consent Decree ¶ 23.

2.    All Funds Recovered by the United States Should be Used Only for Future Response Actions Performed by the PRPs.

Though they each take a slightly different approach, all three PRP commenters contend that all settlement proceeds should ultimately be made available to them, urging that the settlement should forbid the United States from spending recovered funds on its own past or future response costs. The PCI Group asks the United States to delete from Consent Decree Paragraph 10 the language implementing EPA's authority under 26 U.S.C. § 9507(b)(2) to

_____

[3] The Portland Harbor Special Account is very active, with frequent transactions unrelated to this settlement, including cost reimbursements under four separate administrative orders and payments of EPA staff salaries and contractor costs for Site-related work.

"transfer all or any portion of such funds to the EPA Hazardous Substance Superfund." Att. C at

7. The PCI Group contends that its proposal is "consistent with the language from the Smurfit-

Stone Order" quoted in its comments. Id.[4] For their part, Intervenors urge the United States to

forgo its authority under 42 U.S.C. § 9622(b)(3) to use Special Account funds to conduct or

finance its own response actions (including oversight of PRP work) and, instead, to restrict itself

to using settlement funds only for  funding or conducting future response actions "other than

EPA oversight of PRP work." Att. D at 7. They urge a different set of changes to Consent

Decree Paragraph 10 from the PCI Group, requiring EPA not only to forgo reimbursing its past

costs, but also to prioritize "reimbursement of parties who agree under a settlement with EPA to

perform work at the Site." See id.. However, like the PCI Group, the RI/FS Performing Parties

assert that their proposed edits are "very similar" to the language the United States agreed to in

the Smurfit bankruptcy. Id. Finally, like the RI/FS Performing Parties, BAE urges the United

States to forgo its statutory authority to use the settlement funds for future EPA response costs or

to reimburse its own past costs. See Att. F at 6-7, 8.

All three PRP groups are concerned that, if EPA uses any of the settlement money to

fund future response costs the Agency is incurring and will incur (including future oversight

costs) or to reimburse EPA's past costs, it will reduce the amount of "orphan share" credit they

may receive in the future, if they enter into a settlement with the United States that is eligible for

---

[4] The "Smurfit-Stone Order" refers to the order approving a consent decree between the
United States and the debtors in the Smurfit-Stone Container Corporation bankruptcy
proceeding. See Ex. 20 (In re: Smurfit-Stone Container Corp., Case No. 09-10235 (Bankr.
Delaware), Dkt,. 8880, Order (January 6, 2011)). The United States proposed the Order in its
memorandum in support of the motion for approval of the consent decree. Ex. 21 (Id., Dkt.
8858, Memorandum (Dec. 20, 2010)).

treatment under EPA's Orphan Share Policy.  See Att. C at 5-6; Att. D at 6-7; Att. F at 6-7.[5]  The

PRPs to some extent raise a hypothetical issue that may never come to pass because there is no

guarantee either that a PRP will enter into an RD/RA settlement or that, if they do, the Orphan

Share Policy will in fact apply.  In any event, because money is fungible, any response cost

expenses EPA incurs, whether it uses Special Account money or not, will increase its total costs

and, absent future reimbursement for those costs, its unreimbursed costs as well.

Moreover, no matter how EPA uses the settlement proceeds, the total liability of the other

PRPs at the Site will be reduced by any recovered amounts.  See 42 U.S.C. § 9613(f)(2).  Thus,

to the extent the PRPs ask EPA to commit to providing an Orphan Share credit that ignores

settlement proceeds, they seek an additional credit for these sums.  Mandating this credit,

especially at the expense of the taxpaying public, is unwarranted.

And the commenters want to mandate not only an additional credit under the Orphan

Share policy, but also the ultimate payment of the settlement proceeds to them, demanding that

EPA not use any settlement proceeds, but instead leave them in the Special Account to fund the

PRPs' own future work under a hypothetical RD/RA settlement.  If any PRP enters into a future

RD/RA settlement (and none have yet committed to do so), it will have the opportunity to

request partial funding from EPA.  See 42 U.S.C. § 9622(b).  BAE and the PCI Group note that

encouraging PRPs to perform work at the Site is an important goal and contend that maximizing

the amount of EPA money available for funding such work is a matter both of maintaining

---

[5] Should any of the commenters enter into such a settlement in the future (and none have
yet committed to do so), they could be eligible for an orphan share credit up to the total
unreimbursed United States' past response costs plus estimated EPA future oversight costs of the
Remedial Design and Remedial Action ("RD/RA").  See Ex. 16 at 2-4 (Interim Guidance on
Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-
Critical Removals, June 3, 1996).

EPA's negotiating flexibility and of strengthening trust with the PRP community.  BAE Comments at 6-7; PCI Group at 5-7.  The RI/FS Performing Parties contend that that this is a matter of fairness to them.  See Att. D at 6-7.

The United States agrees that encouraging PRPs to enter into settlements in the future to perform remedial work, after EPA issues a ROD, is an important goal.  Indeed, CERCLA makes clear that such settlements are desirable.  See 42 U.S.C. § 9622(d)(1).  This is especially true in an era of declining resources, in which the federal Superfund is no longer funded by taxes on certain industries, but is instead reliant on appropriations from Congress.  However, adopting the PRP's recommendations would frustrate other important statutory purposes and would, in fact, undermine the goal of encouraging PRPs to perform remedial work.

First, forbidding EPA to use settlement monies to fund response costs it is incurring and will incur could undermine EPA's ability to complete cleanup of the Site as quickly as possible. In particular, EPA will incur significant response costs in preparing and finalizing the ROD.  See supra at p. 3-4.  If EPA Region 10 cannot use the settlement proceeds to conduct that work, it will have to apply for and receive funding from EPA Headquarters through the Superfund budget process.  Given the precarious state of the Superfund's finances, this could delay issuance and completion of a remedial decision, contradicting the purpose of CERCLA to expedite cleanups.

Second, if EPA must rely only on Superfund money for future oversight and cannot reimburse the Superfund with settlement money, it would effectively shift the burden of those costs from the PRPs to the taxpaying public.  That clearly contravenes Congress' intent.

Third, EPA's authority to create Special Accounts represents an enlargement of an executive agency's discretion to direct funds to particular accounts.  Ordinarily, the Miscellaneous Receipts Act would require EPA to deposit all funds received directly into the

general U.S. Treasury. 31 U.S.C. § 3302(b). In the CERCLA context, recoveries under Section 107 are credited to the Treasury's Superfund account by default. 26 U.S.C. § 9507(b)(2). However, Congress provided the President the authority to retain CERCLA settlement money in a Special Account within the Superfund Treasury account and to use that money for purposes of carrying out a settlement agreement "notwithstanding any other provision of law." 42 U.S.C. § 9622(b)(3). The fact that Congress authorized not only the Superfund Treasury account itself, but also the use of Special Accounts within the Fund, demonstrates its intent that EPA apply its executive discretion in the use of recovered funds. This discretion extends to decisions about whether and to what extent to fund PRP performance of remedial work, which are judicially unreviewable. See 42 U.S.C. § 9622(b)(2). EPA's discretion is guided by Congress's expressed intent to a) require the parties responsible for hazardous waste contamination fund cleanup and b) expedite the cleanup of contaminated sites. See supra at p. 1-3. For this reason, the model Ability to Pay CERCLA Consent Decree contains the language commenters object to in this Amended Consent Decree. The United States sees no reason to deviate from it here.

Finally, the PRPs' insistence on requiring EPA to fund future RD/RA work by PRPs reduces, rather than enhances, EPA's flexibility in negotiations. Indeed, such a requirement would undermine EPA's ability to extract concessions during future negotiations that enhance the public interest value of such settlements. While both BAE and PCI Group recognize the importance of maintaining EPA's "flexibility" in such future negotiations, neither acknowledges that their demands actually limit such flexibility by mandating a particular outcome.

The Intervenors also comment that because proceeds from the settlement are not specifically dedicated to RD/RA work at Portland Harbor, EPA is not complying with alleged promises it made to them in the December 28, 2000 Special Notice Letter and the RI/FS AOC.

See Att. D at 6-7.  However, EPA' offer to "defer recovery of all past costs to the remedy

implementation stage" in its December 28, 2000 letter, id. at 6, meant only that EPA would defer

seeking past costs from parties who performed the RI/FS, not from all other PRPs.  As promised,

EPA did not demand that the RI/FS performing parties reimburse its past costs incurred as of the

AOC date.  See Ex. 17, § XXI. (Reservation of Rights), ¶ 1.  However, EPA explicitly reserved

its rights as to any other party, including the right to seek all past costs.  See id., ¶¶ 1-6.

Commenters also assert that EPA's agreement to apply its Orphan Policy in the future

(see Ex. 17, § XXI. (Reservation of Rights), ¶ 6), prohibits EPA from spending any settlement

money it may receive from other PRPs until some future time when the Orphan Share Policy

might be applied.  See App. D at6-7.  However, EPA never agreed to limit its discretion

regarding when or how to use settlement money nor would such an agreement have been in

compliance with EPA's obligations under CERCLA to maximize cost recovery to the Superfund.

See, e.g., 42 U.S.C. § 9622(b)(3) (discretion to retain settlement funds for purposes of carrying

out a settlement agreement "notwithstanding any other provision of law.").  Moreover, to the

extent the PRP commenters suggest that EPA's Orphan Share Policy or other guidance somehow

create a judicially enforceable right to maximization of future reimbursements to PRPs for work

performed pursuant to yet-to-be-negotiated settlements, such a view is flatly contradicted by the

statute and guidance.  See 42 U.S.C. § 9622(b)(2); Ex. 15 at 15.

All that said, EPA agrees with the general thrust of the PRPs' concerns, which is that

settlement proceeds generally be directed toward future uses at the Site rather than toward costs

already incurred.  For this reason, the United States deviated from its model ATP CD language

by agreeing that settlement proceeds would be used to fund or conduct response actions "after

the date of entry of the consent decree."  Amended Consent Decree, ¶ 10.  EPA Region 10

intends to dedicate proceeds received from this settlement to conduct or finance response actions after the date of entry of the Amended Consent Decree.  If EPA is able to enter into a settlement with one or more parties who agree to implement the Record of Decision, EPA intends to make such disbursements as agreed to by EPA and such parties from any remaining settlement proceeds to perform work required under the settlement.[6]  This clear statement of EPA's intentions should address the PRP commenters' concerns regarding perceptions of the settlement in the PRP community.  See Att. C at 6-7; Att. F at 7.  However, for the reasons discussed above, requiring EPA to act on its intentions is consistent with neither CERCLA nor the public interest.

       3.      The Portion of the Sale Proceeds to be Recovered Are Insufficient.

The PRP commenters also object to the United States' decision not to interfere with LPA's payment of earned, but not-yet-paid, wages (the Retains) and share redemptions to its former workers out of the proceeds of the property sale.  See Att. C 10-11; Att. D at 4-5; Att. F at 3-4.  As discussed above, these former workers are entitled to such payment pursuant to LPA's bylaws and the judgment they obtained in 2009.

The PRP commenters are flatly wrong when they suggest that the Retains are "not compensation for services rendered."  See Att. F at 4; see also Att. D at 4-5 (characterizing the former LPA workers only as "shareholders").  In fact, the Retains are the portion of each worker's patronage-based (i.e., hourly) compensation that LPA retained over the years for the purpose of capitalizing the cooperative.  Ex. 1 at 3; Ex. 2 at 2; Ex. 3 at 6.  Each worker was required to, and did, pay taxes on these retained wages.  See Holter Decl. ¶¶ 7-9; Ex. 5 at Art. VI, § E, ¶ 3.  Indeed, as this court has previously noted, LPA's retained patronage reflects neither

---

[6] The language in this paragraph is essentially identical to that in the Smurfit Bankruptcy Order, which the PCI Group and the RI/FS Performing Parties characterize as "wholly consistent with" and "very similar to," respectively, their requested language here. Att. C at 8; Att. D at 7.

"capital" nor proceeds from "entrepreneurial risk," but, rather, each "members' contribution in the form of work." LPA Tax Case II, 410 F. Supp. at 1107.

The PCI Group and RI/FS Performing Parties comment that the United States must demonstrate why allowing the Weiss Judgment to be paid is either "legally required," see Att. C at 11; Att. D at 5, or justified "as a matter of policy," see Att. D at 5. The claim that the Amended Consent Decree cannot be approved unless the United States can show that it was "legally required" to permit payment of the Weiss Judgment would require that CERCLA deprive the United States of considerations it normally weighs in deciding how to litigate and resolve claims, based on facts specific to the claim and the defendant. If anything, CERCLA suggests the opposite, by acknowledging that the United States may consider such factors as inability to pay, inequity, and the public interest. See, e.g., 42 U.S.C. § 9622(e)(3)(A). Thus, the PRP commenters' demand that the United States identify a legal requirement to permit the payment of the Weiss Judgment is unfounded. Cf., Heckler v. Chaney, 470 U.S. 821, 831 (1985) ("an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion.").

In the context of CERCLA settlements, fairness to other PRPs and the public interest can sometimes be in conflict. See Bay Area Battery, 895 F. Supp. at 1529-30 (approving governments' decision not to "squeeze the settlors for more money" as a fair tradeoff of a "small increase in recovery" against the "value of permitting a functioning business to continue to earn money and employ workers . . . and compassion for individuals who are aged and/or impoverished."). In these circumstances, the United States' decision not to demand every last available cent is due significant deference. Id. at 1531 (government ability to pay settlement that does not demand payment of all available amounts is fair and reasonable so long as the payment

"falls within a range of reasonable amounts.").  Here, as discussed above, the United States determined that preventing LPA from paying its former workers their earned, but never paid, hourly wages and shares would be contrary to the public interest and inconsistent with EPA's ability to pay policy, which requires compassion for individuals.  See supra at 15-16.  Courts reviewing consent decrees based on similar considerations have judged them fair and reasonable.  See Bay Area Battery, 895 F. Supp. at 1529-30; United States v. Brook Village Assocs., 2006 WL 3227769 at *7-9 (D.R.I. Nov. 6, 2006) (approving CERCLA settlement with operators of homes for low-income elderly that did not demand all available funds as fair and reasonable given considerations of compassion for individuals and provision of benefits to community).

In addition, whether the United States could even step in front of the Weiss Judgment plaintiffs, as the PRP commenters urge, would be a hotly litigated issue.  The Weiss Judgment became a judgment lien on LPA's property as soon as it was entered on October 28, 2009.  O.R.S. § 18.150(2)(a).  The state court's February 20, 2014 corrected judgment, incorporating the October 28, 2009 judgment, erased any doubt about that fact by clearly establishing a money-judgment lien on LPA's property.  There is no doubt that LPA and the Weiss Judgment plaintiffs would argue that this lien establishes a secured interest that cannot be trumped by the Federal Priority Statute, 31 U.S.C. § 3713 ("FPS") on the grounds that Section 107(l) of  CERCLA, 42 U.S.C. § 9607(l), sets forth a particular process for establishing response cost-based liens on real property that supplants the FPS.  Cf. United States v. Estate of Romani, 523 U.S. 517 (1998) (holding that FPS cannot be used to prioritize government tax claims over secured liens because federal Tax Lien Act sets forth process to establish tax lien).  While the United States disagrees with this argument, confronting it would necessitate an expensive and time-consuming fight with

an uncertain outcome.  Meanwhile, LPA's assets would continue to waste away, jeopardizing the prospects for any recovery.

The United States has considered the PRP commenters' concerns with regard to the Weiss Judgment, but continues to believe that allowing LPA to pay its former workers the hourly wages they earned and paid taxes on, and to return the par value of the one share each worker was compelled to purchase in order to work, is fair and reasonable and in the public interest.[7]

        4.     <u>The United States Has Not Satisfactorily Explained How it Determined that LPA Has a Limited Ability to Pay.</u>

Two of the PRP Commenters suggest that the United States has not satisfactorily explained its conclusion that LPA has limited ability to pay its CERCLA liability.  <u>See</u>, Att. F at 2; Att. D at 4.  However, the settlement captures all of LPA's available assets for the United States' benefit (leaving aside the Weiss Judgment payments)—suggesting that the PRPs either believe that there are untapped assets beyond the Weiss Judgment or that LPA's share is actually less than what it is paying.  There is no evidence for the former, and it would not be in the PRP's interests to argue the latter, while it would be in LPA's interest to do so.  That LPA has not made such an argument indicates what everyone, including the PRPs, recognizes:  that LPA's liability for its comparative fault at the site dwarfs LPA's assets.  The United States need not analyze LPA's comparative fault in this circumstance.  <u>See Coeur d'Alenes Co.</u>, 767 F.3d at 878.

Here, the United States' qualified financial analyst reviewed LPA's financial information and concluded that LPA could pay only the value of its insurance policies and the net proceeds from the sale of its property.  <u>See supra</u> at 7-9.  The Court should defer to the United States' reasonable reliance on this determination.  <u>See Couer d'Alenes Co.</u>, 767 F.3d at 879.

---

[7] Allowing LPA to pay its outstanding attorneys fees is justified.  <u>See supra</u> at 15.

5.      None of the Settlement Proceeds Should be Allocated to NRD.

Two PRP commenters urge that none of the settlement proceeds should be devoted to NRD.  See Att. C at 9-10; Att. D at 8-9.  They contend that it is improper to allocate money to NRD before all remedial work is completed.  Ids. They also argue that because the purchaser of LPA's land contemplates implementing a natural resource restoration project, the NRD Trustees are already getting a significant benefit from the settlement.  Att. C at 9-10.  Finally, they urge that the Consent Decree should at least require the NRD Trustees to use the proceeds solely for natural resource restoration at the Site.  Att. C at 9; Att. D at 8-9.

While it is true that NRD determinations must take into account remedial measures, nothing prevents NRD trustees from assessing damage to natural resources during the remedial decisionmaking process.  Moreover, CERCLA expressly requires the inclusion of NRD trustees in the negotiation of any settlement in which "a release or threatened release of any hazardous substance . . . that may have resulted in damage to natural resources" is a subject.  42 U.S.C. § 9622(j)(1).  Here, the NRD Trustees have already determined that releases at the Site may have resulted in damage to natural resources, and have preliminarily estimated such damage in excess of $291 million after taking into account EPA's likely remedial measures.  Amended Consent Decree ¶ C.  It is unlikely LPA would have agreed to any settlement lacking a covenant not to sue for NRD, since it intends to dissolve upon winding up its remaining assets and liabilities.  NOAA and DOI's voluntary participation as federal NRD trustees in negotiating the consent decree is, therefore, mandated by CERCLA.  42 U.S.C. § 9622(j)(2).

Nor would the United States have entered into a settlement that did not obtain some recovery for NRD in these circumstances.  After all, there will not be another opportunity to assert NRD claims, or recover on any such claims, against LPA after it dissolves.  It would contravene the goals of CERCLA and the public interest to forego any NRD recovery when the

NRD Trustees know that NRD at the Site will be significant and that LPA is liable for that NRD. The 3:1 ratio between response costs and NRD recovered is justified because the median projected site-wide response costs are approximately three times as large as the estimated NRD.

The purchaser's proposal to use LPA's land for a natural resource restoration project benefits future settling PRPs, who will have the opportunity to purchase restoration credits generated by such a project to satisfy their own NRD liability, more than the NRD trustees. The use of the LPA property as a restoration project would not alone adequately compensate the public. Moreover, it is by no means assured, given the many intervening steps between entry of the Amended Consent Decree and realization of the buyer's intent to implement such a project. On the other hand, assigning settlement proceeds to NRD benefits both the NRD trustees (by providing funding for restoration activities) and the non-settling PRPs (by reducing their total liability at the Site, 42 U.S.C § 9613(f)(2)).

The United States does agree that NRD moneys recovered under the proposed Amended Consent Decree should be used for natural resource restoration, replacement, acquisition, and assessment activities. However, there is no need to insert such a requirement in the Amended Consent Decree because CERCLA already restricts the use of amounts recovered for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction or release." See 42 U.S.C. §§ 9607(a)(4)(C), (f)(1). Likewise, CERCLA already prohibits double recovery of NRD, 42 U.S.C. § 9607(f)(1), so inserting such a requirement into the Amended Consent Decree, see Att. D at 9, is also unnecessary.

6.      The Consent Decree Unfairly Cuts Off the RI/FS Performing Parties'
        Contribution Claims for RI/FS Costs.

The RI/FS Performing Parties urge the United States to exempt their RI/FS costs from the definition of "matters addressed" for purposes of contribution protection. Att. D at 9-10. They

suggest that the RI/FS AOC preserved their right to seek contribution, and that they voluntarily deferred attempting to assert such claims against other PRPs (including LPA) in an effort to reach a comprehensive allocation of liability.  Id. at 9.

CERCLA confers contribution protection for matters addressed in a settlement.  42 U.S.C. § 9613(f)(2).  This provision provides an incentive for PRPs to settle rather than litigate CERCLA claims.  See, e.g., Chubb Custom Ins. Co., 710 F.3d at 971.  Exemption of substantial known costs, like the PRPs' asserted $100 million in RI/FS costs, from "matters addressed," would significantly undermine this incentive.

There is also no basis for the RI/FS Performing Parties' apparent view that the RI/FS AOC somehow prohibits EPA from granting contribution protection for RI/FS costs in other settlements.  Nothing in the RI/FS AOC suggests that whatever rights the RI/FS Performing Parties "retained" with respect to future contribution claims, Att. D at 9, could not later be affected by operation of CERCLA's settlement provisions.

Moreover, when the RI/FS Performing Parties voluntarily stayed the Arkema litigation in order to pursue a comprehensive allocation scheme through mediation, they expressly acknowledged the United States' right to assert CERCLA claims in its sovereign capacity against PRPs in any appropriate forum.  See Ex. 18 (Order of Stay, May 18, 2010, ECF Doc. 337, Case No. 3:09-cv-00453-PK).  There is nothing unfair about the United States using its sovereign authority to obtain recoveries from LPA, which might otherwise become unavailable should LPA dissolve, and/or its assets become wasted, prior to completion of the allocation mediation.

Ultimately, the RI/FS Performing Parties' complaint boils down to a concern that they will be held disproportionately liable for response costs at the Site because they cannot assert contribution claims against LPA or obtain a portion of the United States' recovery from LPA.

However, as the Ninth Circuit has observed in affirming the district court's approval of a

CERCLA ability to pay settlement, the imposition of disproportionate liability on other PRPs is

an "integral and purposeful component of CERCLA." Coeur d'Alenes Co. 767 F.3d at 877-878.

As such, "absent [a] reason that actually has some grounding in the statutory provision at issue"

in a CERCLA settlement, disproportionate liability on its own does not render a CERCLA

settlement unfair. Id. at 878. The RI/FS Performing Parties have identified nothing in CERCLA

that would suggest they are entitled to have their costs exempted from the "matters addressed."

> 7.    The Trust Agreement Improperly Fails to Identify Future Grantors Or to Account
> for Unidentified and Currently Unknowable Circumstances.

The RI/FS Performing Parties comment that the Trust Agreement unfairly denies them

access to recovered sums, and that the Trust Agreement unfairly permits the assignment of

"unspecified and unknown 'rights under insurance policies' of unidentified future settling

parties" to the Trust. See Att. D at 10; see generally id. at 10-13.

On the first issue, the United States believes that altering the Trust Agreement to provide

recoveries to the RI/FS Performing Parties is neither necessary nor appropriate. See supra at §

II.A.2. Indeed, given LPA's protection from contribution actions, it is difficult to see how the

RI/FS Performing Parties could hope to obtain insurance recoveries in any event.

The second issue seems directed at future settlements rather than this settlement with

LPA. See Att. D at 12-13 (discussing insurance coverage of DIL Trust, who is not a party to this

settlement). In any event, any future "rights under insurance policies" granted to the Trust will

be specified and known, as will the identity of the future grantor, because they will be set forth in

a Consent Decree between the United States and that future grantor. And, to the extent that the

needs of non-parties to such a future settlement need to be addressed, see Att. D at 12, the Trust

Agreement can either be modified, see Trust Agreement at ¶ 38, or abandoned in favor of

another structure if necessary.  Thus, the United States will not amend the Revised Trust

Agreement as requested by the RI/FS Performing Parties.

       8.    <u>The United States Should Defer to the Ongoing Mediation and Allocation Process</u>
            <u>and Should Only Undertake Early Settlements in Compelling Circumstances.</u>

The PCI Group urges the United States to defer to the allocation mediation in the <u>Arkema</u>

litigation and to make settlements outside that process "the exception rather than the rule."  Att.

C at 12.  BAE goes one step further, urging the United States to view the LPA settlement as

"unique" and not as "an example or template for any future early settlements."  Att. F at 8.  Both

commenters also urge greater coordination between the government and PRPs in any future pre-

ROD settlements.  Att. C at 12; Att. F at 8-9.

The United States agrees that the ongoing allocation mediation process is beneficial and

important.  The mediation will hopefully result in a comprehensive allocation among all

participating PRPs, resulting in an enormous cost savings for everyone involved, and ultimately

expediting cleanup of the Site.  The United States has no desire to disrupt that process.

However, as the PRPs recognized when they voluntarily dismissed LPA from the <u>Arkema</u>

litigation in order to negotiate settlements separately from the allocation process, LPA presents

unusual and compelling circumstances.  It has been out of business for almost fifteen years and

every day it continues to exist its limited assets waste away even further.  This early settlement

with LPA preserves resources for cleanup that otherwise would have been lost.

The United States also takes seriously its commitment to the success of the allocation

process and intends to continue keeping the PRPs informed of any negotiations with potential

early settlors.  The United States is, furthermore, happy to, as the PCI Group suggests, "engage

in constructive discussions [with the PRPs] about how to structure such early settlements to

advance rather than undermine overall settlement possibilities."  Att. C at 12.

**B.**  **Comments of the Confederated Tribes and Bands of the Yakama Nation**

The Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation" or "Tribe") has asserted co-trusteeship over certain natural resources at the Site.  The Yakama Nation generally contends that the United States failed to fulfill its trust responsibilities during the negotiation of the settlement, and specifically asserts that it "only learned of the proposed Consent Decree through its publication."  Id. at 1.  The Tribe further comments that: 1) the settlement unfairly leaves no monies available for any other NRD Trustees; 2) the settlement unfairly fails to identify the Yakama Nation as a natural resource trustee; and 3) the United States did not "consult with or to include the Yakama Nation in any of its negotiations."  Id. at 2.

To the extent the United States' trust responsibilities are implicated, they have been satisfied by the agencies' compliance with the general regulations and statutes governing CERCLA settlements.  See Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 574 (9th Cir. 1998) (holding that the United States' general trust responsibility to Indian Tribe "is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes."); United States v. Shoshone-Bannock Tribes, 229 F.3d 1161, 2000 WL 915398 at *1-2 (9th Cir. 2000) (citing Morongo Band of Mission Indians in approving environmental consent decree over tribal objections).  Here, the Yakama Nation has not alleged that the government failed to comply with any CERCLA regulatory or statutory requirement.

EPA kept all members of the Portland Harbor Legal Coordinating Team ("LCT"), including counsel for the Tribe, informed of the status of consent decree negotiations with LPA, notwithstanding the Tribe's assertion that it was unaware of the Consent Decree prior to its publication, Att. G at 1.  For example, on February 11, 2010, EPA informed the LCT that it intended to enter into settlement discussions with LPA and outlined the likely settlement

structure.  See Ex. 12 (Email from L. Cora to LCT members, February 11, 2010).  Likewise, the

"Status of Settlement Discussions with Linnton Plywood Association" was on the agenda for the

EPA-hosted LCT conference call on August 9, 2010.  See Ex. 13(Email from L. Cora to LCT

members, July 26, 2010); Ex. 14 (Email from L. Cora to LCT members, August 6, 2010).  Had

the Tribe wanted additional information, it could have requested it.

Regarding the Tribe's further specific comments, first, pursuant to the Memorandum of

Agreement governing the Portland Harbor Superfund Site Trustee Council, settlement proceeds

for NRD at the Site can only be spent by a unanimous resolution of the Trustee Council.  See Ex.

11, §§ IV.5, VI (Natural Resource Trustee Memorandum of Agreement for the Portland Harbor

Superfund Site).  As noted in its comment letter, the Yakama Nation voluntarily withdrew from

the Trustee Council in 2009.  See Att. G at 1.  The treatment of NRD monies in the proposed

settlement is not rendered unfair by the Tribe's decision to give up its participation in the Trustee

Council's determination of how to spend settlement funds.  Moreover, while the Yakama Nation

is not directly recovering funds, and has chosen not to participate on the Trustee Council, the

natural resources over which the Yakama Nation has asserted co-trusteeship with members of the

Trustee Council will still benefit from the proposed settlement.

Second, while the Amended Consent Decree does define "Natural Resource Trustees" as

"those Trustees who are members of the Portland Harbor Natural Resource Trustee Council," it

clearly states that such definition is "for purposes of this Consent Decree," see Amended

Consent Decree ¶ 3.o, and the Amended Consent Decree does not purport to settle any claims on

behalf of the Tribe.  The United States respectfully submits that the omission of the Tribe from

this definition is reasonable, given that the Tribe withdrew from the Trustee Council more than

five years ago and the purpose of the definition is limited to the LPA settlement.  Finally, to the

extent the Tribe now suggests that the United States should have included it in negotiations with LPA it has identified no authority for such a requirement.

### C.      Comment of Pamela Allee (Private Citizen)

Ms. Pamela Allee comments that "the sum of $450,000 seems rather paltry" and that the settlement is problematic because it "pass[es] the buck on to the next developer and tenants." <u>See</u> Att. H.  However, LPA is not only paying $450,000, but also providing the net proceeds of the sale of its property (currently projected to be between $250,000 and $500,000) and assigning its insurance rights to a trust for the United States' benefit.  The United States respectfully notes that this is the most the LPA can pay toward its liability, and that a larger recovery through litigation would be unlikely.  Also, the effect of this settlement is not necessarily to pass on liability to the next landowner or tenants.  <u>See</u> 42 U.S.C. §§ 9601(40); 9607(q)(C).  Finally, the proposed settlement is the product of compromise in which, "in exchange for the saving of cost and the elimination of risk, the parties each g[a]ve up something they might have won had they proceeded with the litigation."  <u>United States v. Armour & Co.</u>, 402 U.S. 673, 681 (1971).

**CONCLUSION**

For these reasons, the Court should find that the proposed Amended Consent Decree is fair, reasonable, and consistent with applicable law, and enter the proposed Amended Consent Decree by signing at page 36 thereof.

Respectfully submitted,

Dated April 10, 2015                                   /s Eric D. Albert
                                                       Eric D. Albert
                                                       Trial Attorney
                                                       Michael McNulty
                                                       Senior Counsel
                                                       United States Department of Justice
                                                       Environmental Enforcement Section
                                                       601 D St. NW, Suite 6142

35

Washington, DC 20004

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing Memorandum in Support of the United States' Motion to Enter Amended

Consent Decree complies with the length limitation of  LR 7-2(b)(1), because it does not exceed

35 pages.

Dated April 10, 2015                                /s Eric D. Albert
                                                                   Eric D. Albert
                                                                   Trial Attorney
                                                                   United States Department of Justice
                                                                   Environmental Enforcement Section
                                                                   601 D St. NW, Suite 6142
                                                                   Washington, DC 20004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served on all counsel of record via filing with the Court's ECF system on April 10, 2015.  In addition, on this day I caused the foregoing document to be mailed to all public commenters at the addresses indicated in their comments.


Dated April 10, 2015                                  <u>/s Eric D. Albert</u>
                                                     Eric D. Albert
                                                     Trial Attorney
                                                     United States Department of Justice
                                                     Environmental Enforcement Section
                                                     601 D St. NW, Suite 6142
                                                     Washington, DC 20004