# ATTACHMENT C

# ARNOLD & PORTER LLP

**Joel M. Gross**
Joel.Gross@aporter.com

+1 202.942.5705
+1 202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

January 21, 2015

**VIA E MAIL TO PUBCOMMENT-EES.ENRD@USDOJ.GOV**

Honorable John C. Cruden
Assistant Attorney General
U.S. DOJ-ENRD
PO Box 7611
Washington D.C. 20044-7611

      Re:    *United States v. Linnton Plywood Association,*
                D.J. Ref. No. 90-11-2-06787/3, FR Docket No.: 2014-27074

Dear Mr. Cruden:

      The Portland Harbor Federal Superfund Site Participation and Common Interest Group (the "PCI Group") submits these comments on the above-referenced proposed settlement between the United States and Linnton Plywood Association ("LPA") related to LPA's CERCLA liability for the remediation of the Portland Harbor Federal Superfund Site (the "Site").[1] The proposed settlement with LPA could be--and should be--a positive step in the process of accumulating funding that can be used for the long-term remediation of the Site. But to achieve that goal, and to ensure that the proposed settlement is fair, reasonable and in the public interest, it is critical that certain modifications be made to the proposed settlement. In particular, as explained below, (i) the funds recovered by the United States under this settlement should only be available for future response actions; (ii) none of the settlement proceeds should be allocated to natural resource damages; (iii) the United Stated should ensure that the insurance trust provisions maximize recovery; (iv) the portion of the proceeds to be made available under the settlement from the sale of LPA's real property should be increased; and (v) going forward, the United States should defer to the ongoing mediation and allocation process and should only undertake early settlements in compelling circumstances.

---

[1] The members of the PCI Group that are agencies of the United States do not join in these comments; the members of the PCI Group that are agencies of the State of Oregon do not join in Comment B below related to payments for natural resource damages.

# ARNOLD & PORTER LLP

## Background

### The Portland Harbor Site

The Portland Harbor Superfund Site, which was listed on EPA's National Priorities List in December 2000, extends for about 10 miles along the Lower Willamette River. As acknowledged by EPA, the Site "is the result of more than a century of industrial use along the Willamette River."[2]

EPA has repeatedly stated that it intends to look to responsible parties for funding of cleanup activities at the Site. EPA has identified 156 parties as potentially responsible parties ("PRPs") for the Site and has sent those parties notice of their potential liability.[3] A group of 14 of those PRPs, called the Lower Willamette Group, is funding and performing the remedial investigation and feasibility study for the Site and to date has spent over $100 million doing so. Certain other members of the PCI Group have also contributed toward those costs. The cost of the studies reflect the size and complexity of this Site; EPA has described Portland Harbor as "big, complex, and dynamic."[4]

EPA stated in the Complaint against LPA that it "anticipates that it will issue a Record of Decision selecting a remedy for the Site in 2017."[5] At this point, because a cleanup plan has not been determined, the costs of implementing that plan are unknown and can only be estimated with a high degree of uncertainty. Nonetheless, EPA has indicated that the costs of such implementation are likely to be very substantial, if not unprecedented, in magnitude. The Consent Decree setting forth the proposed settlement with LPA states: "A 2012 draft Feasibility Study estimated the cost of different remedial alternatives could range between $169 Million and $1.7 Billion."[6]

In 2008, EPA initiated an alternative dispute resolution process for the Site and encouraged parties notified of their potential liability to participate therein.[7]

---

[2] http://yosemite.epa.gov/R10/CLEANUP.NSF/ph/Portland+Harbor+Superfund+Site.

[3] http://www.epa.gov/region10/pdf/ph/uplands/gnl_address_list_september_2014.pdf.

[4] http://www.epa.gov/region10/pdf/ph/sitewide/fact_sheet_april2012.pdf.

[5] Complaint, page 5, para. 17.

[6] Consent Decree, page 2, para. C.

[7] http://yosemite.epa.gov/R10/CLEANUP.NSF/6d62f9a16e249d7888256db4005fa293/31ae45c9c90a674988256e470062ced9/$FILE/GNL%20Letter%20Template%2002_23_0 9.pdf ("EPA is encouraging PRPs to convene a mediated allocation process. Through such a process PRPs work together to allocate the cleanup costs and work through intra-party issues to prepare for future negotiations with EPA for performance of the cleanup

Footnote continued on next page

# ARNOLD & PORTER LLP

### The PCI Group

The PCI Group is comprised of about 100 private and public entities that have been identified by EPA as PRPs for the Site. It includes the 14 members of the Lower Willamette Group and about 85 other parties.

The PCI Group was formed for the purpose of conducting a non-binding mediation and allocation process among the Site's PRPs so that when a remedy is selected for the Site, members of the PCI Group in conjunction with other PRPs will be best situated to discuss with EPA a possible agreement related to the implementation of that remedy. The PCI Group's mediation and allocation process has proceeded with the support of EPA and the approval and supervision of the United States District Court.

In particular, in April 2009, 10 members of the Lower Willamette Group commenced a civil action in the United States District Court for the District of Oregon (No. 3:09-CV-453-PK) against about 60 additional parties. The plaintiffs later filed a motion to refer the matter for alternative dispute resolution. In support of that motion, the plaintiffs described the then-ongoing mediation/allocation process, which is the very process that is being undertaken by the PCI Group. The plaintiffs stated in their motion:

> The plaintiffs have identified more than 300 parties who are potentially liable for past and future investigation and cleanup costs at Portland Harbor. Many of these parties are insolvent or defunct and represent an "orphan share." The plaintiffs and 64 other parties who are not defendants (many of whom are participating on behalf of multiple subsidiaries, indemnitees or other potentially responsible parties) have agreed to participate in a voluntary non-judicial allocation process in an effort to develop a settlement offer to EPA for remedy implementation and to settle claims for RI/FS costs. The participating parties include public as well as private entities. EPA supports this non-judicial allocation process and in fact provided an EPA ADR professional to convene the allocation group.[8]

---

Footnote continued from previous page

and reimbursement of response costs after EPA has issued its Record of Decision for the Portland Harbor Superfund Site. A comprehensive settlement for performance of all work and reimbursement of response costs will avoid litigation and significant transaction costs to you and your company. A group of PRPs have formed a convening group to start this effort.")

[8] Memorandum in Support of Motion for Referral to Alternative Dispute Resolution, Doc. 169, September 24, 2009.

## ARNOLD & PORTER LLP

District Judge Michael W. Mosman entered an order staying the action and encouraging the parties to participate in the mediation/allocation process being undertaken by the PCI Group:

> Proceedings in this action are stayed until one year from the date that EPA issues a Final Record of Decision for the Portland Harbor Federal Superfund Site, or until further order of this Court. . . . The defendants may, but are not required to, participate in the Portland Harbor alternative dispute resolution process described in the plaintiffs' Motion for Reference to Alternative Dispute Resolution (Docket. No. 169).[9]

The parties report to the Court on a regular basis on the progress of the mediation process.

The PCI Group, accordingly, has a strong interest in supporting those Site-related processes that maximize the likelihood that the ongoing mediation/allocation process will be successful in achieving its goals. In particular, one of the PCI Group's goals is to ensure that any early settlements reached with the United States support, rather than undermine, the mediation/allocation process. It is for that reason that the PCI Group is submitting these comments. In doing so, neither the PCI Group nor any of its members is (i) conceding that any particular member of the PCI Group has liability for the Site under CERCLA or any other provision of law; (ii) waiving any legal rights, claims or defenses; (iii) conceding that any liability that may exist for the Site is joint and several among any number of parties; or (iv) agreeing to any factual or legal position that has been, is, or may hereafter be, disputed.

### Linnton Plywood Association

LPA operated a plywood manufacturing facility at 10504 NW St. Helens Road from at least 1951 to 1995, and available information indicates that as a part of its operations, LPA released many of the hazardous substances that are the subject of the ongoing Site studies, including PCBs. Among other things, the facility had two private outfalls that discharged directly to the Lower Willamette River. LPA was named by EPA as a PRP for the Site, and the United States alleged in its complaint against LPA that LPA is liable all for response costs incurred and to be incurred at the Site.

In proposing to settle LPA's CERCLA liability for the Site, the United States has not sought to quantify LPA's contributions to the Site. Rather, the sole basis for the settlement is that the United States has determined that LPA "has limited financial ability to pay response costs incurred and to be incurred at the Site and Natural Resource

---

[9] Order of Stay, Doc. 337, May 18, 2010.

# ARNOLD & PORTER LLP

Damages related to the Site."[10]  Accordingly, instead of requiring LPA to pay a reasonable share of the already substantial and potentially enormous Site response costs, the total to be recovered from LPA under the proposed settlement will be (i) $450,000 to be paid after entry of the Consent Decree; (ii) certain limited proceeds of the pending sale of 26.5 acres of real property owned by LPA; and (iii) any amounts recovered by the Portland Harbor Superfund Site Insurance Recovery Trust to be created under the Consent Decree, which will pursue claims against insurers of LPA.

**Comments:**

**A.     Any and All Funds Recovered by the United States Should Be Available Only for Future Response Actions**

The objective of an ability-to-pay settlement such as the proposed settlement with LPA should be to generate as much funding as possible from the settling PRP and then to ensure that those funds are used in a manner that is fair and reasonable, and consistent with federal law.  In LPA's case, the only such manner for handling the settlement proceeds at a site where remediation costs may exceed $1 billion is to provide that the proceeds will be set aside in a separate fund and used only for implementing future response activities at the Site.  None of the funds should be used to reimburse EPA for its past costs or for future oversight costs.  There are several reasons why that limitation is so critical:

1.     Almost all of the CERCLA claim of the United States that underlies the settlement is for future costs, and at most only a negligible portion of the claim is based on EPA's past costs.  This becomes clear when one compares EPA's past costs (alleged to be $9 million) with the anticipated future costs, for which the only range provided by EPA is $169 million to $1.7 billion.  At the high end of that range, EPA's past costs will amount to a fraction of a percent of total costs, and even at the low end, past costs are still dwarfed by future costs.  From this analysis, it is clear that at most a tiny portion of the LPA recovery could reasonably be allocated to EPA's past costs.

2.     Beyond that, it is essential that *no portion* of the settlement proceeds be used to reimburse past or future governmental oversight or enforcement costs, because to do so would jeopardize the ability of the PCI Group's members and other PRPs to reach a remedial settlement with EPA once the remedy is selected.  When those settlement discussions take place, a pivotal issue will be how to deal with the very substantial orphan shares at this Site.  There is no dispute that among the hundreds of entities that operated during a

---

[10] Consent Decree, page 3, para. H.

ARNOLD & PORTER LLP

period longer than a century at Portland Harbor, many are no longer extant and viable. One need look no further than the LPA settlement itself to see the creation of a significant orphan share.

Certainly, any group of potentially settling PRPs will reasonably expect to have the orphan share issue addressed fairly as a condition of participating in the settlement process. EPA's own Orphan Share Policy[11] makes clear that orphan share funding was a "cornerstone" of a series of reforms by EPA "intended to provide greater fairness, reduce litigation and transaction costs, and promote private party cleanup of Superfund sites." However, the Policy--if applied mechanically--could limit the amount of orphan share funding to forgiving EPA's past costs and its future oversight costs. Such application of the Policy, and the minimal orphan share funding it would generate in the context of this Site, would not produce "greater fairness" or "promote private party cleanup."

Here, the past cost element of orphan share forgiveness is small to begin with (because a group of PRPs has already spent far more money of its own on the RI/FS than EPA has spent overall). Allocating any of the settlement proceeds here to EPA's past costs or future oversight costs will only constrain further how much orphan share funding EPA ultimately can provide under its existing policy. In a settlement which is itself creating an orphan share, every possible step should be taken to allow EPA to fairly address that orphan share as part of a remedial settlement by purposefully applying the LPA settlement proceeds only to future response costs, rather than applying any portion of such proceeds to EPA's past costs or future oversight costs.

3.   Finally, allocating all of the United States' recovery to future response costs is important because it reinforces PRP participation in the PCI Group allocation process and encourages future potential PRP participation in remedial funding. Given the size of this Site, the potential scope of the remedy and magnitude of its costs, the very large number of PRPs involved, the daunting orphan share issues, and many other challenges, there are enough reasons why certain PRPs could well feel that this process will be hard pressed to reach its goal of a negotiated remedial settlement. On the other hand, a positive collaboration between PRPs and EPA to address these issues in constructive and creative ways will help build the momentum needed to tackle these challenges. Put more simply, it would send an unfortunate message to the PRPs involved with this Site if EPA were to settle with a PRP and thereby remove that PRP from any future

---

[11] EPA's Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals, June 3, 1996, http://www2.epa.gov/sites/production/files/2013-10/documents/orphan-share-rpt.pdf.

# ARNOLD & PORTER LLP

allocation, while failing to ensure that the settlement funds will be available for future response action by performing parties.

Given how critical it is for the United States' settlement proceeds to be available for future response activities, it is disappointing that the proposed LPA settlement as currently drafted will not promote that goal. While the Consent Decree suggests that the settlement proceeds might be available for future response actions, it does not guarantee this result, and instead gives EPA broad discretion to do essentially whatever it wants with the proceeds. In particular, paragraph 10 provides:

> The total amount to be paid to EPA as required by Paragraphs 6 and 7 of this Section and all funds received by EPA from the Trust shall be deposited in the Portland Harbor Special Account in the EPA Hazardous Substance Superfund. <u>EPA may retain</u> and or use the monies received from this settlement to conduct or finance response actions taken after the Effective Date of this settlement at or in connection with the Site, <u>or transfer all or any portion of such funds to the EPA Hazardous Substance Superfund.</u>[12]

The PCI Group members are concerned about the final 15 words. Those words would allow EPA the discretion to "transfer all or any portion of such funds to the EPA Hazardous Substance Superfund." In other words, EPA could decide to allocate the recoveries to its own past costs or simply move the funds to the Superfund for use at other sites throughout the country.

The final 15 words of Paragraph 10 should be deleted for the reasons described above, or alternatively the Consent Decree should be revised to reflect that all of the proceeds received by the United States from LPA and its insurers (i) will be dedicated to future response action and made available to settling parties who agree to perform all or part of the remedial action if such settlements are obtained, and (ii) in accordance with EPA policy, will not be transferred out of the Special Account unless all response actions at the Site have been completed.[13] Because such a deletion or revision will not prejudice LPA in any way, there should be no obstacle to obtaining LPA's consent to the deletion.[14]

---

[12] Emphasis added.

[13] This is consistent with EPA's Guidance on CERCLA Special Accounts, http://www2.epa.gov/sites/production/files/2013-10/documents/congui-estmgt-specacct.pdf, which provides that "EPA generally will transfer funds from the special account to the Trust Fund at the point in the process when there are no longer unaddressed risks and unreimbursed Agency costs at a site."

[14] We understand that other PRPs are suggesting alternative modifications to accomplish the same objective. The PCI Group would support any modification that makes clear that

Footnote continued on next page

# ARNOLD & PORTER LLP

       There is precedent for the approach the PCI Group advocates in an earlier settlement at this very Site. In connection with a settlement with another PRP, Smurfit-Stone Container Corp., the United States Bankruptcy Court in Delaware, with the consent of the United States, issued an order making clear that the settlement proceeds received by EPA would be "dedicate[d] . . . to conduct or finance response actions" at this Site. The Order approving the Settlement Agreement[15] provided that:

> [S]ubject to all appropriate legal authorities, EPA Region 10 shall place the proceeds received from this settlement into a Portland Harbor Superfund Site Special Account within the EPA Hazardous Substances Superfund. EPA Region 10 intends to dedicate the proceeds received from this settlement to conduct or finance response actions after the Record of Decision for the Portland Harbor Superfund Site is issued. If EPA is able to enter into a settlement with one or more parties who agree to implement the Record of Decision, EPA intends to make such disbursements as agreed to by EPA and such parties from the settlement proceeds to perform work required under the settlement.

The requested deletion to Paragraph 10 of the LPA Consent Decree is wholly consistent with the language from the Smurfit-Stone Order quoted above. EPA would not be venturing into uncharted territory by complying with the PCI Group's request, but rather, would ensure that it acts in a manner consistent with existing precedent at the Portland Harbor Federal Superfund Site.

       The PCI Group understands that the language at issue in Paragraph 10 of in the LPA Consent Decree has been used is certain settlements at other Sites. But nothing compels that the language be used here, particularly when doing so will harm the possibility of achieving the overall goal of a remedial settlement. Moreover, there should be no concern about the potential for having funds remaining in a special site account after the Site has been remediated. As a practical matter, there is no possibility that the costs of future response actions at Portland Harbor will be less than the United States' settlement recoveries from LPA, and therefore, there is *no chance* that LPA funds will be left stranded in a site specific account. However, if the theoretical possibility of stranded

---

Footnote continued from previous page
all recoveries will be used for implementing future response action and not for reimbursing past or future governmental oversight or enforcement costs.

[15] Order Pursuant to Fed. R. Bankr. P. 9019(a) Approving the Settlement Agreement Between the Debtors and the United States and Between the Debtors and Certain Potentially Responsible Parties, *In re Smurfit-Stone Container Corp.*, Case No, 09-10235 (Bankr. D. Del. Jan, 6, 2011).

# ARNOLD & PORTER LLP

funds is of concern to EPA, that scenario can be readily addressed by providing, as mentioned above, that funds can be transferred out of the site specific account when, and only when, all response activities at the Site are complete.

**B.     None of the Proceeds Should be Allocated to NRD**

Paragraph 8(a) of the Consent Decree provides that only 75% of the proceeds of the LPA settlement will be made available to EPA, with the remaining 25% being paid to the Federal Natural Resource Trustees for alleged natural resource damages ("NRDs"). The proposed Consent Decree does not specify how the natural resource damages payments will be used, and does not limit their use to resource restoration as the law requires. However, federal law and fundamental fairness require all of the settlement funds to be applied to future response actions, as described above.

The first order of business for a CERCLA site is getting the site cleaned up through the EPA response program, and the NRD process comes later to address any historic, interim and residual natural resource injuries. This order of priority--response first, then NRD--is made clear from both the language of CERCLA and the manner in which the NRDs for the Site are to be quantified. According to the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan: "The Trustee Council recognizes that the anticipated remedial clean-up activities will likely reduce injuries to the natural resources in the future, but past and residual injuries will need to be addressed by the [Natural Resource Damage Assessment]."[16] Likewise Section 113(g) of CERCLA provides that an NRD action "must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities)." In other words, the Trustee Council must determine what the remedial action accomplishes (in terms of abatement of natural resource injuries) as part and parcel of quantifying an NRD claim.

In addition the public interest is best served by applying all settlement proceeds to response costs. A significant driver for the LPA settlement and the sale of the LPA property is to make it available as a site for a habitat restoration project already under development.[17] In 2012, the Trustee Council's Ecological Restoration Portfolio noted: "The land is in private ownership and is currently for sale. There is significant development pressure, as it is currently zoned for river-industrial use. Many members of the Linnton community are strongly supportive of restoration at the site."[18] The proposed

---

[16] Portland Harbor Superfund Site Natural Resource Damage Assessment Plan, page 1-2, § 1 (June 1, 2010).

[17] K. House, *Linnton Plywood: Restorcap Environmental Restoration Company To Turn Old Mill into Salmon Habitat*, OregonLive.com by The Oregonian (May 8, 2014).

[18] Portland Harbor Natural Resource Trustee Council, Ecological Restoration Portfolio at 21 (Apr. 2012).

# ARNOLD & PORTER LLP

settlement would facilitate development of the LPA property into a habitat restoration site and permanently protect it from industrial redevelopment. Thus, the Trustee Council and the public already will receive significant natural resource benefits from the LPA settlement, and the equitable considerations and risks to the PCI Group process discussed above in Comment A do not favor allocation of settlement proceeds for unquantified NRDs as further compensation to the federal members of the Trustee Council. Given these considerations, all of the settlement proceeds should be paid into a trust and used for implementing future removal and remedial action activities.

## C.   The Insurance Trust Provisions Should Maximize Recovery

The proposed LPA Consent Decree contains extensive provisions for the creation of a Portland Harbor Superfund Site Insurance Recovery Trust, and the pursuit of claims against LPA's liability insurers. The PCI Group agrees that creating a mechanism for the pursuit of potential liability insurance is an integral part of any ability-to-pay settlement and clearly much thought and constructive effort has gone into the structure of the insurance provisions of this settlement.

Because insurance issues can be complex, and involve issues of state law that vary considerably among the states, it is tremendously important that the final settlement structure allow the insurance claims to be fairly litigated by the trustee for the Insurance Recovery Trust. The PCI Group is aware that certain other PRPs, including certain members of the Lower Willamette Group, have expressed particular concerns to the United States in this regard, and that they are submitting written comments as well. The PCI Group urges the United States to consider those comments and to make any necessary modifications to maximize the potential for insurance recoveries with respect to LPA's liability. Consistent with the preceding comments, all such recoveries should be dedicated to future response actions.

In addition, the PCI Group and its members have a strong interest in receiving real-time information about the amount of any recoveries received by the Special Account from the Insurance Recovery Trust, as well as from the sale of LPA's real property, so that they can monitor all payments into and out of the Special Account. The Consent Decree should be modified to provide for the United States to make such information available to the PRPs as funds are received in or paid out of the Special Account.

## D.   The Portion of the Sales Proceeds to be Recovered Under this Settlement Are Insufficient

The proposed Consent Decree provides for the United States to receive as part of the settlement the "Net Proceeds of Sale" of certain real property owned by LPA. "Net Proceeds of Sale" is a defined term under the Consent Decree and means "the total value

# ARNOLD & PORTER LLP

of all consideration received by Settling Defendant from the sale of the Property either on the terms set forth in Appendix C, or by a future purchase and sale agreement, not including: (i) any payment in consideration of the release of any lien listed in Appendix A; (ii) any reasonable closing costs paid regarding the sale; (iii) any reasonable broker's fees regarding the sale; (iv) any state and/or municipal transfer taxes regarding the sale; (v) amounts owed those trade creditors disclosed to the US prior to the lodging of this Consent Decree, if any; (vi) payments of retains from earnings and share redemption as ordered by the court in the matter of Weiss, et al. v. Linnton Plywood Association, et al., Circuit Court of the State for Multnomah County Case No. 0807-1 0423; and (vii) federal, state, or county taxes owed on the Property and Sale proceeds."

A review of documents in the record for the settlement reveals that only a tiny fraction of the actual proceeds of the sale of LPA's property will be paid to the United States with respect to the Site. In particular, of estimated sales proceeds of $5,500,000, only $319,430, or less than 6%, are the estimated "net proceeds."[19] The United States has not justified why in this ability-to-pay settlement, so much of what LPA can pay is being paid to other parties.

Of particular concern, over $3 million of deductions from the total sales proceeds is on account of "Court Ordered Distributions," including $2,484,045 on account of "Payment to 199 Members/shareholders of previous earnings" and $630,000 of "Payment of par value of membership stock." It appears that these amounts are the "retains from earnings and share redemptions" referred to in the definition of "net proceeds of sale" that were agreed to in settlement of litigation brought against LPA in Oregon Circuit Court by certain of LPA's members/shareholders. But there is no justification provided as to why the payment of these amounts should have priority over the CERCLA claims of the United States for the Site.

Unless the United States can justify that all 94% of proposed deductions from the sales price are somehow legally required with priority over the CERCLA claim, the Consent Decree should be revised so that substantially all of the available proceeds are paid to resolve LPA's CERCLA liability for the Site.

**E.    The United States Should Defer to the Ongoing Mediation and Allocation Process and Should Only Undertake Early Settlements in Compelling Circumstances**

The PCI Group has focused extensively on the LPA settlement because of the possibility that this settlement may serve as a precedent for similar ability-to-pay

---

[19] Linnton Plywood Association Schedule of Estimated Property Sale Proceeds and Required Payment/Distribution Obligations, dated February 28, 2014.

-11-

# ARNOLD & PORTER LLP

settlements for this Site in the future. Although the PCI Group is not unequivocally opposed to such early settlements, they should be the exception rather than the rule, and examined on a case-by-case basis to ensure that the specific settlement crafted meets the aforementioned goals. For this reason, the PCI Group's comments on the proposed LPA settlement should not be construed to apply to such future ability-to-pay settlements.

The mediation and allocation process that the PCI Group is pursuing is arduous, time-consuming, and expensive for all the PCI Group members, but necessary given the many issues that have to be addressed. That process may be followed by an equally arduous negotiation process with EPA, and then by a lengthy implementation process. Some PRPs might wish to reduce their transaction costs by proposing to "cut to the chase," and pay some money to EPA in the near-term to be done. But if such settlements happen in any routine way, it will undermine and potentially destroy the mediation/allocation process by short-circuiting allocation-related decisions that will be based on the extensive information developed by the PCI Group about parties and facilities--information that is not available to EPA. In most cases, it will be far more constructive to let the PCI Group process run its course, with the ability to address varying financial constraints as part of that process. EPA should not be providing incentives for parties to attempt to settle outside the established mediation/allocation process.

The PCI Group's expectation is that there should be only a very limited number of additional settlements, if any, prior to the selection of the remedy for the Site. And to the extent that there are any such additional settlements, the PCI Group urges the United States to undertake early outreach to the PCI Group and other PRP representatives and to engage in constructive discussions about how to structure such early settlements to advance rather than undermine overall settlement possibilities.

*******************************************************

The PCI Group appreciates the opportunity to comment on the proposed LPA settlement and is prepared to discuss any of these issues with you further.

Sincerely,

Joel M. Gross