# ATTACHMENT D

January 20, 2015

**VIA EMAIL:**

**pubcomment-ees.enrd@usdoj.gov**

Eric Albert, Esq.
Eric.Albert@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources Divisions
United States Department of Justice
P.O. Box 7611
Washington D.C. 20044-7611

Re:    *United States v. Linnton Plywood Association, D.J.*
       Ref. *No. 90-11-2-06787/3, Docket number: 2014-27074*

Dear Eric:

The ten signatories to the Administrative Settlement Agreement and Order on Consent For Remedial Investigation/Feasibility Study at Portland Harbor (U.S. EPA Docket Number CERCLA-10-2001-0240) (respectively, "the RI/FS performing parties" and the "Administrative Settlement") appreciate the opportunity to submit these comments on the United States' proposed Consent Decree settlement with Linnton Plywood Association ("Linnton Plywood") lodged November 7, 2014 in the United States District Court for the District of Oregon.[1]

The RI/FS performing parties have incurred more than $100 million conducting an investigation of environmental conditions and an evaluation of cleanup alternatives at the Portland Harbor Site. Linnton Plywood has not contributed at all to this work.  The key elements of the Consent Decree to which the RI/FS performing parties object are:

1. The Consent Decree is premised on Linnton Plywood's limited financial ability to pay its share of Portland Harbor costs.  The United States has not satisfactorily explained how it determined that Linnton Plywood is not able to contribute its share.
2. The terms of the Consent Decree do not require EPA to use the settlement proceeds for cleanup of the Portland Harbor Site.
3. The Consent Decree unfairly allocates a portion of the settlement proceeds to natural resource damages claims.
4. No portion of the settlement funds will be used to reimburse the RI/FS performing parties' costs.  Moreover, the Consent Decree unfairly cuts off the RI/FS performing parties' contribution claims against Linnton Plywood.

---

[1] Civil Action No. 3:14-1772-ST.  The AOC Signatories are plaintiffs in the related litigation captioned *Arkema Inc. et. al. v. Anderson Roofing Co, Inc.*, et. al. (Case No. 3:09-CV-453-PK)

5. The Consent Decree establishes a trust solely for the benefit of the United States, not the parties expected to pay for the cleanup. Further, the Consent Decree and its insurance trust is a defective model for potential future settlements with parties that assert a limited financial ability to pay their share of response costs and seek to settle based on the transfer of insurance proceeds claims.

The bases for our objections are set forth in detail below.

The Portland Harbor Site was added to the National Priorities list in December 2000. The RI/FS performing parties stepped up early and agreed to perform a remedial investigation and feasibility study ("RI/FS") of ten miles of river sediments in Portland Harbor under a settlement with EPA. The RI/FS performing parties are ten of the more than 150 potentially responsible parties ("PRPs") at Portland Harbor to which EPA has issued General Notice Letters.[2] Since 2001, the RI/FS performing parties have completed major field investigations, data reporting and evaluation, risk assessments and a draft feasibility study under EPA oversight pursuant to the Administrative Settlement. Although EPA originally anticipated issuing its Record of Decision for Portland Harbor as early as 2006, EPA now anticipates it will not issue its ROD until 2017 due to the complexities of this large, urban sediment site. To date, the RI/FS performing parties, which entered into the Administrative Settlement with the expectation that the RI/FS work would be completed nearly a decade ago, have incurred more than $100 million in RI/FS costs. Future costs beyond the RI/FS are unknown, but the RI/FS performing parties' December 2012 draft Feasibility Study evaluated potential cleanup alternatives that estimated future response costs ranging from $169 million to almost $1.8 billion.[3]

The Administrative Settlement specifically acknowledges the RI/FS performing parties' rights to assert claims against other PRPs and provides them with contribution rights under CERCLA Section 113(f)(3)(B).[4] Now, as RI/FS costs exceed $100 million -- far above the original expectations of the RI/FS

[2] Independent PRP searches by the RI/FS performing parties and others have identified many other PRPs. At present, 100 parties are participating in a voluntary non-judicial allocation process, approximately 100 others have agreed to toll claims pending the completion of the allocation, and still another 24 parties are defendants to the stayed *Arkema* litigation.

[3] The RI/FS performing parties, together with four additional parties who have not signed the Administrative Settlement Agreement and Order on Consent but who provide significant funding for the RI/FS work, are known as the Lower Willamette Group.

[4] Administrative Settlement, XXIV.1. and XXV.2. and Amendment No. 2 ¶ XXX. In parallel with the RI/FS settlement with EPA, RI/FS performing parties also settled with the State of Oregon for the remedial investigation and remedy evaluation of the Portland Harbor under ORS chapter 465, and to address petroleum products and other state law cleanup requirements, under a Consent Judgment dated November 1, 2006. As with the Administrative Settlement, the RI/FS performing parties secured contribution rights, for the matters they were addressing, against non-settlors under ORS 465.325(6)(c)(B). Attachment B at p. 16 of 35 of the pdf attachment to the *Arkema* Amended Complaint ("The Parties agree that this Consent Judgment is a judicial settlement within the meaning of ORS 465.325(6)(c)(B), pursuant to which Defendants have resolved their liability to the State of Oregon and therefore may seek contribution regarding the Matters Addressed.")

performing parties --  the preservation of claims against non-performing parties has gained importance. The RI/FS performing parties have worked throughout the RI/FS process to protect their contribution rights against the many non-settling liable parties at Portland Harbor, while honoring EPA's request to focus on the RI/FS and a voluntary allocation aimed at a performance settlement for remedy implementation.  Thus, the RI/FS performing parties have entered into an agreement with 90 other parties to allocate liability through an alternative dispute resolution process and into tolling agreements with more than 100 additional parties.  When other parties were recalcitrant, the RI/FS performing parties sued them for contribution but immediately sought and obtained a stay of that litigation pending the outcome of the allocation process.  Linnton Plywood was originally named in that contribution suit, but in an effort to preserve its assets for settlement, the RI/FS performing parties agreed to dismiss that claim without prejudice and have engaged for the past five years in negotiations with Linnton Plywood to resolve the RI/FS performing parties' claims.[5]

       The proposed consent decree with Linnton Plywood will unfairly destroy any contribution claims of the RI/FS performing parties, rendering fruitless our efforts to accommodate Linnton Plywood over the past five years.  Despite that result, the RI/FS performing parties generally support ability-to-pay settlements that will raise funds and preserve resources for the cleanup of Portland Harbor.  However, based upon the information we have reviewed, we do not understand how the United States arrived at its conclusion that Linnton Plywood is unable to pay a fair, or at least a greater, share of response costs at Portland Harbor.  Further, we are concerned that the terms of the Linnton Plywood settlement do not adequately ensure that proceeds from the settlement will in fact be dedicated to cleanup work at Portland Harbor. Indeed, certain terms of the settlement are plainly unfair to the RI/FS performing parties in that they undermine incentives promised by and rights secured from EPA in exchange for the RI/FS performing parties' agreements with EPA to perform and fund the RI/FS.  Finally, we are concerned that the Linnton Plywood settlement will set a precedent for later settlements with dissolving or otherwise disappearing PRPs that may have more assets.  We ask the United States to provide a better explanation of the basis for the Linnton Plywood settlement, to modify some of the terms of the proposed Linnton Plywood settlement if it proceeds with the settlement, and to confirm the extent to which it intends to use the Linnton Plywood settlement as a model for later settlements based on limited ability to pay, bankruptcy, corporate dissolution or other asset liquidation considerations.

---

[5] On January 12, 2015, the Court granted the RI/FS performing parties' motion to reinstate Linnton Plywood as a defendant in the *Arkema* litigation.  The filing of a Fourth Amended Complaint naming Linnton Plywood as a defendant does not affect the stay.

United States Department of Justice
January 20, 2015
Page 4

Specific Comments

1.      *The United States' Administrative Record for the Linnton Plywood settlement provides no
        explanation to support a conclusion that Linnton Plywood lacks the ability to pay response costs.*

        The information identified in Appendix A of the proposed Consent Decree as comprising Linnton
Plywood's financial information includes a July 30, 2014 "estimated current 'net proceeds' analysis."
From that document, it appears that Linnton Plywood will receive $4,951,368 at the closing of an
anticipated sale of its real property, but as little as $252,246 of the proceeds of sale may be available to
pay CERCLA response costs because of other "payment obligations."  The "payment obligations" are
stated to include payment of real property taxes, closing costs, and an estimated $850,000 in attorney
fees.  The bulk of the "payment obligations," however, are identified as consisting of distribution of
$3,114,045 to current and former shareholders of Linnton Plywood, described in the July 30, 2014 "net
proceeds" analysis as the "Weiss Judgment Lien."[6]

        Among the other documents identified in Appendix A is an October 28, 2009 "Stipulation for
Settlement" approved by the Multnomah County Circuit Court in the *Weiss v. Linnton Plywood
Association* litigation.  This "Stipulation for Settlement" describes the process for distribution of assets
to shareholders "after payment of or reservation for all liabilities or anticipated liabilities."   An October
30, 2009 letter from Bill Hutchison to Lori Cora describing the settlement explains that, prior to
distribution of assets, "[f]irst, the Association must pay all of its third party creditors."  This court-
approved priority on the distribution of assets is entirely consistent with ORS 62.665, which requires a
dissolving cooperative corporation to "pay, satisfy and discharge its liabilities and obligations and do all
other acts required to liquidate its business and affairs, and, after paying or adequately providing for the
payment of all its obligations, distribute the remainder of its assets either in cash or in kind, among the
persons entitled to the same by law, the articles and the bylaws."  According to Multnomah County
Circuit Court records, the *Weiss* case was closed on December 7, 2009.

        On February 20, 2014, however, the Court entered a "Stipulated Corrected General Judgment
(Money Award)."   Although the "corrected" judgment provides that "the terms of the stipulation for
settlement as confirmed by the Court on October 20, 2009[7], is (*sic*) incorporated herein by this
reference," the "corrected" judgment also specifies a $3,300,000 money judgment to the *Weiss*
plaintiffs and places a lien on the Linnton Plywood real property in this amount.  The "motion"
requesting entry of this "corrected" judgment is missing from the court file.

---

[6] Linnton Plywood's other assets apparently consist of $500,000 in proceeds from an insurance settlement and
claims of unknown value under additional insurance policies.  Issues related to the insurance claims are discussed
below.
[7] We assume that the September 20, 2009 date is an error; an earlier paragraph in the judgment correctly
identifies the date of "Stipulation for Settlement" as September 28, 2009.

United States Department of Justice
January 20, 2015
Page 5

Because the terms of the 2009 "Stipulation for Settlement," which are expressly incorporated into the 2014 Money Award, specifically provide that distribution of Linnton Plywood's assets to the current and former shareholders is subordinate to "all liabilities or anticipated liabilities" of Linnton Plywood, including claims by both the United States and the RI/FS performing parties, it is unclear how much of the proceeds of sale will actually be paid to the United States under the proposed settlement.

If the United States has determined that, notwithstanding the express terms of the "Stipulation for Settlement," the United States' claims are subordinate to the Linnton Plywood shareholder claims as a legal matter, the United States should provide the basis for that determination.  If the United States has voluntarily decided to subordinate its claims as a matter of policy, the United States should explain that determination as well, including how that decision is fair to the other parties who will have to shoulder an extra burden in carrying out or funding any required remediation, why the United States' determination to extinguish the RI/FS performing parties' claims in favor of the shareholders supersedes the Multnomah County Circuit Court's order for distribution of Linnton Plywood's available assets, and on what basis the United States intends to decide in future settlements which corporate shareholders are entitled to a priority distribution of corporate assets  and which are not.  If, instead, the United States believes that, under the terms of the *Weiss* judgment it will actually collect between $3.35 and $3.6 million (plus all of the insurance proceeds), it is unclear that this is an ability to pay settlement at all, as opposed to simply an accommodation to a corporation that would prefer to dissolve rather than complete the alternative dispute resolution process EPA has prescribed for the other potentially responsible parties.

This settlement cannot be adequately evaluated much less approved based upon the current administrative record, which contains <u>no</u> explanation of why the settlement reflects either the amount Linnton Plywood can afford to pay or fairly should pay.  Consistent with the size, complexity and cost of the investigation and expected cleanup at Portland Harbor and given the rights of the RI/FS performing parties, the United States should undertake a rigorous, principled and transparent analysis in determining that a responsible party is unable to pay a fair share of response costs.

2.      *The proposed Consent Decree provides EPA with unlimited discretion to use the settlement proceeds for Superfund activities wholly unrelated to the cleanup of Portland Harbor.*

Given the extraordinary estimated cleanup costs for Portland Harbor, it is critical that all funds to settle Portland Harbor claims be reserved for the Portland Harbor cleanup.  Although proceeds from the settlement are to be paid into the Portland Harbor Special Account, paragraph 10 of the proposed Consent Decree places no limitation on EPA's discretion to use the settlement proceeds to reimburse its own past costs or to transfer settlement funds out of the Portland Harbor Special Account and into the general Superfund at any time.

United States Department of Justice
January 20, 2015
Page 6

Section 122(b)(3) of CERCLA authorizes EPA to "retain and use" proceeds of a settlement "for purposes of carrying out" that settlement agreement.[8]  Special account funds should be used at the site for which the payment was made, and the settlement can specify how the money is to be used (e.g., to partially reimburse other parties performing work at the site).[9]  EPA policy emphasizes that PRPs should conduct remedial actions wherever possible, and EPA prefers to achieve PRP-led cleanups through settlements.[10]  Superfund special accounts provide important financial incentives to encourage PRPs to enter into performance settlements with EPA because special account money can be disbursed to performing parties to assist them in funding remedy implementation.[11]

From the initial listing of the Portland Harbor fourteen years ago, EPA has promised incentives to parties that were willing to work cooperatively with EPA toward an expedited and cost effective cleanup at Portland Harbor.  On December 28, 2000, EPA followed up its first set of 69 General Notice Letters for Portland Harbor with a letter encouraging the formation of a relatively small, efficient PRP Group to complete the RI/FS:

> [O]ur experience is that the formation of a large PRP group at the investigation/feasibility stage generally has little if any benefit.  With this approach, EPA recognizes the need to create incentives for participants and assurances for non-participants, allowing entities with more Superfund experience to perform the study with substantial efficiencies. …  At Portland Harbor, if EPA had only a small subset of responsible parties come forward to perform the RI/FS, EPA would … defer recovery of all past costs to the remedy implementation stage….  PRP search costs would be another cost category EPA would defer to remedy implementation….[12]

The ten RI/FS performing parties stepped forward.  Linnton Plywood, also an original General Notice Letter recipient, did not.

Similarly, in the Administrative Settlement itself, EPA acknowledged that, "Respondents are entering into this Order notwithstanding that contamination at the Site may have been caused by entities other than Respondents.  In actions concerning the Site, EPA agrees to apply the EPA Orphan Policy, Attachment C hereto."[13]  The EPA Orphan Policy directs EPA to "maximize compensation" for the orphan share by forgiving unreimbursed past costs and projected future oversight costs for remedial

---

[8] 42 U.S.C. §9622(b)(3).

[9] EPA, *Superfund Special Accounts*, (EPA-250-F-13-001, December 2013), p. 1.

[10] EPA, *Enforcement First for Remedial Action at Superfund Sites* (OECA, September 20, 2002).

[11] *Id.* at p. 3.  *See also*, EPA, *Negotiation and Enforcement Strategies to Achieve Timely Settlement and Implementation of Remedial Design/Remedial Action at Superfund Sites* (OECA, June 17, 1999), p. 3; USDOJ, *Defining "Matters Addressed" in CERCLA Settlements* (March 14, 1997), fn. 6.

[12] Letter from Wallace Reid, December 28, 2000 (attached at Tab 1).

[13] Administrative Settlement Agreement and Order on Consent, ¶XXI.6.

United States Department of Justice
January 20, 2015
Page 7

design and implementation in an amount up to 25 percent of projected remedy costs.[14]  The orphan share is the missing contribution from parties that are defunct or insolvent and, therefore, unable to pay their fair share.  At Portland Harbor, which has "served as a major industrial water corridor for more than a century"[15] and where remedy costs could reach $1.8 billion, the only way for EPA to "maximize" compensation for the inarguably substantial orphan share is to forebear from using the proceeds of any ability to pay or other settlements either to reimburse past EPA costs or to fund future EPA oversight work.

Accordingly, EPA should honor its promises to the RI/FS performing parties to defer EPA past cost reimbursement and to apply the EPA Orphan Policy by specifically agreeing to limit the use of proceeds from the Linnton Plywood settlement and future ability to pay settlements to paying for or conducting future response actions (other than EPA oversight of PRP work) at Portland Harbor.  The United States should modify Paragraph 10 of the proposed Consent Decree to read:

> The total amount to be paid to EPA as required by Paragraphs 6 and 7 of this Section and all funds received by EPA from the Trust shall be deposited in the Portland Harbor Special Account in the EPA Hazardous Substance Superfund.  EPA shall retain and use the monies received from this settlement to conduct or finance response action (other than oversight of PRP work) taken after the Effective Date of the settlement, with priority for reimbursement of parties who agree under a settlement with EPA to perform work at the Site, and if there are no longer unaddressed risks and unreimbursed EPA costs at the Site, for transfer to the EPA Hazardous Substance Superfund.

The United States agreed to very similar restrictions on the use of settlement proceeds in the *Smurfit* bankruptcy.[16]  Clearly, the United States can legally agree to dedicate proceeds of Portland Harbor settlements to the Portland Harbor cleanup.   It should do so in fairness to the RI/FS performing parties, which have so far spent over $100 million in reliance on EPA's promises to level the playing field at the remedy implementation stage, as well as to future performing parties that will be asked to take on one of the largest and most expensive cleanups in Superfund history.

---

[14]  EPA, *Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals* (OECA, June 3, 1996).
[15] Administrative Settlement Agreement and Order on Consent, ¶V.2.
[16] *In re Smurfit-Stone Container Corporation, et al*, Case No. 09-10235 (BLS), (Bankrpt D Del. Jan 6, 2011).  A copy of the *Smurfit* Order is attached at Tab 2.  Our proposed language is consistent with the language discussing the avoidance of stranded funds once a site cleanup has been completed and paid for, set forth in EPA guidance on Special Accounts. http://www2.epa.gov/sites/production/files/2013-10/documents/congui-estmgt-specacct.pdf p. 7.

United States Department of Justice
January 20, 2015
Page 8

3.      *The United States should not give priority to the Federal Natural Resource Trustees' claims,*
        *which address historic, interim, and residual natural resource injuries remaining after clean up.*
        *At a minimum, any proceeds paid to the Trustees should be dedicated to restoring habitat*
        *consistent with the Trustees' CERCLA obligations and their stated policies for natural resource*
        *restoration at Portland Harbor.*

The proposed settlement provides no explanation for the allocation of 25 percent of the Linnton
Plywood settlement proceeds to the Federal Natural Resource Trustees for alleged natural resource
damages. Nothing in CERCLA supports giving priority to natural resource damage claims. Indeed, the
first priority is cleaning up the site through the EPA response program. Once that is complete, then the
Trustees can assess what past and residual damages remain to be addressed by the natural resource
damage assessment. Diverting one-quarter of settlement proceeds to the Trustees undermines this
structure and is fundamentally unfair to the RI/FS performing parties, whose claims against Linnton
Plywood are being extinguished by this settlement.[17]

If the United States continues to designate proceeds for the Trustees, then at the very least the
Trustees should commit to dedicating those proceeds to restoration of natural resources.  In addition to
the Administrative Settlement, each of the RI/FS performing parties also has entered into a Funding and
Participation Agreement with the Portland Harbor Natural Resource Trustee Council, through which the
RI/FS performing parties and other cooperating parties are funding a preliminary natural resource
damage assessment for purposes of early settlement negotiations.[18]  Linnton Plywood has not
participated in this cooperative assessment.

The proposed Linnton Plywood settlement places no restrictions whatsoever on the use of
settlement proceeds paid to the federal Natural Resource Trustees.  Paragraph 8 of the proposed
Consent Decree requires only that settlement payments reference "Natural Resource Damages for the
Portland Harbor Superfund Site." The Portland Harbor Natural Resource Trustee Council has established
far more stringent requirements for restoration-based settlements with other Portland Harbor PRPs.
For example, the Trustee Council's current policy requires that at least one-half of the restoration for
each settling party must be provided inside the Portland Harbor Study Area.[19] If the Trustees receive
any proceeds from the Linnton Plywood settlement, then they should commit to dedicate those funds to
restoration of natural resources on the same terms that they are requiring for settlements by the RI/FS

---

[17] We understand Linnton Plywood intends to sell the property to a firm which plans to construct a salmon habitat
restoration project on the property.  There is no provision in the Consent Decree, however, that guarantees this
will be the future use of the property.  Further, the potential future use of the property does not mitigate the
adverse impacts to the RI/FS performing parties and should not be a factor in evaluating the overall fairness of the
settlement.
[18] Phase 2 Funding and Participation Agreement (August 26, 2010):
http://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/Documents/Phase2FPA082610.pdf
[19] *DRAFT Portland Harbor Programmatic EIS and Restoration Plan* (NOAA, July 9, 2012), pp. ES-6 – ES-7.

performing parties and others cooperating in the natural resource damage assessment. Finally, the proposed Consent Decree also should provide for a careful accounting of the receipt and use of such funds to ensure that there is no double recovery for alleged natural resource damages at Portland Harbor.[20]

4.      *The proposed consent decree unfairly and inappropriately purports to extinguish the RI/FS performing parties' rights to recover any portion, let alone a fair share, of the RI/FS costs they are incurring*.

As noted above, the RI/FS performing parties have so far spent more than $100 million to investigate contamination at Portland Harbor.  They did so based on EPA's express acknowledgement in the Administrative Settlement that "Respondents retain their rights to assert claims against other potentially responsible parties at the Site" and that "Nothing in this Order shall constitute or be construed as a release from any claim . . . against any person, firm, partnership, subsidiary, or corporation not a signatory to this Consent Order for any liability it may have arising out of, or relating in any way to, the . . . release . . . of any hazardous substances, pollutants, or contaminants found at, taken to, or taken from the Site."[21] Further, at EPA's request, the RI/FS performing parties have deferred litigation seeking to recover payment of RI/FS costs in excess of the RI/FS performing parties' fair shares and are instead participating in a voluntary, non-judicial allocation intended to resolve past and future response claims among Portland Harbor PRPs after EPA issues its Record of Decision.[22]

USDOJ guidance recognizes that an EPA settlement must be fair to potential contribution plaintiffs whose rights are purportedly extinguished by the settlement.[23]  Here, EPA asked the RI/FS performing parties not only to forebear from demanding the participation of Linnton Plywood and other PRPs at the outset of the RI/FS, but also to defer claims against those other PRPs in favor of a non-judicial allocation to be completed after the ROD. Given this history, it is patently unfair for the United States to take all of Linnton Plywood's remaining assets for itself _and_ wipe out the RI/FS performing parties' ability to recover costs they have been forced to incur on Linnton Plywood's behalf.[24]  Indeed, it

---

[20] 42 U.S.C. §9607(f)(1).

[21] Administrative Settlement Agreement and Order on Consent, ¶XXIV.1 and XXV.2.

[22] Yamamoto letter, October 17, 2007, attached at Tab 3.  *See also,* United States' Memorandum in Response to Plaintiffs' Motion for Referral to Alternative Dispute Resolution (*Arkema et al v. Anderson Roofing,* U.S. Dist. of Oregon Case NO. 3:09-CV-453-PK, December 9, 2009 (Dkt 260)), p. 4 ("All of the PRPs … should be given an opportunity to let the ADR process bear fruit, and to spend their resources on that rather than litigation. Indeed, the United States strongly encourages the ADR process in play in this matter….")

[23] USDOJ, *Defining "Matters Addressed" in CERCLA Settlements* (March 14, 1997), pp 4-5.

[24] The United States' decision to extinguish the RI/FS performing parties' contribution claims is especially unfair to the extent that EPA has decided as a matter of policy to allow Linnton Plywood's shareholders to keep approximately 90 percent of the proceeds of sale of the real property despite the fact that distribution of assets to shareholders is clearly subordinate to Linnton Plywood's liabilities to third parties under both the Multnomah County Circuit Court judgment and Oregon law.

would appear to be in EPA's own long term interest at Portland Harbor, where anticipated future response costs are nearly unprecedented, to deal fairly with its earliest settling parties:

> "[T]he government has a serious disincentive to collude with later settlors to cut off the rights of prior settlors just to extract a higher second-round settlement in a single clean-up proceeding. It is the government that is the *repeat* player in the world of CERCLA clean-ups. Should the government develop a reputation for cheating early settlors, that would deter settlements in later clean-ups (and reduce the amounts early-round settlors are willing to pay) and hence, in the long run, hurt the government's interests."[25]

At a minimum, the United States should exclude costs for RI/FS work performed under the Portland Harbor Administrative Settlement from the "matters addressed" defined in Paragraph 24 of the proposed Consent Decree.[26] The United States should further commit that future settlement agreements with alleged ability to pay or peripheral parties will impair the contribution rights of the RI/FS performing parties only if the settling parties are in the most urgent and dire financial circumstances. Otherwise, EPA should allow the allocation process it urged the RI/FS performing parties to pursue to proceed without interference.

5.    *The proposed consent decree improperly establishes a trust solely for the benefit of the United States to pursue the insurance claims not only of Linnton Plywood but of future unidentified parties in unidentified and currently unknowable circumstances.*

While the idea of establishing a Trust to which future insurance-based settlements may contribute claims is a commendable way to secure funding to cover the costs of cleanup and restoration of Portland Harbor, the proposed trust is flawed and should be modified.   By the terms of paragraphs 9 and 10 of the proposed Consent Decree and Appendix E thereto, the United States proposes to create an insurance recovery trust  for two purposes:  (1)  to serve as the trust to which Linnton Plywood would assign its claims against certain insurers with respect to liability at the Portland Harbor Superfund Site with the EPA and Federal Natural Resource Trustees as the sole beneficiaries, and (2) "to allow and accommodate future contributions to the [insurance trust] from future grantors, whether presently known or unknown, . . . for the benefit and interest of EPA and the Federal Natural Resource Trustees."

---

[25] *United States v. Charter International Oil Company*, 83 F. 3d 510, 518 n.11 (1st Cir. 1996).

[26] *Id.* at p. 11, n. 10 ("it may be appropriate in some cases to consider an arrangement whereby the proceeds of such settlements are shared with potential contribution plaintiffs.")  *See also*, *United States v. Charter*, 83 F.3d 510, 522 (consent decree not unfair to prior settling parties because it did not bar contribution claims).

The proposed assignment and the proposed Appendix E Insurance Recovery Trust Agreement are improper, inappropriate and inadequate with respect to both proposed purposes. [27]

First, the assignment of claims solely for the benefit of EPA and the Federal Natural Resource Trustees is unfair and improper for the reasons explained above. The proposed Trust is established solely for the benefit of limited beneficiaries, namely EPA and the Federal Natural Resource Trustees. Docket Entry 2-1 Appendix E ¶¶ II.2; I.1.a.    The Trustee and "[e]ach Grantor" "intend that no third parties have access to the Fund."  ¶ II.3. Linnton Plywood is barred from asserting or pursuing additional claims against its insurers.  Docket Entry 2-1, Appendix E, pp. 7-8 ¶III.5.d.  All insurance proceeds claims are transferred to the proposed trust, and any recoveries are to be paid only to United States beneficiaries.

This arrangement unfairly divests the RI/FS performing parties of even the opportunity to pursue their contribution claims to the extent they could be satisfied through these insurance policies. Just as with the cash proceeds that Linnton Plywood will realize from the sale of property and from settlement of certain of its insurance claims, any proceeds that may be realized on Linnton Plywood's remaining insurance claims are proceeds on which the RI/FS performing parties have a claim under CERCLA's contribution provisions, to reimburse them for Linnton Plywood's fair share of the over $100 million in costs incurred performing the RI/FS.  The RI/FS performing parties should therefore be assigned a portion of Linnton Plywood's insurance claims.   Tab 4 provides proposed modifications to pertinent pages of Appendix E to the proposed Consent Decree to provide a mechanism under which this could be done, by assigning only a percentage of the insurance proceeds claims to the United States, which would leave the remaining percentage to be assigned to the RI/FS performing parties under a separate settlement with Linnton Plywood.

Second, proposing to establish a limited purpose trust applicable to all future insurance proceeds from claims-based settlements involving unknown parties, insurance, and other circumstances creates complexities that are not addressed in the proposed Appendix E.  Under the proposed consent decree, "Grantor" is not simply Linnton Plywood, but anyone "who contributes assets, funds, moneys, rights under insurance policies, and/or other property to the Trust, *whether now or in the future, and whether presently known or unknown* …."  Docket Entry 2-1 Appendix E p. 3 ¶ I.1.e (emphasis added).  In addition, the proposed Trust Agreement includes a section on "Future Grantor(s) and Funds."  Docket Entry 2-1 Appendix E pp. 10-11 ¶¶ III.8 – III.10.  Under this provision, the Trustee is given authority to accept future rights under insurance policies and other property, to treat the Trust assets as a "single undivided corpus" without having to take into account the "contribution from any current or future Grantor(s), whether presently known or unknown," and to "manage [the assets] in accord with the terms of this Agreement."  *Id.* p. 11 ¶ 9.

---

[27] Under CERCLA Section 122(2)(B), the Attorney General should withdraw or withhold consent to a proposed consent decree when facts or considerations indicate the proposed judgment is inappropriate, improper, or inadequate.

Case 3:14-cv-01772-MO   Document 33-4   Filed 04/10/15   Page 13 of 16

This structure is unfair and improper because the United States is committing unspecified and unknown "rights under insurance policies" of unidentified future settling parties to a trust with an inappropriately narrow purpose. To the extent the proposed trust is future-focused, its provisions should be flexible enough to accommodate the rights of settling plaintiffs other than the United States and allow for other purposes and beneficiaries. An example illustrates the impropriety and unfairness of the current structure of the proposed trust's forward-focused provisions. The United States and the RI/FS performing parties are currently in settlement negotiations with DIL Trust, a liquidating trust holding the assets of major (*i.e.*, non-*de minimis*) ship builders and repairers that owned property and operated businesses in Portland Harbor. The framework for settlement is driven by DIL Trust's desire to complete its liquidation. Investigation into DIL Trust's predecessors' insurance coverage has resulted in a preliminary conclusion that DIL Trust has rights under insurance policies with face values of tens of millions of dollars over multiple decades. DIL Trust's EPA 104(e) Information Request response of January 15, 2015, as summarized in the insurance coverage chart attached at Tab 5,[28] reflects that:

- From 1966 to 1978 DIL had approximately $5 million of liability insurance per year,
- From 1979 to 1982 it had approximately $11 million of liability insurance per year, and
- From 1983 to 1985 it had approximately $50 million of liability insurance per year.

Not all future Grantors will be in the same position as Linnton Plywood, and some, such as DIL, may have significant insurance assets warranting transfer of multiple insurance proceeds claims under the Appendix E Trust Agreement. Thus, unless greater flexibility is incorporated into the United States' proposed Appendix E Trust Agreement, it would be inappropriate to use the proposed trust as a template for a "one size fits all" approach for handling all insurance policy-based settlements, especially given the RI/FS performing parties' cost recovery and contribution claims for more than$100 million in RI/FS response costs.

If the United States retains the future-focused provisions of the proposed trust, then Tab 4 provides proposed modifications to the Consent Decree and Appendix E thereto to provide a mechanism under which the trust would be sufficiently flexible to cover a variety of settlements involving plaintiffs beyond the United States that will likely be based substantially on the transfer of rights under insurance policies. At a minimum, the trust agreement would have to: (1) have a purpose extending to investigation and remedy evaluation; (2) broaden the category of Beneficiaries to include any RI/FS performing parties who settle with any Grantor; and (3) have payment terms to address the respective payments to United States and RI/FS performing parties.

Such revisions will enable the trustee, in appropriate circumstances involving settlements by the United States and other parties with cost recovery and contribution claims, to seek recovery on derivative insurance claims and then disburse payments to settling party beneficiaries beyond merely

---

[28] The DIL insurance coverage chart attached as Tab 5 was prepared by the Port of Portland.

the United States, for investigation, remedy evaluation, cleanup and other recoverable costs incurred by such settling beneficiaries in connection with the Portland Harbor Superfund Site.

Thank you for considering these comments.   We may have additional comments after we receive the United States' complete response to our November 24, 2014 Freedom of Information Act response.  We may also submit additional comments in the event that the United States modifies or revises the proposed settlement with Linnton Plywood.

Sincerely,

PEARL LEGAL GROUP

By:

Patricia M. Dost
OSB# 902530
(503) 467-4675
Of Attorneys for Plaintiffs NW Natural and TOC Holdings Co

PORT OF PORTLAND

By:     s/ David Ashton
        David Ashton
        OSB# 010193
        (503) 415-6090
        Of Attorneys for Port of Portland

DAVIS WRIGHT TREMAINE LLP

By:     s/ Gerald George
        Gerald George
        CSB# 142573
        (415) 276-6526
        Of Attorneys for Chevron U.S.A. Inc.

Case 3:14-cv-01772-MO    Document 33-4    Filed 04/10/15    Page 15 of 16

CITY OF PORTLAND

By:    s/ Karen Moynahan
       Karen Moynahan
       OSB# 954924
       (503) 823-4538
       Of Attorneys for City of Portland


JOYCE ZIKER PARKINSON PLLC

By:    s/ Stephen Parkinson
       Stephen Parkinson
       OSB# 090709
       (206) 957-5965
       Of Attorneys for Legacy Site Services LLC, agent
       for Arkema Inc.


BEVERIDGE & DIAMOND, P.C.

By:    s/ Timothy M. Sullivan
       Timothy M. Sullivan
       OSB# 004053
       (410) 230-1300
       Of Attorneys for ConocoPhillips Company


RIDDELL WILLIAMS P.S.

By:    s/ Loren R. Dunn
       Loren Dunn
       OSB# 060350
       (206) 389-1794
       Of Attorneys for Evraz Inc., NA


TONKON TORP, LLP

By:    s/ Max M. Miller, Jr.
       Max M. Miller, Jr.
       OSB# 832872
       (503) 802-2030
       Of Attorneys for Gunderson LLC

United States Department of Justice
January 20, 2015
Page 15


JOYCE ZIKER PARKINSON PLLC

By:     s/ Tod A. Gold
        Tod A. Gold
        WSB# 23832
        (206) 957-5953
        Of Attorneys for Union Pacific Railroad
        Company


cc:     Lori Cora, US EPA Region 10
        Cora.Lori@epamail.epa.gov