# ATTACHMENT F



J Wring, Managing Partner
Direct: 503-964-6724
Cell: 503-616-6860
Cell: 503-841-8415
jwring@ringbenderlaw.com

621 SW Morrison Street, Suite 600
Portland, Oregon 97205
503-964-6730

2 Park Plaza, Suite 550
Irvine, California 92614
949-202-5810

1 Alhambra Place, Suite 620
Miami, Florida 33134
786-235-2030

Legal Assistant: Sarah Goodling
Direct: 503-964-6729

www.ringbenderlaw.com

January 22, 2015

**VIA EMAIL ONLY** (pubcomment-ees.enrd@usdoj.gov)

Honorable John C. Cruden
Assistant Attorney General
U.S. DOJ-ENRD
PO Box 7611
Washington, DC 20044-7611

**RE:**  *United States v. Linnton Plywood Association*, D.J. Ref. No. 90–11–2–06787/3

Dear Mr. Cruden:

We represent BAE Systems San Diego Ship Repair Inc. and The Marine Group LLC (jointly, BAE/TMG), which are submitting these comments (Comments) on the above-referenced proposed settlement (Settlement) between the United States and Linnton Plywood Association (LPA) related to LPA's CERCLA liability for the remediation of the Portland Harbor Federal Superfund Site (Site). As explained below, BAE/TMG have substantial concerns regarding the potential for the Settlement to establish adverse precedent that could undermine ongoing efforts by numerous potentially responsible parties (PRPs) to negotiate a comprehensive settlement for the Site to implement the selected remedy. To address their concerns, BAE/TMG request that the U.S. Environmental Protection Agency (EPA) modify the Consent Decree to indicate that this Settlement is unique and will not serve as precedent or a template for future early settlements at the Site.

These Comments incorporate by this reference the discussion of the historic context for the Settlement contained in the public comments submitted by the Portland Harbor Participation and Common Interest Group (PCI Group). The factual discussion in this memorandum focuses on the ability-to-pay analysis, which is a critical aspect of the Settlement that is not addressed in the Consent Decree, other than in conclusory statements, such as: "[T]he United States has determined that Settling Defendant has limited financial ability to pay response costs incurred and to be incurred at the Site and Natural Resource Damages related to the Site …." Consent Decree ¶ H at 3. These Comments recommend that EPA take a harder look at whether LPA


qualifies for an ability-to-pay settlement and, if so, scrutinize the proposed distribution of the Settlement proceeds to ensure they are distributed equitably and in accordance with federal law.

The Comments also discuss the potential public benefits and detriments, monetary and nonmonetary, resulting from the Settlement, in the context of evaluating whether the Settlement is in the public interest as required by CERCLA. *See United States v. Montrose Chemical Co.*, 50 F.3d 741, 746 (9th Cir. 1995). In particular, BAE/TMG are concerned by the implications of applying the Settlement proceeds to EPA's oversight costs and recommends that the Consent Decree be modified to provide that all proceeds from the Settlement should be paid into a trust fund for payment or repayment of costs associated with implementing removal and remedial action activities and not for reimbursing past or future governmental oversight or enforcement costs.

I.      **ABILITY-TO-PAY ANALYSIS**

   A.   <u>**Overview of LPA's Liability and Ability To Pay**</u>

Although not required to perform a full-blown liability allocation in the context of ability-to-pay settlements, *see United States v. Coeur d'Alenes Co.*, 767 F.3d 873 (9th Cir. 2014), EPA must at least consider the settling PRP's potential liability, as informed by recognized equitable allocation factors, *see* EPA, Addendum to "Interim CERCLA Settlement Policy" Issued on Dec. 5, 1984 (Sept. 30, 1997). The Consent Decree alleged that LPA has approximately $9 million in remedial liability and $2 million in natural resource damage (NRD) liability, Consent Decree ¶ C at 2, although it is unclear how EPA calculated these amounts.

EPA's guidance on ability-to-pay settlements allows reduction of the settlement amount only to the extent that payment is likely to result in an "undue financial hardship." EPA, General Policy on Superfund Ability to Pay Determinations (Sept. 30, 1997). "An undue financial hardship occurs if, in the opinion of EPA, satisfaction of the environmental claim will deprive a PRP of ordinary and necessary assets or cause a PRP to be unable to pay for ordinary and necessary business expenses and/or ordinary and necessary living expenses." *Id.* at 1. LPA no longer operates as a business and instead is essentially in wind-up, or distribution, mode, so it has no ordinary and necessary assets or business expenses. *See* Or. Rev. Stat. § 62.708 (dissolution of cooperative). Thus, it is questionable whether LPA even qualifies for an ability-to-pay reduction in the settlement amount based on "undue financial hardship."

   B.   <u>**Computation of Settlement Proceeds**</u>

Even assuming that LPA does qualify for ability-to-pay treatment, the Settlement cannot result in a windfall to third parties. Unfortunately, the Settlement as proposed would provide a windfall to LPA's shareholders and creditors. The proposed Settlement would generate the following proceeds:[1]

---

[1]   Documents cited in these Comments as sources for additional detailed information regarding the Settlement were obtained from EPA pursuant to a Freedom of Information Act (FOIA) request.



| Amount | Payee and Source of Payment | Timing of Payment |
|---|---|---|
| $450,000 | Direct payment to U.S. | 30 days after court enters consent decree |
| 319,430† | Payment to U.S. of net proceeds from sale of property | 30 days after sale of property closes |
| 50,000 | Payment to trustee of insurance trust | 30 days after court enters consent decree |
| 1,337,000‡ | Potential insurance trust recoveries | Upon recovery from insurers |
| $2,156,430 | **Total Estimated Proceeds** | |

† Estimated amount.  Source:  Linnton Plywood Association Schedule of Estimated Property Sale Proceeds and Required Payment/Distribution Obligations (Feb. 28, 2014) ("Schedule of Estimated Sale Proceeds"), attached hereto as <u>Attachment 1</u>.

‡ Approximate amount; assumes successful recovery of total policy limits ($1.9 million) minus insurance indemnity payments to date and to fund Settlement.  Sources:  Letter from Michael E. Farnell, coverage counsel for LPA, to Lori Houck Cora, assistant regional counsel for EPA Region 10 (Aug. 30, 2010); letter from Paul B. George, counsel for LPA, to L. Houck Cora (Mar. 24, 2010).

In a best-case scenario, the Settlement will generate $2.2 million toward an approximately $11 million total liability, meaning that there will be at least an 80 percent "unfunded share."[2]  In exchange, LPA will receive contribution protection and will be absolved of further responsibility for all remedial costs and NRDs in excess of the Settlement proceeds.

According to the Schedule of Estimated Sale Proceeds, the Settlement also will result in the distribution of the remainder of the purchase price of $5.5 million to multiple third parties, including $3,114,045 to LPA's shareholders and $700,000 to LPA's creditors.  Thus, these third parties will collectively garner significantly greater economic benefits from the Settlement than the United States, even assuming maximum recovery of insurance limits (which is unlikely), and even though some of these third parties were personally involved in LPA's activities that contributed to environmental contamination.  Consequently, the proposed distribution of Settlement proceeds should be carefully scrutinized to determine whether it is in the public interest and comports with EPA polices regarding ability-to-pay settlements.

### C.    Analyses of Proposed Distributions of Settlement Proceeds

EPA's FOIA production (described in note 1) contained minimal detail regarding the $700,000 disbursement for "accounts payable" in the Schedule of Estimated Sale Proceeds.[3]  To determine whether this disbursement is appropriate, EPA needs to evaluate the proposed payees and the bases for the underlying obligations.  It is likely that at least some of these payments are subordinate to the United States' claims pursuant to the Federal Priority Statute, which provides: "A claim of the United States Government shall be paid first when a person indebted to the Government is insolvent and the debtor without enough property to pay all debts makes a voluntary assignment of property."  31 U.S.C. § 3713(a)(1)(A)(i).  The consequences of violating this statute are severe:  "A representative … paying any part of a debt of the person or estate

---

[2]    As discussed below in Section I.A.1, this amount is not within EPA's definition of "orphan share."
[3]    LPA's balance sheets reference "accounts payable—trade."  This label suggests that the underlying obligations may not have priority over the claims of the United States under CERCLA.



before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." 31 U.S.C. § 3713(b).

The distribution of $3,114,045 to LPA's shareholders is proposed to satisfy the Oregon state trial court judgment in *Weiss v. Linnton Plywood Ass'n*, No. 0807 10423 (Multnomah Cnty. Cir. Ct. Oct. 27, 2009), approving a stipulated settlement among the parties. This litigation was commenced on July 22, 2008, more than eight years after LPA and its shareholders were first put on notice regarding EPA's claims by LPA's receipt of a general notice letter from EPA in December 2000, and more than six months after LPA received a CERCLA Section 104(e) information request regarding the Site from EPA in January 2008.[4] It is unclear whether LPA was insolvent in October 2009, but LPA appears to be currently insolvent, as it has ceased active operations, and its remaining property rental operations result in negative monthly income ranging from $5,000 to $15,000. Letter from William P. Hutchison, counsel for LPA, to L. Houck Cora (Mar. 3, 2014); LPA's 2007, 2008 & 2009 federal income tax returns.

LPA is a cooperative association owned by the former workers at the historic plywood manufacturing facility from which the releases of hazardous materials occurred. To work at LPA, an employee was required to buy one share of the association for $5,000. Employees were paid wages or salaries for their labor. In addition, they were entitled to receive a share of the earnings from the manufacturing operation. However, LPA would retain some of these earnings to continue operating the business. In *Weiss*, the former workers sued LPA for their share price, shown as "Payment of par value of membership stock" on the Schedule of Estimated Sale Proceeds. They also sued for the return of retained earnings, shown as "Payment to 199 Members/Shareholders of previous earnings" on the Schedule of Estimated Sale Proceeds. Letter from W. Hutchison to L. Houck Cora (Oct. 30, 2009).

The proposed payments to LPA's shareholders are not compensation for services rendered. Instead the Settlement would result in a small business paying its shareholders for their share price and business profits, in priority over the environmental claims of all the PRPs at the Site and the United States, despite the fact that these shareholders were personally involved in operating the business that contributed to the environmental contamination and thus had full knowledge of the risk of their investment, unlike typical business investors, who do not directly control business operations. From a policy perspective, this is an unacceptable result. There are many businesses with investors of limited means that are PRPs at the Site, and this settlement would establish the precedent that, if they can frame their argument in just the right way, they might get their money back free and clear of environmental liability for the Site. That message is not consistent with meeting the goal of timely funding and implementing a Site remedy.

Instead EPA should follow the Federal Priority Statute, and the United States should receive all of these proposed payments to third parties. This reallocation would increase the amount of the United States' recovery by nearly 300 percent from $2,156,430 to $5,970,475, and would decrease the unfunded share from 80 percent to 54 percent. It also would eliminate the apparent inequitable windfall to LPA's shareholders and creditors that would result from the Settlement as proposed.

---

[4] In addition, LPA was sued on April 24, 2009, by the Lower Willamette Group members with respect to its Site liability. LPA was dismissed as a defendant so the parties could attempt to negotiate a settlement through the PCI Group process. Letter from P. George to L. Houck Cora (Mar. 24, 2010).



## II. PUBLIC INTEREST ANALYSIS

### A. Public Benefits from Proposed Settlement

In addition to the apparently limited financial benefits, a significant driver for the Settlement and the sale of the LPA property is to make it available as a site for a habitat restoration project already under development. K. House, *Linnton Plywood: Restorcap Environmental Restoration Company To Turn Old Mill into Salmon Habitat*, OregonLive.com by The Oregonian (May 8, 2014). This unique public benefit distinguishes the Settlement from other potential future settlements at the Site and addresses the Trustee Council's specific concern about the potential for industrial redevelopment of the Linnton property.[5]

The proposed Settlement would facilitate development of the LPA property into a habitat restoration site and permanently protect it from industrial redevelopment. Thus, the Trustee Council and the public will receive significant natural resource benefits from the LPA Settlement. While these additional benefits may tip the scales in favor of the proposed Settlement despite the substantial detriments discussed below, they also serve to distinguish this Settlement from other potential early settlements of remedial liability at the Site. Because of its unique circumstances, this Settlement should not be used as a model for other pre-ROD remedial settlements, and the Consent Decree should be modified to expressly acknowledge this limitation.

### B. Public Detriments from Proposed Settlement

It is critical that all settlement funds from the LPA are used for payment or repayment of costs associated with implementing removal and remedial action activities and not for reimbursing governmental oversight or enforcement costs, due to the limitations contained within EPA's orphan share policies. Every CERCLA settlement, particularly the proposed ability-to-pay Settlement under which LPA would pay an amount far below its estimated liability, must further the objectives of achieving a global response and ultimate settlement for the entire Site that is fair, reasonable and in the public interest. *See Montrose Chemical Co.*, 50 F.3d at 746. The Consent Decree, by not requiring EPA to utilize settlement funds for removal and remedial action activities, does not satisfy these requirements.

The proposed Settlement approach, particularly if used as a model for future single-party settlements at the Site, will make any large settlement with the vast majority of PRPs much more difficult, if not impossible. EPA's ability to negotiate pursuant to its orphan share policies is key to any successful final settlement with PRP groups, and anything that limits EPA's discretion under these policies reduces the likelihood of global settlement. Mindful of the massive and costly remediation ahead, together with limitations on EPA's discretion to reimburse PRPs for so-called "orphan shares," the integrity and viability of the settlement process can be assured only if the proceeds from this Settlement are allocated for removal and remedial action costs and not to EPA's oversight costs.

---

[5]  In 2012, the Trustee Council's Ecological Restoration Portfolio noted: "The land is in private ownership and is currently for sale. There is significant development pressure, as it is currently zoned for river-industrial use. Many members of the Linnton community are strongly supportive of restoration at the site." Portland Harbor Natural Resource Trustee Council, Ecological Restoration Portfolio at 21 (Apr. 2012).



       *1.     Overview of EPA's Orphan Share and Work Policies.*

EPA defines an orphan share as "that share of responsibility which is specifically attributable to identified parties EPA has determined are: (1) potentially liable; (2) insolvent or defunct; and (3) unaffiliated with any party potentially liable for response costs at the site." EPA, Interim Guidance on Orphan Share Compensation for Settlers of Remedial Design/Remedial Action and Non-Time-Critical Removals at 2 (June 3, 1996) ("Orphan Share Guidance"). Significantly, this definition does not include settling parties such as LPA that settle, based on inability to pay, for a reduced amount relative to their equitable allocation of liability for the total anticipated response costs of the site. Orphan Share Guidance at 2-3. Accordingly, under EPA's application of joint and several liability, all remaining PRPs at the Site would be required to absorb LPA's "unfunded amount," quantified above in Section I.B, with no associated potential orphan-share reduction—even though this amount is tantamount to an orphan share.

EPA's Orphan Share Guidance specifically directs the Regions to "maximize compensation for the orphan share component of a federal compromise," up to an amount not exceeding the lesser of: (1) the estimated amount of the total site-wide orphan share; (2) twenty-five percent of projected total site response costs; or (3) total unreimbursed past costs plus estimated future oversight costs for EPA. Orphan Share Guidance at 4. The proposed use of LPA's settlement funds to reimburse EPA for past costs will reduce potential orphan share compensation, which will have a significant negative effect on the prospects for future settlements with performing PRPs at the Site.

       *2.     The LPA Settlement Will Decrease the Orphan Share Funds Available for Future Global Settlement and Will Significantly Restrict EPA's Flexibility in the Negotiating Process.*

Applying the Settlement proceeds as proposed to past oversight costs would disproportionately increase the financial burden on those PRPs engaged in and funding the PCI Group process. While the LPA site is not classified as an orphan site, the Orphan Share Guidance remains highly relevant to any evaluation of the Settlement. At the Portland Harbor Site, total response costs are likely to exceed a billion dollars, and there are substantial orphan shares due to the age of the Site, so it is almost certain that the limitation on compensation for orphan shares will be the amount of EPA's total unreimbursed past costs and estimated future oversight costs for the Site. Thus, if EPA applies the proceeds of the LPA settlement to its past costs, as is currently proposed, EPA effectively would be diverting funds away—on a dollar-for-dollar basis—from the orphan-share pot available to credit to the performing PRPs for the cost of remediating the orphan sites.

This outcome is particularly harmful at the Portland Harbor Site, because the majority of the remedial investigation and feasibility study (RI/FS) work has been funded and conducted by PRPs, so the amount of EPA's past costs is already significantly reduced as compared to other sites where EPA has performed the RI/FS. In view of the Site's anticipated remediation costs (currently estimated at up to $1.7 billion) and the numerous orphan PRPs, resulting from more than a century of industrial operations, this outcome would be egregious and unfairly burdensome upon the PRPs performing and funding the remedy. Consequently, EPA should allocate LPA's Settlement funds exclusively to the remediation effort and not to its own limited past costs.



Furthermore, as EPA is aware, its ability to waive oversight costs under the Orphan Share Guidance is an instrumental bargaining chip in reaching settlements with PRPs. Should EPA apply the LPA Settlement solely toward past costs, EPA will lose a large portion of its flexibility to negotiate with PRPs, reducing the likelihood that future successful settlements will be reached. EPA's ability to settle with other, more financially viable PRPs, particularly the large group of PRPs participating in the PCI Group process, will undoubtedly involve some give and take, and undermining the prospects for comprehensive settlement in exchange for the paltry sums of money involved in the LPA Settlement is short-sighted. Should EPA lose what little flexibility it has in settlement negotiations, we are concerned that the global settlement which is the ultimate goal of the PCI Group process will fall apart, and the result will be lengthy and costly federal litigation, a result that would benefit neither the PRPs nor EPA and would delay the cleanup of the Site by years, if not decades.

> 3. *Allocating the LPA Funds to Past Costs Breeds Distrust with PRPs and Threatens the Negotiation Process.*

Our clients share the PCI Group's view that EPA's failure to allocate LPA Settlement funds toward future response costs could threaten the positive collaboration occurring between the PRPs and EPA. As explained above, any election by EPA to reimburse its past costs with LPA's Settlement funds necessarily comes at the expense of the PRPs, because it shrinks the pot of orphan-share funds. The PRPs, in good faith, are incurring millions of dollars both in RI/FS costs to investigate and develop remedial options for the Site and in allocation mediation costs to fund the remedy; to date these expenses far exceed EPA's oversight expenditures. Should EPA allocate Settlement funds to itself, rather than to the costs for remediating the Site, and in turn increase the burden on the PRPs actively involved in Site remediation, it would send a clear message that PRPs cannot rely on EPA to administer this Site in a manner that fairly accounts for their efforts and would significantly hamper the prospects for global settlement.

The public interest is best served by protecting and fostering the collaborative approach, which already has yielded substantial public benefits in the form of a PRP-funded RI/FS process and holds promise for funding the entire Site remedy. To maintain the trust and positive momentum associated with this collaborative effort, EPA must allocate the entirety of the LPA Settlement proceeds to removal and remedial action costs and not to EPA's oversight costs.

## III.    CONCLUSION

These Comments make three specific recommendations:

First, EPA should carefully scrutinize the proposed distributions of proceeds from the sale of LPA's property to third parties, including LPA's shareholders and creditors. These distributions are substantial, well in excess of the estimated settlement proceeds, and it is unclear how, in light of the Federal Priority Statute, the United States could afford these distributions priority ahead of the Site cleanup to ensure the protection of human health and the environment.

Second, EPA should expressly acknowledge that this Settlement is unique, due to the Trustee Council's plan to use LPA's property as a habitat restoration site, among other things, and that this Settlement will not serve as an example or template for any future early settlements at the



Portland Harbor Site. It is critical to preserving the viability of the PCI Group process that this Settlement not be treated as precedent for additional early settlements.

Third, all Settlement proceeds must be dedicated to removal and remedial action costs and not used to offset EPA's oversight costs. Many PRPs, including our clients, have spent substantial amounts on the PCI Group process in response to EPA's request that they participate in this private allocation mediation. Using Settlement proceeds to reimburse EPA's oversight costs would send the wrong message, in exchange for a relatively modest sum, and risk alienating the hundreds of PRPs that EPA has identified for the Portland Harbor Site.

Thank you for the opportunity to make these Comments. If you have any questions concerning them, please feel free to contact me.

Sincerely,

J.W. Ring, Managing Partner

cc: Arthur E. Engel, The Marine Group
    Herbert G. Engel, The Marine Group
    Laura J. Machado, The Marine Group
    Raymond A. Parra, BAE Systems
    Sandor (Shaun) Halvax, BAE Systems

**ATTACHMENT 1**

February 28, 2014

## Linnton Plywood Association
## Schedule of Estimated
## Property Sale Proceeds
## and
## Required Payment/Distribution Obligations*

| | | |
|---|---:|---:|
| Estimated Sale Proceeds | | $5,500,000 |
| | | |
| Gross Proceeds at Closing (8-11-14) | | $5,500,000 |
| Less Purchase Price Advances: | | |
| - 2008-09 Real Property Taxes | $ 166,059 | |
| - 2009-10 Real Property Taxes | $ 147,908 | |
| - Additional Advances (1-10-13 through 7-31-14) | $ 297,480 | |
| | | |
| Less Total Purchase Price Advances: | | $ 611,447 |
| Proceeds Due and Available at Closing (8-11-14) | | $4,888,553** |
| | | |
| Estimated and Required Payment/Distribution Obligations | | |
| | | |
| Ad Valorem Real Property Taxes | $ 480,078 | |
| Closing Costs of Sale including realtor commission | $ 200,000 | |
| Accounts Payable | $ 700,000 | |
| Court Ordered Distributions | | |
| - Payment to 199 Members/Shareholders of previous earnings | $2,484,045 | |
| - Payment of par value of membership stock | $ 630,000 | |
| - Court ordered fees | $ 25,000 | |
| Total Obligations | | $4,519,123 |
| | | |
| Estimated Post Closing Balance of Net Proceeds*** | | $ 319,430 |

---

* Schedule assumes pending transaction is consummated.
** Does not include deductions for potential additional contingent advances.
*** Omits the deduction of any amount which may be needed to meet DSL Submerged Land Lease restoration expectations, and the addition of any residual purchase price advances received.

093907.0004/5949530.4