# Exhibit 1

# roberts | kaplan llp
ATTORNEYS AT LAW

Direct Phone
503-219-8133

Direct Facsimile
800-600-2138

E-Mail
butch@robertskaplan.com

October 2, 2009

*VIA E-MAIL AND*
*FIRST CLASS MAIL*

Lori Houck Cora
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
Region 10, ORC-158
1200 Sixth Avenue
Seattle, WA 98101

Re: *Linnton Plywood Association ("LPA")/Environmental Protection Agency ("EPA")*
**FRE 408 CONFIDENTIAL SETTLEMENT COMMUNICATION**

Dear Lori:

This confirms LPA's commitment to achieve a settlement with EPA that resolves LPA's CERCLA liability in the Portland Harbor Superfund site. You have requested that LPA submit a settlement proposal. We are preparing to do so. Preliminary to that, we intend to provide in this letter the information you requested relative to LPA's financial circumstances that particularly bear on its ability to pay and the limited opportunity it has to pay. We have nearly completed a letter to you and Kristine Koch which will respond to the questions articulated by Kristine during our meeting in Seattle on July 13, 2009. We will have it sent to you within a few days. With these letters and the information contained in them as a foundation, we will propose settlement terms for your consideration.

This letter responds to your questions about LPA's financial circumstances.

First, providing information about LPA's insurance coverage is not as easy as enclosing a copy of the policies. The applicable insurance policies were written by General Insurance Company of America, predecessor of SAFECO Insurance; Safeco in turn is a more recent predecessor of Liberty Mutual, LPA's present insurer. Based upon current information, SAFECO and now Liberty have advised us that LPA may have a total of $1,900,000.00 worth of coverage related to Superfund liability under 19 confirmed and unconfirmed policies ($100,000.00 of coverage for each policy year from 1966 to 1985.) SAFECO acknowledges that based upon present information SAFECO must recognize coverage under the unconfirmed

Lori Houck Cora
October 2, 2009
Page 2

policies for which only secondary evidence exists.[1] SAFECO has issued a "Reservation of Rights" as to all of the policies. Our understanding is that these are wasting policies, *i.e.* defense costs are deducted from the coverage, and to date there is approximately $1,500,000.00 still available. We are contacting the insurance company about settlement and their response will form the settlement proposal we would hope to submit shortly.

With regard to the contingent sale to BP, there remain a number of unresolved conditions, the most significant of which is resolution of "environmental claims". Whether BP or another entity is the purchaser, we expect that closing of such a transaction will require protections to be provided by EPA in the nature of a prospective purchaser agreement as appears to have been contemplated in the Statement of Work attached to EPA's AOC for the Remedial Investigation/Feasibility Study (US EPA Docket Number CERCLA-10-2001-0240). Using the

---

[1] The following statement is excerpted from Safeco correspondence dated May 8, 2008:

General has confirmed that it has issued the following policies identified in the table below. Each year of coverage provided a limit of $100,000 per occurrence and $100,000 aggregate in property damage liability.

*Confirmed Policies*

| Policy No: | Effective Dates | Liab. Form | Cond. Form | Pollution Exclusion |
|---|---|---|---|---|
| CP383478 | 4/23/73 to 4/23/76 | C-10 1/73, | C1652 1/73, | C1599 1/72 |
| CP646638 | 4/23/76 to 4/23/79 | C-10 9/74*, | C1652 5/74*, | C1599 1/72* |
| CP646638A | 4/23/79 to 4/23/82 | C1138 4/78, | C1652 8/78, | C1599 1/72 |
| CP646638B | 4/23/82 to 4/23/85 | CI 138 4/78*, | CI652 8/78*, | CGL212C1 4/80* |

*Policy forms are unconfirmed. The noted forms are those that were likely to have been issued with the referenced policy.

Secondary evidence exists to suggest that the following policies were issued to LPA, and each of the policies listed in the table below is believed to have provided a limit of $100,000.00 per occurrence and $100,000 aggregate in property damage liability. The applicable forms noted are the forms most likely to have been issued with each policy.

This information, from secondary evidence, is unconfirmed and General reserves all of its rights to amend the policy information should the actual policy be revealed or if other policy information arises.

*Unconfirmed Policies*

| Policy No. | Effective Dates | Liab. Form | Cond. Form | Other | Pollution Excl |
|---|---|---|---|---|---|
| BLP232479 | 4/23/66 to 4/23/67 | C-10 1/65 | | | |
| CP160977 | 4/23/67 to 4/23/70 | C-10 1/67, | CF640 10/66, | CF646 10/66 | |
| CP276891 | 4/23/70 to 4/23/73 | C-10 1/67, | CF640 6/69, | CF646 1/67, | C-1599 11/70 |
| (effective 4/23/71) | | | | | |

30167240.2

Lori Houck Cora
October 2, 2009
Page 3

BP transaction as an example and assuming that all of the conditions precedent can be met, closing the transaction would provide numerous benefits to the harbor through the redevelopment plans proposed by BP, and would result in $6.5 million gross proceeds to LPA. This is less than an earlier sale that was lost due to concerns over environmental liabilities.

LPA started its operations as a co-op in 1951. In 1972, LPA purchased the bulk of this former lumber mill site, and later purchased a small parcel in 1973. As stated by many of the oldest, surviving members of LPA, a goal in purchasing the property was to have an asset that would one day be sold to benefit the members over and above the operations of the plywood mill. The net proceeds from LPA's operations during each fiscal year were allocated to the members of LPA in accordance with the ratio each member's hours worked ("Patronage Credits") bore to the total Patronage Credits of all members during that year. To capitalize the cooperative, LPA retained a portion of those credits ("Retains"). Members were individually required to pay tax on all of their share of these credits.

LPA ceased operations, for all intents and purposes, and adopted a plan of liquidation in December 2001. Leading up to that termination there were a number of difficult years that resulted in losses that forced those members who continued to work at the mill to lose some or all of their Retains.

LPA has been involved in litigation initiated by shareholders and former members regarding its continued operations, the sale of the property and the distribution of proceeds. Settlement of this litigation has in part been conditioned upon LPA's agreement to distribute proceeds in accordance with amended Bylaws. These are intended to balance the sacrifices made by all members who were trying to keep the mill viable in the hope that the property could be sold. At present there are 199 individuals with Retains (some which have been on the books since 1985) or shares of stock. Some members have died; the survivors are generally over 70 years of age.

As it stands using the BP transaction as a model, sale proceeds must be distributed as follows:

 A. $1.5 million to accrued liabilities and costs of sale;

 B. $3.2 million for share redemption and refund of Retains; and,

 C. $1.8 million to members with Retains on the books of LPA under a formula that recognizes the appreciation in the property during the time these members were working but not getting paid their Retains.

After fulfilling these obligations, there would be little or no sale proceeds for LPA to contribute to settlement. At best, LPA will work with the insurer to determine what authority they may extend towards achieving the settlement we seek.

Lori Houck Cora
October 2, 2009
Page 4

    We look forward to further communication and invite your questions about this information.

Very truly yours,

William P. Hutchison

WPH/dod