# Exhibit 2





Direct Phone
503-219-8133

Direct Facsimile
800-600-2138

October 30, 2009

E-Mail
hutch@robertskaplan.com

*VIA E-MAIL AND*
*FIRST CLASS MAIL*

Lori Houck Cora
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency
Region 10, ORC-158
1200 Sixth Avenue
Seattle, WA 98101

Re:   *Linnton Plywood Association/Environmental Protection Agency ("EPA")*
      **FRE 408 CONFIDENTIAL SETTLEMENT COMMUNICATION**

Dear Lori:

In our discussions regarding settlement of any of Linnton Plywood Association's (sometimes hereafter the "Association" or "LPA") CERCLA liability arising out of the Portland Harbor Superfund Site, a number of questions have been raised regarding LPA's status as a cooperative and LPA's assets as it relates to its ability to pay any settlement amount to EPA or the Lower Willamette Group ("LWG"). In my correspondence to you of October 2, 2009, I gave a broad description of LPA's answers in these two areas of inquiry. In this correspondence I hope to provide more specific information for your consideration.

- Formation. LPA started its operations as a coop in 1951. I have enclosed as Exhibit A a copy of LPA's Articles of Incorporation and Bylaws. A cooperative is owned and governed by its members. To be a member in LPA, an individual had to own one share of the Association's common stock. There were other criteria that had to be met to be a member which changed over time, including the requirement that a member had to be actively working at the Association's plywood operation or otherwise not be absent more than 45 days without approval. Shareholders per se did not have a vote in the operation or governance of the Association, only individuals who met all the criteria of membership were entitled to vote. After its initial issuance of approximately 200 shares of Common

Lori Houck Cora
October 30, 2009
Page 2

    Stock, the Association did not issue any further shares. These shares had a par value of $5,000; ownership of a share did not entitle the owner to any dividends or other distributions.

- Patronage. A cooperative normally does not issue dividends to its members or shareholders. In the case of a cooperative, the issuance of stock is usually not a viable alternative to raise capital because there are only so many patronage opportunities, or in LPA's case, only so many jobs available in its mill. Stock ownership was merely one of the criteria to be a member and to be able to work, not an investment. Workers were paid an hourly wage (an advance) which fluctuated with the market place but for the most part was lower than what a worker would earn at a more traditional mill. These wages were effectively advances of a member's share of any profits but subject to adjustment for losses from mill operations for each fiscal year. Each member's allocation of profit and losses was based upon their "patronage" (number of hours worked) in the Association's business. Patronage was determined by taking the hours worked by a member compared to the total hours worked by all members. In good years a member might make more than his peer at a standard mill operation but in bad years he might not make as much after incurring responsibility for a share of the losses.

- Retains. The Association capitalized its operations by allocating but not distributing all of its profits to members. So, when the Association "retained" some of these membership profits, the Association recorded in its books and records the profit earned, but not distributed to each individual member. The members paid income tax on the Retains as if they had been received. This single tax treatment, i.e., only the members (not the Association) paid tax; this is one of the unique features of a cooperative. Today, LPA has Retains on its books which go as far back as 1984.

- Purchase of the Land. LPA purchased its mill property in 1972. It was then supplemented by an additional purchase of a small portion in 1973. The history and use of the property is detailed in LPA's October 27, 2008, response to EPA's 104(e) Information Request and my memorandum to you which was forwarded on October 9, 2009. As you know, we believe that the information provided thoroughly documents the fact that LPA's contribution to the contaminants in the superfund site is de minimis.

- Termination of Mill Operations. LPA, like others in the wood industry, saw the Plywood market start to shrink in the early 90s. As far back as 1992, some of the members wanted to close the operation and liquidate. However, the majority voted to keep the mill operations going. Finally, in October 2001, the remaining

Lori Houck Cora
October 30, 2009
Page 3

working members voted to cease operations and liquidate the company's assets for distribution. Winding down the mill operations was not completed until approximately October 2002 and resulted in the Association absorbing considerable losses during that fiscal year. Consistent with cooperative principles, those losses were allocated to the members who had agreed to continue employment at the mill in order to facilitate the shutdown. Most of those members had Retains on the books which were then offset against the 2002 losses.

- October 2002 Bylaw Amendment. The Board of Directors and the remaining voting members of the Association believed it was inequitable for the members who had facilitated the shutdown to absorb all the losses and lose their Retains which would otherwise be payable when the Association liquidated its assets. They also realized that the existing Bylaws should be clarified to expressly comport with the then recently Court validated favorable tax treatment given to cooperatives upon the sale of its capital assets, and if unchanged could result in double taxation of proceeds received from the sale of the Association's assets. The membership in October 2002 voted to amend the Bylaws to provide that upon the sale of the Association's real property, the Retains that had been lost by those members who facilitated the liquidation in 2002 would be reinstated and be refunded by the Association upon liquidation. Further, the amendment provided that any proceeds available after first paying the outstanding debts of the Association, all Retains, and the book value of the shares, would be distributed to members who still had stock or retains, and who had worked between 1991 and 2001 according to their patronage credits.

- The Lawsuit. In July 2008 five former members of the Association filed a lawsuit in the Multnomah County Circuit Court alleging in part that the October 2002 Bylaw Amendment was improperly adopted. The Association moved to dismiss the complaint in its entirety. The parties were ordered to participate in mediation before the motion would be heard by the Court. As a result of the mediation, which took many long hours and hard work on both sides, the parties were able to reach a resolution. Because the claims asserted by plaintiffs were in the nature of a derivative action on behalf of all shareholders, the settlement required notice to all members and former members and an order from the Court approving the settlement. The hearing to approve the settlement took place on October 12 at which time the Court granted the Motion. The Court entered the Order Approving the Settlement on October 28, 2009. I have enclosed as Exhibit B a copy of the Court's Order.

- Stipulation for Settlement. The Stipulation accomplishes two primary goals which the Court believed was fair and consistent with cooperative principles and

Lori Houck Cora
October 30, 2009
Page 4

governing law. First, the Association must pay all of its third party creditors. Second, it must pay all the Retains to its members including reinstating and paying those Retains that were lost by members in 2002. Third, it must distribute to its shareholders the par value of the stock which was $5,000 per share. Lastly, the Association must distribute the remaining proceeds, if any, to its members, former members and shareholders based on the hours worked from 1984 to 2001. I have enclosed as Exhibit C a copy of the Stipulation for Settlement.

- LPA's Assets and Liabilities. Since ceasing operations, the Association's only income has been derived from lease revenue for a portion of the property. This income covers only a portion of the ongoing monthly recurring expenses of maintaining the property, let alone paying for a number of items including property taxes that have been incurred in the last seven years. The Association's last remaining principal asset is the real property and I have enclosed as Exhibit D a copy of the Association's 2000/2010 property tax statement. Were a sale transaction to be consummated with BP/ARCO, the gross amount of the sale would be $6.5 million. By the time this transaction could close, the Association will owe to third party creditors approximately $600,000.00. The cost to close the sale, commissions, etc. are expected to also be approximately $600,000.00. In addition to the accrued liabilities and costs of sale, the Association will expend approximately $3.2 million for share redemption and payment of Retains. The balance of approximately $2.1 million is to be distributed according to the court approved Stipulation for Settlement. Most of the members of the Association that would receive this distribution are well above retirement age. Some have passed away, and it is their heirs or their estates that would be the recipients of the distribution. While an argument could be made that some portion of this balance, which is the result of the property's appreciation, should be used to settle the claims with the EPA, it would be inequitable to deny these hardworking individuals this meager return on their contribution of years of sacrifice and hard work.

- Sale of the Real Property to BP. As you know, there is a pending sale transaction with BP which is on the verge of failing primarily because of LPA's inability to resolve the CERCLA claims of EPA and others. There is also the necessity of resolving the claims asserted by LWG. While BP does not require a release from the LWG claims, the magnitude of those claims, even though they are contingent, jeopardizes the Association's ability to make any payment to creditors, or distribution to members even if the sale were to close. We are presently in discussion with LWG regarding settlement, but they have indicated they are not willing to go forward unless LPA's issues with EPA are resolved first. Both BP and LWG have set a deadline of approximately November 30th to reach a

Lori Houck Cora
October 30, 2009
Page 5

resolution of these issues, otherwise, BP will withdraw from the sale and LWG will bring LPA back into its existing lawsuit against certain PRPs. This latter point is critical to our discussions with EPA because as noted in my correspondence of October 2nd and more specifically addressed below, LPA's limited insurance company coverage is a "wasting" policy and amounts spent in defense of the LWG claim will be deducted from available coverage.

- Insurance Coverage. In my October 2, 2009, correspondence I included a footnote quoting the "Reservation of Rights" language in Liberty Mutual's correspondence to LPA regarding coverage of the environmental claims, including EPA's. The remaining policy limits of approximately $1.5 million continue to deteriorate through cost and expenses associated with resolving EPA's and LWG's claims. Liberty Mutual may have grounds to deny coverage under one or more of those policies. I have enclosed as Exhibit E a specimen copy of SAFECO's (f/k/a General Insurance Company of America, n/k/a Liberty Mutual) policy. Their Reservation of Rights letter holds out the threat of their filing a Declaratory Relief Action to determine whether or not there is coverage under any of the policies for the periods in question.

- Settlement. We have maintained that LPA's responsibility, if any, for the contaminants in the Harbor is not more than de minimis. We recognize that neither EPA nor LWG is prepared to make a substantive evaluation of LPA's contribution or its possible share of the clean up cost. With this in mind we have focused our discussions on LPA's "ability to pay". As you can see from the information we have provided, the Association has very few resources from which to make any contribution towards settlement. The sale to BP is tenuous and LPA's ability to find a new buyer if BP withdraws is limited. Even if the sale to BP is successful, the proceeds must and should be distributed according to the Stipulation for Settlement as approved by the Court. Just as importantly for equitable reasons is the need, after 40 years, to return a small portion of their hard earned cash to LPA's members who worked hard and sacrificed.

- Monetary Settlement Offer. We have contacted Liberty Mutual for their approval of an offer of insurance proceeds to resolve EPA's claims. Despite their reluctance and continued reservation of rights, they have authorized us to propose the amount of $100,000 in settlement of EPA's claims.

It is important that we receive your response to this proposal quickly. As I have indicated, time is running out on all of the options available to LPA that would lead to some settlement contribution by the Association. We suggest that we establish a schedule and identify

Lori Houck Cora
October 30, 2009
Page 6

the ensuing steps that we will take in our effort to resolve this matter. In response to your request for additional documentation and information to assist EPA and ultimately the Department of Justice in considering this settlement, we attach a list of documents being furnished with this letter.

                                    Very truly yours,

                                    William P. Hutchison

WPH/dod
Enclosures (via first class mail only):

    Exhibit A - LPA's Articles of Incorporation and Bylaws
    Exhibit B - Court Order Approving Settlement
    Exhibit C - Stipulation for Settlement
    Exhibit D - LPA's 2009-2010 Property Tax Statement
    Exhibit E - Specimen Copy of Liberty Mutual's (General Insurance Company of
        America/Safeco) policy



File No. 49819

Current as of 5/17/54

# State of Oregon
## CORPORATION DEPARTMENT

### Certificate of Filing Articles of Association

**To all to whom these presents may come, greeting:**

**Know ye,** That whereas JOHN J. OLLEY, M. BECCARIA, LOREN S. HARRIMAN, H. C. ROGERS and MORRIS SCHULTZ

having presented Articles for a Cooperative Association organized and formed under and pursuant to the Laws of the State of Oregon, and paid the organization and annual license fees;

**Now, Therefore** I, **Maurice Hudson**, Corporation Commissioner of the State of Oregon, DO HEREBY CERTIFY, That said Articles of Association have been filed in the office of the Corporation Commissioner; that the name assumed by said association is

COLUMBIA PLYWOOD ASSOCIATION

the duration is Twenty-five years ; the enterprise, business, pursuit or occupation in which it proposes to engage is:

1. To produce, cultivate and harvest forestry products and to process, treat and manufacture these products into lumber, plywood and other commodities, and to engage in any activity in connection with the planting and cultivation of forestry products and the treatment, processing and manufacture thereof on the cooperative plan;

2. To develop and encourage the development of forestry products and to establish efficient systems for the processing and manufacture thereof into useful commodities and to develop methods of cooperative action on the part of the members of this association which will seem most likely to minimize costs of production and simplify the processes of marketing and distribution of forestry products;

In order that this association may perform the business and pursuits for which it is organized, it shall have the following powers:

1. To acquire by purchase, lease or otherwise, and to manage, operate and maintain timber and timber lands, mills, kilns, warehouses, machinery and other facilities and properties useful or necessary to the business pursuits of this association;

2. To borrow money and to mortgage or otherwise hypothecate any property of the association; to open bank accounts, to execute and deliver promissory notes, bonds and debentures, negotiable or otherwise, whether secured by a mortgage, deed of trust or otherwise;

3. To hold memberships in other organizations, to advertise its business and the commodities it has for sale; to open, maintain and conduct branch offices for business elsewhere in the State of Oregon and outside the State of Oregon;

4. To purchase or otherwise acquire and to hold, vote and own and to sell, assign, pledge or otherwise dispose of shares of capital stock, bonds or other securities and obligations of any other corporation or association;

5. To purchase or otherwise acquire and to cancel, hold, pledge, issue and re-issue shares of its own capital stock;

6. To acquire, hold, sell, encumber or otherwise deal in letters patent of the United States of America or of any other country; and

7. Generally, to carry out all business relating to the purposes and pursuits for which this association is organized and which may be calculated, either directly or indirectly, to promote the interests and convenience of the association and its members, and to have and to exercise all rights, powers and privileges which now are or which hereafter may be conferred upon this association by law, as fully and to the same extent as a corporation or person might or could do.

the authorized capital stock is: |common, 400  shares of the par value of $ 5,000 each;
|preferred, 200  shares of the par value of $ 2,500 each

The amount of each membership certificate shall be                    Dollars
($        ).

The preferences, rights, privileges, and restrictions of each class of stock are as follows:

A. COMMON STOCK shall be issued to and shall be held and owned by only by the members of this association who are actually engaged in the production of forestry products or the manufacture of the same into commodities. No member shall be issued nor shall any member own or hold more than two shares of said common stock. Dividends may be paid on said stock as determined from time to time by the Directors of this association, said dividends not to exceed five percentum per annum of the consideration for which said stock is issued. Each member holding common stock shall have one vote, but shares of stock as such shall not be voted.

B. PREFERRED STOCK shall be issued to and owned and held by patrons of this association, but members shall also be entitled to own and hold such preferred stock. Said stock shall have a preference as to patronage dividends which shall be paid annually in a sum equal to eight percentum per annum of the consideration for which said stock is issued. The holders or owners thereof shall not be entitled or permitted, either directly or indirectly, to participate in the earnings or savings hereof, upon dissolution or otherwise, beyond said dividends. Patrons holding preferred stock shall have no vote or voice in the management of the business affairs of this association.

Both the Common Stock and the Preferred Stock may be transferred only on the books of this association and the Preferred Stock shall be subject to redemption as indicated on the certificates.

the date of filing its Articles of Association is the  2nd  day of  February , A.D. 19 51;
the location of its principal office is in the  City  of  Portland  , in the
County of  Multnomah  , State of Oregon; the amount of the organization fee paid is  Ten and 00/100  ---($  10.00  ) Dollars and the amount of annual license fee paid is  Forty and 83/100
($  40.83  ) Dollars for the current fiscal year ending June 30, 19  51.

**In Testimony Whereof,** I have hereunto set my hand and affixed hereto the seal of the Corporation Department of the State of Oregon at Salem.

this  2 : day of  February  19  51

SEAL

ARTICLES OF ASSOCIATION

OF

COLUMBIA PLYWOOD ASSOCIATION

KNOW ALL MEN BY THESE PRESENTS: That we, JOHN J. OXLEY, LOREN S. HARRIMAN, L. C. ROGERS, N. BECCARIA and MORRIS SCHULTZ, whose names are hereunto subscribed, do hereby associate ourselves together for the purpose of forming a non-profit cooperative association under and by virtue of the provisions of Chapter 5, Title 77, O.C.L.A., 1940:

I

The name of this association shall be COLUMBIA PLYWOOD ASSOCIATION.

II

The principal office and place of business of this association shall be at the City of Portland, County of Multnomah, State of Oregon, and its postoffice address at Portland, Oregon.

III

The duration of this association shall be twenty-five years, ending December 31, 1976.

IV

The purpose of this association and the enterprise, business and pursuit in which it proposes to engage is:

1. To produce, cultivate and harvest forestry products and to process, treat and manufacture these products into lumber, plywood and other commodities, and to engage in any activity in connection with the planting and cultivation of forestry products and the treatment, processing and manufacture thereof on the cooperative plan;

2. To develope and encourage the developement of forestry products and to establish efficient systems for the processing and manufacture thereof into useful commodities and to develope methods of cooperative action on the part of the

-1-

members of this association which will seem most likely to minimize costs of production and simplify the processes of marketing and distribution of forestry products;

V

In order that this association may perform the business and pursuits for which it is organized, it shall have the following powers:

1. To acquire by purchase, lease or otherwise, and to manage, operate and maintain timber and timber lands, mills, kilns, warehouses, machinery and other facilities and properties useful or necessary to the business pursuits of this association;

2. To borrow money and to mortgage or otherwise hypothecate the property of the association; to open bank accounts, to execute and deliver promissory notes, bonds and debentures, negotiable or otherwise, whether secured by a mortgage, deed of trust or otherwise;

3. To hold memberships in other organizations, to advertise its business and the commodities it has for sale; to open, maintain and conduct branch offices for business elsewhere in the State of Oregon and outside the State of Oregon;

4. To purchase or otherwise acquire and to hold, vote and own and to sell, assign, pledge or otherwise dispose of shares of capital stock, bonds or other securities and obligations of any other corporation or association;

5. To purchase or otherwise acquire and to cancel, hold, pledge, issue and re-issue shares of its own capital stock;

6. To acquire, hold, sell, encumber or otherwise deal in letters patent of the United States of America or of any other country; and

7. Generally, to carry out all business relating to

-2-

the purposes and pursuits for which this association is organized and which may be calculated, either directly or indirectly, to promote the interests and convenience of the association and its members, and to have and to exercise all rights, powers and privileges which now are or which hereafter may be conferred upon this association by law, as fully and to the same extent as a corporation or person might or could do.

VI

The total amount of the capital stock of this association shall be $2,500,000, consisting of 400 shares of Common Stock of the par value of $5,000 each, and 200 shares of Preferred Stock of the par value of $2,500 each. The privileges and restrictions attached to the ownership of said stock are as follows:

A. COMMON STOCK shall be issued to and shall be held and owned by and only by the members of this association who are actually engaged in the production of forestry products or the manufacture of the same into commodities. No member shall be issued nor shall any member own or hold more than two shares of said common stock. Dividends may be paid on said stock as determined from time to time by the Directors of this association, said dividends not to exceed five percentum per annum of the consideration for which said stock is issued. Each member holding common stock shall have one vote, but shares of stock as such shall not be voted.

B. PREFERRED STOCK shall be issued to and owned and held by Patrons of this association, but members shall also be entitled to own and hold such preferred stock. Said stock shall have a preference as to patronage dividends which shall be paid annually in a sum equal to eight percentum per annum of the consideration for which said stock is issued. The holders or owners thereof shall not be entitled or permitted, either directly or indirectly, to participate in the earnings or savings hereof, upon dissolution

-3-

or otherwise, beyond said dividends. Patrons holding preferred stock shall have no vote or voice in the management of the business affairs of this association.

Both the Common Stock and the Preferred Stock may be transferred only on the books of this association and the Preferred Stock shall be subject to redemption as indicated on the certificates.

IN WITNESS WHEREOF, We have hereunto set our hands and seals this 30th day of January, 1951.

John J. Oxley (SEAL)

M Beccaria (SEAL)

Loren S Harriman (SEAL)

L. C. Rogers (SEAL)

Morris Scholten (SEAL)

STATE OF OREGON ) ss.
COUNTY OF MULTNOMAH )

THIS CERTIFIES, That on this 30th day of January, 1951, before me the undersigned, personally appeared the within named JOHN J. OXLEY, LOREN S. HARRIMAN, L. C. ROGERS, M. BECCARIA and MORRIS SCHOLTEN, who are known to me to be the identical persons named in and who executed the foregoing articles of association in triplicate, and acknowledged to me that they executed the same freely and voluntarily for the uses and purposes therein mentioned.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year last above written.

George E Burns

Notary Public for Oregon
My Commission expires May 29, 1951

-4-



Corporation
No. 49819

# State of Oregon
## CORPORATION DEPARTMENT

### Certificate of Filing Supplementary Articles of Association

**To All to Whom These Presents May Come, Greeting:**

**Know Ye,** That whereas DAVE J. BOLAND, HARRIS J. CARMAN, MORRIS J. SCHOLTEN, KERMIT PARSONS and HAROLD T. LIVENGOOD

Directors of    COLUMBIA PLYWOOD ASSOCIATION

a cooperative association organized and formed under and pursuant to the laws of the State of Oregon, having presented Supplementary Articles of Association, and paid the filing fee, in accordance with the Corporation Laws of the said state providing for the licensing of Domestic Cooperative Associations;

**Now, Therefore, I, Maurice Hudson,** Corporation Commissioner of the State of Oregon, DO HEREBY CERTIFY, that said

### Supplementary Articles of Association

have been filed in the office of the Corporation Commissioner the 20th day of April .19 51, amending Article I of the articles of association of this corporation, to read as follows:

ARTICLE I

The name of this association shall be LINNTON PLYWOOD ASSOCIATION.

I Further Certify, that said Supplementary Articles of Association were accompanied by fee of Five Dollars ($5.00).

In Testimony Whereof, I have hereunto set my hand and affixed hereto the seal of the Corporation Department of the State of Oregon, at Salem, this 20th day of April, 1951.

Corporation Commissioner

STATE PRINTING DEPT.

# SUPPLEMENTARY ARTICLES OF ASSOCIATION

OF

...... COLUMBIA PLYWOOD ASSOCIATION ......
(Use the old name here)

WHEREAS at a meeting of the members of the above named association, duly and regularly called and held, at ..1:00. o'clock.. p.m., the ..15th day of ...April,........... 19 51 at .....319. Southwest. Pine. Street, Portland, Oregon, ...............................................................

in the City of ...Portland..............................................................................................................................

there was presented and adopted by a majority vote of the members present or represented by ballot a resolution authorizing the directors of the said association to execute and file supplementary articles. ..changing the name of this association for the reason that it
(State the purpose thereof)
was similar to the name of another firm engaged in the same business
as is this association ..................................................................................................................................

NOW, THEREFORE, We...... .KERMIT. PARSONS, .MORRIS.SCHOLTEN, DAVE L..
HARRIS
BOLAND,..HARRY..J..CARMAN and .HAROLD..T..LIVENGOOD......................................................

being all of the directors of ........... COLUMBIA.PLYWOOD ASSOCIATION........................................

a cooperative association, and being duly authorized by the resolution aforesaid, do hereby execute and acknowledge supplementary articles of association, amending Article    I    ................ of the original articles of association of this corporation, to read as follows:..

ARTICLE. I.

The name of this association shall be LINNTON PLYWOOD ASSOCIATION

IN WITNESS WHEREOF, we have hereunto set our hands and seals this ....16th.... day of ....APRIL........, A.D. 19.51.

*[signatures]*
Alex Garland
Harry J. Garland
Marilyn Garland
Robert Thurston
Harold T. Levengood

STATE OF OREGON,
County of Multnomah } ss.

THIS CERTIFIES that on this 16th day of April, A. D. 1951, before me, the undersigned, a Notary Public in and for said county and state, personally appeared KERMIT PARSONS, MORRIS SCHOLTEN, DAVE J. BOLAND, HARRIS - HARRY J. CARMAN and HAROLD T. LIVENGOOD

known to me to be the identical persons named in and who executed the foregoing supplementary articles of association, and acknowledged to me that they executed the same freely and voluntarily for the uses and purposes therein mentioned.

IN TESTIMONY WHEREOF, I have hereunto set my hand and Notarial seal, the day and year last above written.

George E. Binns
NOTARY PUBLIC FOR OREGON

My commission expires May 20, 1951

[Notarial Seal]

STATE OF OREGON,
County of Multnomah } ss.

I, KERMIT PARSONS, being first duly sworn, depose and say: That I am the duly elected, qualified and acting secretary of COLUMBIA PLYWOOD ASSOCIATION (LINNTON PLYWOOD ASSOCIATION), a cooperative association; that at a meeting of the members of said association held on the 15th day of April, 1951, pursuant to a notice to each member thereof, mailed more than ten days prior thereto, specifying the proposed amendments to the articles of said association, a majority of the members present or represented by ballot and by vote duly taken authorized the board of directors to file the foregoing Supplementary Articles of Association, which in all things conform to said notice and authorization of said members, as I verily believe.

Kermit Parsons
KERMIT PARSONS

Subscribed and sworn to before me this 16th day of April, 1951.

George E. Binns
NOTARY PUBLIC FOR OREGON

My commission expires May 20, 1951