# Exhibit 7



RECEIVED
JUL 0 1 2009
Environmental
Cleanup Office

Direct Phone
503.219.8133

Direct Facsimile
800.600.2138

E-Mail
butch@robertskaplan.com

May 29, 2009

**VIA FEDERAL EXPRESS**

Dan Opalski
Director, Office of Environmental Cleanup
U.S. Environmental Protection Agency, Region 10
1200 6th Avenue, M/S ECL-111
Seattle, WA 98101



USEPA SF
1309314

    Re:    Linnton Plywood Association
            Portland Harbor Superfund Site Opportunity

**CONFIDENTIAL SETTLEMENT COMMUNICATION (FRE 408)**

Dear Mr. Opalski:

    As counsel to and on behalf of Linnton Plywood Association, an Oregon cooperative corporation ("LPA"), we submit this request for EPA's early determination (at the reasonably earliest possible time) that LPA and its property, known as 10504 NW St. Helens Road, Portland, Oregon, as shown on Exhibits A-1 and A-2 ("Property"), are eligible for a *de minimis* settlement of any alleged liability arising out of the Portland Harbor-Willamette River ("Portland Harbor") Superfund Site. This determination and settlement ("Settlement") with EPA will allow LPA to proceed with its pending sale transaction with BP West Coast Products LLC, a Delaware limited liability company ("BP") which will result in the redevelopment of the Property consistent with the goals of EPA's ER3 program and will allow the release of life savings to LPA's 199 members. As stated previously, BP is not willing to complete the transaction unless it is clear that it will not assume any liability because of past or current operations on the Property. BP's purchase of the Property is supported by a wide array of interests because of the environmental, social and economic benefits it will provide, as will be described in this letter.

    The purpose of this submission is to establish a foundation and mutually agreed path forward for EPA's consideration. To accomplish this purpose, this submission: (a) includes a description of LPA's manufacturing and regulatory history, (b) proposes a method of analysis to demonstrate LPA's *de minimis* contribution of contaminants to Portland Harbor sediment, and (c) describes the benefits that an early *de minimis* Settlement would provide to the community and the environment. At this point, LPA seeks EPA's concurrence that the path forward described in this letter provides an acceptable basis to proceed to determine whether LPA

30162289.12

601 SW Second Avenue, Suite 1800   Portland, Oregon 97204   |   PHONE: 503.221.0607   |   FAX: 503.221.1510   |   WEB: robertskaplan.com

May 29, 2009
Page 2

qualifies for a *de minimis* Settlement that will account for its liability for response costs for the Portland Harbor Superfund Site.

(A)   **Past and Current Operations on the Property and the Property's regulatory history reveal nominal potential contaminant sources and pathways to the River.**

  1.   **Manufacturing processes and potential impacts.** LPA's Property has had a long but relatively simple history of industrial use. The Property was first developed as the Clark and Wilson Lumber Company[1], which operated from 1894 to 1947, when significant portions of the mill burned. LPA began operation in the surviving sawmill building in 1951, and operated on the northern portion of the Property until 2001, when it closed because of changing market conditions[2]. The southern portion of the Property was unused from 1947 until 1994 when LPA leased the land for use as a sand transfer site, which involves slurrying clean sand ashore from a barge and trucking the sand offsite[3]. The sand transfer operation is still active.

  These uses of the Property over the past 100 years have involved activities which have had relatively little potential impact on the Willamette River and its sediments. In earlier days, the sawmill converted logs to lumber, with wood waste (used for fuel) being the byproduct[4]. LPA's plywood operation was also timber-based, and from 1951 to 1992 LPA cut logs to length in the River and moved them by conveyor into the plant, where they were peeled into veneer[5]. The veneer was dried in kilns fired by sawdust and natural gas. The veneer was then glued together with a phenol-formaldehyde glue mixed on the Property from formaldehyde, sodium hydroxide and soda ash (none of which contained polynuclear aromatic hydrocarbons ("PAHs"), metals, polychlorinated biphenyls ("PCBs")[6], or other constituents identified as contaminants in the sediments offshore from LPA). Plywood was shipped from the plant in trucks and by rail[7]. No glue waste was generated, as excess glue was mixed with water and recycled back into a mixing tank. Wood waste was sold for fuel[8].

  Other products used in the plywood manufacturing process included water-based paint (used for painting plywood edges) and light petroleum hydrocarbons (such as diesel fuel)[9]. Four underground storage tanks were removed in the 1990s with clean closure from the Oregon Department of Environmental Quality ("DEQ")[10]. Several small soil removals were conducted in 2003; one to remove accumulated abrasive material used in sharpening lathe blades[11], and one to remove soil containing petroleum hydrocarbons and metals from beneath a stormwater outfall (which drained an outdoor steam cleaning pad and a small paved area at the North side of the plant)[12]. The soil was tested and taken to a municipal waste landfill. Wood ash residue from the sawdust-fired veneer kiln was trapped in an air pollution control device, and the residue (about one cubic yard per month) was initially placed onsite[13]. Material generated after 1997 was shipped to a municipal waste landfill[14]. Material remaining onsite was tested in 2007, found to be benign, and with DEQ approval, left onsite[15].

  The sand operation on the southern portion of the Property did not store fuels onsite until recently, when small quantities of fuel and oils were brought on the

30162289.12

May 29, 2009
Page 3

Property, within secondary containment, for equipment maintenance[16]. The northern portion of the Property is used, beginning in 1997 and continuing to the present, for the storage of steel rail and track hardware[17]. The plant building and paved portions near it were also leased after the plant closed in 2001 to several entities for the temporary storage of forest products equipment, pallet wood and miscellaneous equipment[18]. Current stormwater controls were maintained during this period[19].

2. **Regulatory history.** LPA operated under relevant permits for its operations, including an air discharge permit (veneer dryer stack), a stormwater permit (outfalls), and a dredging permit (clearing wood debris from its in-water log processing area)[20].

LPA reported a spill of about 25 gallons of a diesel-like petroleum hydrocarbon to a storm drain in 1995[21]. The spill created a sheen on the River which quickly dissipated and no further regulatory action was taken.

LPA entered DEQ's Voluntary Cleanup Program in 2000, to assess its potential contribution of contamination to Portland Harbor. In 2004, DEQ concluded, with EPA concurrence, that LPA was not a current or likely future source of contamination to the River. DEQ also determined that LPA's inclusion in DEQ's confirmed release list was not warranted. Further investigation and evaluation was conducted in 2007 to support a determination of "no further action" ("NFA") for the Property, which is expected from DEQ by June 15, 2009[22].

3. **Potential Contaminant sources and pathways.** Historical uses of the Property did not include chemicals or processes likely to release significant quantities of hazardous substances. Several environmental investigations have been conducted on the Property, and the results of these studies validates the logical conclusion that the Property has had a nominal impact on River sediment.

The historical operations on the Property had no process or industrial discharges to the River. The only direct contact with the River by plant equipment was the conveyor belt, which operated from 1951 to 1992, moving logs from the River up to the veneer lathe[23]. Potential contaminants associated with the Property include the following:

- Small quantities of petroleum hydrocarbons (and by association the small PAH component of these products) associated with miscellaneous oils (e.g., hydraulic fluid), lubrication greases, fuels, and a diesel-grade oil used for some plywood products to keep wood forms from adhering to concrete[24];

- Very small quantities of volatile organic compounds ("VOCs") and semi-volatile organic compounds ("SVOCs") potentially associated with equipment maintenance, cleaning and repair[25];

- Potential though unlikely releases of PCBs associated with onsite electrical transformers[26]; and,

- Metals from general Property operations and zinc from stormwater runoff from a galvanized metal roof[27].

May 29, 2009
Page 4

      Environmental investigations have focused on three potential pathways to the River: (1) entrainment and transport of contaminated soils in stormwater discharge, (2) riverbank soils in areas where stormwater outfalls discharge, and (3) the discharge of groundwater which may have been affected by historic releases. Constituents detected in groundwater include low levels of metals (below DEQ ecological risk screening criteria) and low levels of petroleum hydrocarbons in an unfiltered sample near the maintenance shop area[28]. A petroleum hydrocarbon plume on the southwestern corner of the Property is being addressed by the adjoining property owner with DEQ oversight[29].

      LPA conducted a focused evaluation of ecological risk using sediment data reported by the Lower Willamette Group ("LWG")[30]. This evaluation showed an absence of unacceptable ecological risk, a conclusion corroborated by bioassay testing conducted by the LWG, which showed high organism survival rates and low ecological risk[31].

**(B)**    **The apportionment framework described below should establish LPA's less than 1/10th of 1% *de minimis* apportioned share of responsibility for Portland Harbor CERCLA Response Costs.**

      With EPA's acknowledgment that our suggested path forward provides a reasonable basis to proceed, we propose to provide our detailed analysis in a second supporting submission in the July-August timeframe. This submission will also include any response to data or information requests received from EPA. This analysis will be based on both qualitative and quantitative assessments of LPA's potential and apparent contribution to contamination in Portland Harbor.

      We understand that the Remedial Investigation report prepared by the LWG will be received by EPA later this summer. When this report is received, it can be used to validate LPA's analysis. However, LPA suggests that with currently-available data it is possible to do two things:

- Demonstrate that past operations on LPA's Property had *de minimis* (<0.1%) contributions to contamination in Portland Harbor; and
- Estimate that contribution for purposes of discussing a Settlement with EPA in advance of the Remedial Investigation report. The methodology needed to accomplish this task is simplified by the fact that there were no process-related discharges to the Willamette River from past operations on the Property.

An estimate of any contribution of contaminants from past operations on the Property can be accomplished using methodology similar to that used for other multi-party Superfund sediment sites, and will include the following steps:

(1)    Inventory the contaminants of interest ("COIs") detected on the Property and in the adjacent sediments;

(2)    For those COIs detected both upland and in nearby sediments, compare the sediment COI concentrations adjacent to the Property with potential risk-based criteria and with concentrations measured in sediments elsewhere in Portland Harbor;

May 29, 2009
Page 5

 (3) Consider toxicity data for sediment adjacent to the Property and document the fact that active remediation is not required for the sediments adjacent to the Property;

 (4) Assess any potential contribution to harbor-wide contamination by considering: (a) potential on-site sources (focusing on the magnitude and nature of the use of COIs on the Property) versus off-site sources, (b) potential on-site and off-site pathways to the River, and (c) the distribution (i.e., depth and volume) of sediment contamination relative to potential pathways to the River;

 (5) Provide an estimate of the contribution from operations on the Property to Portland Harbor contamination, with a transparent description of all calculations and assumptions used; and

 (6) Review the *de minimis* calculations with EPA.

LPA's apportionment of liability based on the outline of steps described above will comply with the U.S. Supreme Court's recent decision in *Burlington Northern & Santa Fe Railway Co., et al. v. United States*, 129 S.Ct. 1870, 2009 U.S. LEXIS 3006 (2009). In that case, the Court concluded that where a defendant provides evidence of a "reasonable basis" for apportioning liability, even if such an apportionment is less than exact or fully precise, the defendant may avoid the imposition of "joint and several liability" under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). *Id. at *31.* Thus, apportioned liability rather than joint and several liability should be applied where the harm is legally divisible.

In *Burlington Northern*, the Court found that the following factors provided a reasonable basis to apportion liability to the railroad:

 (1) The percentage of the overall site that was owned by the railroads;

 (2) The percentage of time that the railroads leased the parcel to the facility operator in relation to the total time period the facility operated; and,

 (3) The percentage of chemicals that were found to be attributable to the parcel owned by the railroads.

The method of apportioning liability that LPA proposes is much more precise and will provide a much more defensible method than the Court found acceptable in *Burlington Northern*. Thus, we are hopeful that EPA will agree that the method proposed will provide a reasonable basis to proceed to determine LPA's share of liability for Portland Harbor response costs.

May 29, 2009
Page 6

**(C)    This Settlement is consistent with EPA's guidance and is in the public interest.**

Based on our evaluation that any releases from LPA's Property are minimal and any response costs associated with the Property are minor in relation to the Portland Harbor Site, we believe LPA is eligible for a *de minimis* early Settlement of CERCLA claims pursuant to 42 USC § 9622(g)(1)(A). We believe all of the elements of this Section of CERCLA will be satisfied:

(1)   **Response costs are minor.** Based on present information described above, and pending the results of the Remedial Investigation, response costs arising from the Property appear to be very minor.

(2)   **The volume of hazardous substances contributed is minimal.** This standard, as applied, does not require precise figures and may include a range. Streamlined Approach for Settlements with *De Minimis* Waste Contributors under CERCLA § 122 (g)(1)(A), dated July 30, 1993, (the "1993 Guidance"), p. 2. There is no bright-line percentage for determining whether a contribution is "minimal". The determination is site-specific. *Id.* As of the 1993 Guidance, "minimal" contributions ranged from .07% to 10.0% of the total volume of hazardous substances released at a facility, with a mean of 1.059% and a median of 1.0%. *Id.* at n. 5. The Property has contributed less than 0.1% to Portland Harbor's contamination.

(3)   **The hazardous effects of the substances contributed are minimal.** If the hazardous substances released by a defendant "are not significantly more toxic and not of significantly greater hazardous effect than other hazardous substances at the facility", then the "toxic or other hazardous effects" of the released contamination will be deemed minimal. 1993 Guidance, at p. 2 (internal quotation marks and citations omitted). The de-listing and the imminent issuance of DEQ's NFA, along with the LWG's and EPA's Remedial Investigation all show that any hazardous substances released from the Property are less hazardous or toxic than other hazardous substances at the Portland Harbor Site.

(4)   **The Settlement is practicable and in the public interest.** The proposed *de minimis* Settlement is practicable, and in the public interest, as demonstrated by the support of the City, the Portland Development Commission, the Port of Portland, the Linnton Community, and the Natural Resource Trustees.

Methodologies for Implementation of CERCLA § 122 (g)(1)(A) *De Minimis* Waste Contributor Settlements, dated December 20, 1989; *United States v. Borough of Lemoyne*, 1994 U.S. Dist. LEXIS 21533, *13 (M.D. Pa. Nov. 17, 1994) (applying criteria).

By entering into an early *de minimis* Settlement with LPA, EPA not only achieves a fair settlement of CERCLA response cost claims, obtaining payment of LPA's response costs, but EPA also satisfies a critical requirement for the redevelopment of LPA's Property as desired by EPA and all federal, state and local stakeholders, consistent with the public interest. As stated earlier, LPA's Settlement with EPA is supported by wide array of interests, including the City of

30162289.12

May 29, 2009
Page 7

Portland, the Portland Development Commission, the Port of Portland, the Linnton community, and the Natural Resource Trustees.

(D) **The redevelopment of the Property that would result from this Settlement and LPA's transaction with BP would meet the goals of EPA's ER3 program and the Portland Harbor Natural Resource Trustees ("the Trustees").**

EPA's Settlement with LPA is needed for LPA to proceed with its sale of the Property to BP. A conceptual site plan showing how BP intends to redevelop the Property is attached as Exhibit B. If the sale of the Property closes, BP's plan to redevelop the Property will satisfy a number of interests. First, BP's redevelopment plan will preserve for ecological uses a significant portion of the Property's undeveloped shoreline. The Portland Harbor Natural Resource Trustees have expressed a high level of interest in preserving and enhancing the Property's shoreline to provide additional near shore habitat for the Harbor's threatened and endangered wildlife. BP's redevelopment plan will also include a significant amount of open green space which local residents and the City of Portland find appealing. Finally, the plan will eventually return the upland northern and southern portions of the Property to productive industrial use, consistent with the land use goals of the Port of Portland and the Portland Development Commission.

BP's plan to redevelop the Property satisfies ER3's core mission which is "to establish the next generation of environmental protection--one that proactively prevents and/or reduces contamination in the developed environment". BP's plan to use a significant amount of the Property for open space and preserve the River's natural shoreline will satisfy ER3's primary goal, as will using the remaining upland portion of the Property for industrial use that will comply with state and local land use and environmental laws. Industrial use of the Property will also create additional jobs for the community and will provide economic development where infrastructure already exists for such development. We believe LPA's sale of the Property to BP and BP's redevelopment plan for the Property provides an exciting opportunity for Region 10 to showcase how it can help to facilitate the redevelopment of a unique and under-utilized parcel of property within the Portland Harbor Superfund Site that will satisfy multiple interests and ER3's goals.

(E) **LPA's remaining members need this Settlement to permit their realization of the social and economic benefits they have earned.**

LPA ceased operating on a cooperative basis in 2001. Since that time, its efforts have been focused on an orderly liquidation of its assets which has been expensive and we hope will culminate with the sale of the Property soon. LPA has addressed environmental issues during this period and sought a purchaser for the Property.

Over the course of LPA's 50 years as a worker-owned plywood manufacturing cooperative, its working members have capitalized the cooperative out of their taxable earnings. Normally those contributions would have been distributed back to the members over time. But a significant portion of the capital contributions have not been returned to LPA's working members, and will remain unavailable until the Property is sold. Returning those funds and the proceeds realized from the proposed sale of the Property to the 199 remaining members will help

30162289.12

May 29, 2009
Page 8

alleviate the financial hardship many of them are experiencing. With an average member age of over 65 years and 35 members who are over 80 years old, it is possible that some members will not live long enough to receive proceeds due them unless the Property is sold soon.

## CONCLUSION

The requested Settlement is supported by the law and underlying facts pertinent to the Property. These include the Property's historic use, the plywood manufacturing process and constituents utilized, the Property's regulatory history (including upland source de-listing and DEQ's anticipated NFA determination), and LWG's and EPA's scientific sediment analytical and characterization results.

In addition, because the Property is immediately below the City of Portland's Forest Park and has the longest vegetated shoreline within the Portland Harbor Superfund Site, it affords the Natural Resource Trustees a unique species refugia and mitigation opportunity which is enhanced by BP's carefully balanced redevelopment plan. In the near future, LPA and BP plan to meet with the Trustees to explore how BP's redevelopment plan might be coordinated with the Trustees' plans for Portland Harbor and explore settlement of any claims the Trustees' may have against LPA. Returning the Property to economic productivity in an environmentally sensitive manner is consistent with EPA's ER3 goals and is supported by the Linnton Community, the Port of Portland and the City of Portland (and the Portland Development Commission) under their Harbor Ready (ReDi) Initiative. Finally, a favorable EPA determination would permit LPA's 199 working members to recover their earnings in their lifetime.

We respectfully request EPA's consideration of LPA's proposed path forward to apportion its CERCLA liability for Portland Harbor response costs. We look forward to EPA's response after you've had a chance to consider this submission. Because I am traveling out of the country until June 26, 2009, during my absence please contact my partner, Elia Popovich at 503-221-7303 or epopovich@robertskaplan.com. Please note our new firm name and, for future reference, my new email address hutch@robertskaplan.com.

Very truly yours,

William P. Hutchison

WPH/dod
cc: Kristine Koch – Project Manager, Office of Environmental Cleanup
    Lori Houck Cora – Assistant Regional Counsel

May 29, 2009
Page 9

---

**References**

EPA 104(E) Response – Linnton Plywood Association, Portland Harbor, Portland, Oregon. Prepared by CH2M HILL. October 23, 2008 ("LPA, 2008").

[1] (LPA, 2008) Questions 8 and 11
[2] (LPA, 2008) Question 20
[3] (LPA, 2008) Questions 11 and 20
[4] (LPA, 2008) Question 11
[5] (LPA, 2008) Question 20
[6] (LPA, 2008) Question 21
[7] (LPA, 2008) Question 21
[8] (LPA, 2008) Question 21
[9] (LPA, 2008) Question 21
[10] (LPA, 2008) Questions 13, 62, 64, and 72
[11] (LPA, 2008) Questions 16, 21, 36, 39, 40, 62, 63, 64, and 72
[12] (LPA, 2008) Questions 63, 64, and 72
[13] (LPA, 2008) Questions 13, 16, 21, 26, 36, and 62
[14] (LPA, 2008) Questions 26, 39, and 40
[15] (LPA, 2008) Questions 16
[16] (LPA, 2008) Questions 28 and 32
[17] (LPA, 2008) Questions 6 and 20
[18] (LPA, 2008) Question 6
[19] (LPA, 2008) Question 13
[20] (LPA, 2008) Question 52
[21] (LPA, 2008) Questions 18, 22, 24, 51, 58, 60, 62, 64, and 67
[22] http://www.deq.state.or.us/lq/ECSI/ecsidetail.asp?seqnbr=237[3]
[23] (LPA, 2008) Questions 22 and 23
[24] (LPA, 2008) Questions 21, 32, and 34
[25] (LPA, 2008) Questions 34 and 64
[26] (LPA, 2008) Questions 22, 36, 47, 48, 51, 60, 62, and 67
[27] (LPA, 2008) Questions 18 and 63
[28] (LPA, 2008) Questions 65, 66, and 71
[29] (LPA, 2008) Questions 6, 13, and 66
[30] (LPA, 2008) Questions 15 and 71
[31] http://mapping2.orr.noaa.gov/website/portal/portland/pdfs/figure_ToxData.pdf

May 29, 2009
Page 10

**EXHIBIT A-1**
**Diagram of the Property**



30162289.12

May 29, 2009
Page 11

**EXHIBIT A-2**
**Diagram of the Property**



30162289.12

May 29, 2009
Page 12

**EXHIBIT B**
**Conceptual Plan for the Proposed**
**Redevelopment of the Property**



30162289.12