# Exhibit 17

RECEIVED

0! OCT 23 AM 8: 14

HEARINGS CLERK
EPA--REGION 10

1

2

3

4    **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY REGION X**

5
6
7    **IN THE MATTER OF:**                                          )
8                                                                    )
9    **Portland Harbor Superfund Site,**                             )
10                                                                   )
11   **ATOFINA Chemicals, Inc., Chevron U.S.A. Inc.,**               )
12   **Gunderson, Inc., Northwest Natural Gas,**                     )
13   **City of Portland, Port of Portland,**                         )
14   **Time Oil Co., Tosco Corporation,**                            )
15   **Union Pacific Railroad Company,**                             )
16                                                                   )
17   **RESPONDENTS,**                                                )
18                                                                   )
19   **Proceeding Under Sections 104, 122(a), and**                  )
20   **122(d)(3) of the Comprehensive**                              )     **U.S. EPA Docket Number**
21   **Environmental Response, Compensation,**                       )     **CERCLA-10-2001-0240**
22   **and Liability Act (CERCLA), as amended,**                     )
23   **42 U.S.C §§ 9604, 9622(a), 9622(d)(3).**                      )
24   ─────────────────────────────────────────────)
25
26
27                   ADMINISTRATIVE ORDER ON CONSENT
28            FOR REMEDIAL INVESTIGATION/FEASIBILITY STUDY
29
30                          **II. INTRODUCTION**

31          1.    This Administrative Order on Consent (Consent Order or Order) is entered into

32   voluntarily by the United States Environmental Protection Agency (EPA) and the above-captioned

33   Respondents.  This Consent Order concerns the preparation of and performance of, and reimbursement

34   for all costs incurred by EPA in connection with a Remedial Investigation and Feasibility Study (RI/FS)

35   for the Portland Harbor Superfund Site (Site) in the state of Oregon.

36

## II. JURISDICTION

1.       This Consent Order is issued under the authority vested in the President of the United States by Sections 104, 122(a), and 122(d)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9622(a), and 9622(d)(3) (CERCLA). This authority was delegated to the Administrator of EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (1987), and further delegated to Regional Administrators by EPA Delegation No. 14-14-C. This authority has been redelegated by the Regional Administrator to the Region X Director, Environmental Cleanup Office, and Unit Managers thereunder. This Consent Order is further supplemented by authority vested in the President of the United States by Section 311(e) of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(e), as amended (CWA), and Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq. This authority has been delegated to the Administrator of EPA by Executive Order No. 12777, 58 Fed. Reg. 54757 (1991), and further delegated to the Regional Administrators by EPA Delegation Nos. (2-85, 2-89), and redelegated by the Regional Administrator to the Region X Director, Environmental Cleanup Office.

2.       Respondents agree to undertake all actions required by this Consent Order.  In any action by EPA or the United States to enforce this Consent Order, Respondents consent to and agree not to contest the authority or jurisdiction of EPA to issue or enforce this Consent Order, and agree not to contest the validity of this Order.

### III.PARTIES BOUND

1.      This Consent Order shall apply to and be binding upon EPA, and shall be binding upon Respondents, their agents, successors, assigns, officers, directors, and principals. Respondents are jointly and severally responsible for carrying out all actions required of them by this Consent Order. The signatories to this Consent Order certify that they are authorized to execute and legally bind the parties they represent to this Consent Order.  No change in the ownership or corporate status of any Respondent or of any facility or the Site shall alter Respondents' responsibilities under this Consent Order.

2.      Respondents shall provide a copy of this Consent Order to any subsequent owners or successors before ownership rights are transferred in any corporate acquisition or other transaction that results in: 1) the transfer of substantially all the assets of any entity that is a signatory to the Consent Order, or 2) the transfer of substantially all of the assets related to the Site (whether or not that constitutes substantially all the assets of the entity as a whole), or 3) constitutes a transfer of ownership rights that results in a change of control of any entity that is a signatory to this Consent Order. Respondents shall provide a copy of this Consent Order to all contractors, subcontractors, laboratories, and consultants which are retained to conduct any work performed under this Consent Order, within fourteen (14) days after the effective date of this Consent Order or the date of retaining their services, whichever is later.  Respondents shall condition any such contracts upon satisfactory compliance with this Consent Order.  Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Consent Order and for ensuring that their subsidiaries, employees, contractors, consultants, subcontractors, agents, and attorneys comply with this Consent Order, to the extent that these persons are associated with the Site or perform any work or tasks for or on behalf of Respondents in furtherance of compliance with this Order.

### IV. STATEMENT OF PURPOSE

1.      In entering into this Consent Order, the objectives of EPA and Respondents are: (a) to determine the nature and extent of contamination and any threat to the public health, welfare, or the environment caused by the release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site, including oil, by conducting an RI including identification of early actions which shall not be implemented or performed pursuant to this Order; (b) to determine and evaluate alternatives for remedial action to prevent, mitigate, or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site, by conducting an FS; (c) to recover response and oversight costs incurred by EPA and its Support Agency, the Oregon Department of Environmental Quality (DEQ), with respect to this Consent Order; and, (d) to accomplish the objectives as further described in the Statement of Work (SOW) (Attachment A), and the Stipulation Agreement (Attachment B), which are incorporated into this Order by this reference and made a part hereof as if fully set forth herein.

2.      The activities conducted under this Consent Order are subject to approval by EPA.  Respondents shall provide all appropriate necessary information for the RI/FS for a CERCLA Record of Decision (ROD) that is consistent with CERCLA and the National Oil and Hazardous Substance Pollution Contingency Plan (NCP), 40 C.F.R. Part 300, as now or hereafter amended.  The activities conducted under this Consent Order shall be conducted in compliance with the NCP and consistent with all applicable EPA guidance, policies, and procedures.

# V. FINDINGS OF FACT

EPA makes the following Findings of Fact, which the Respondents neither admit nor deny:

1.      The Site consists of the areal extent of contamination, and all suitable areas in proximity to the contamination necessary for implementation of response action, at, from and to the Portland Harbor Superfund Site Assessment Area from approximately River Mile (RM) 3.5 to RM 9.2 (Assessment Area), including uplands portions of the Site that contain sources of contamination to the sediments at, on or within the Willamette River. The boundaries of the Site will be initially determined upon issuance of a Record of Decision. RI/FS work for uplands facilities is being or will be conducted pursuant to separate agreements or orders issued by DEQ or EPA and is not covered by this Order which is for the in-water portion of the Site. Portland Harbor and the River have served as a major industrial water corridor for more than a century. Industrial use of the Harbor and River has been extensive. The River is also habitat to wildlife, numerous fish, shellfish, and other aquatic species, including species listed under the Endangered Species Act (ESA). The Confederated Tribes and Bands of the Yakama Nation, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Nez Perce Tribe, and the Confederated Tribes of the Warm Springs Reservation of Oregon have treaty-reserved rights and resources, and/or other rights, interests, or resources in the Site.

2.      EPA and DEQ have agreed to share responsibility for investigation and cleanup of the Site. DEQ has the lead responsibility for conducting upland work necessary for source control, and EPA is the Support Agency for that work, consistent with the role of Support Agency as set forth in the NCP. DEQ may elect for any reason to ask EPA to assume Lead Agency responsibility for any upland source control, which shall in no event be within the scope of this Order. EPA has the lead responsibility for conducting in-water work, including coordination of EPA's lead work with DEQ's source identification and source control activities. DEQ is the Support Agency for EPA's in-water work, consistent with the role of Support Agency as set forth in the NCP.

3.      Based on site assessment activities conducted by EPA in the Assessment Area, contaminants found in the Assessment Area include, but are not limited to, polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), polychlorinated dibenzo-dioxins and furans (PCDD/PCDF), total petroleum hydrocarbons (TPHs), semi-volatile organic compounds (SVOCs), dichloro-diphenyl-trichloroethane (DDT) and other pesticides, herbicides, tributyl tin, mercury and other metals, and phthalates. The Site has been the subject of several studies by government and private entities. The Site has also been subject to historic dredging activities for many years. Sources of releases to the Site include releases over a long history of commercial shipping activities, releases from industrial and commercial operations, sewer outfalls, urban storm runoff, and agricultural runoff.

4.      The Site has been listed on the National Priorities List pursuant to Section 105 of CERCLA, 42 U.S.C. 9605, at 65 Fed. Reg. 75179-01, December 1, 2000.

5.      Respondent ATOFINA Chemicals, Inc. is a Pennsylvania Corporation doing business in the state of Oregon, primarily engaged in chemicals manufacturing. Respondent Chevron U.S.A. Inc. is a Pennsylvania Corporation doing business in the state of Oregon, primarily engaged in petroleum product production and distribution. Respondent Gunderson, Inc. is an Oregon Corporation primarily engaged in rail car and barge manufacturing. Respondent Northwest Natural Gas is an Oregon Corporation primarily engaged in the distribution of natural gas. Respondent Time Oil Co. is a Washington Corporation doing business in the state of Oregon, primarily engaged in retail petroleum distribution. Respondent Tosco Corporation is a Nevada Corporation doing business in the state of

**Portland Harbor Superfund Site RI/FS AOC - 4**

1    Oregon, primarily engaged in oil refining and petroleum product distribution and sales. Respondent
2    Union Pacific Railroad is a Delaware Corporation doing business in the state of Oregon, primarily
3    engaged in railroad transportation. Respondent Port of Portland is a public port duly organized under
4    Oregon law. Respondent City of Portland is the most populous municipality in the state of Oregon.
5                  6.        EPA has not yet performed a potentially responsible party (PRP) search for the
6    Site. Additional parties may be identified as potentially liable for releases and contamination at the Site.
7
8                            **VI. CONCLUSIONS OF LAW AND DETERMINATIONS**
9                  EPA makes the following Conclusions of Law and Determinations which Respondents
10   neither admit nor deny.
11                 1.        The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. §
12   9601(9), and includes onshore facilities, offshore facilities, and inland waters of the United States and
13   navigable waters, as defined in Sections 311(a)(10), (11) and (16) of CWA, 33 U.S.C. § 1321(a), and
14   Sections 1001(24) and (21) of OPA, 33 U.S.C. §2701(24) and (21).
15                 2.        Wastes and constituents thereof at the Site, as identified in the preceding Section,
16   are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), or
17   constitute "any pollutant or contaminant" that may present an imminent and substantial danger to public
18   health or welfare under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1). TPHs at the Site, as
19   identified in the preceding Section, are from discharges of oil, as defined in Sections 311(a)(1) and (2)
20   of CWA, 33 U.S.C. § 1321(a)(1) and (2), and Sections 1001(23) and (7) of OPA, 33 U.S.C. §2701(23)
21   and (7).
22                 3.        The presence of hazardous substances at the Site or the past, present, or potential
23   migration of hazardous substances currently located at or emanating from the Site, constitute actual
24   and/or threatened "releases" as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). The
25   presence of actual or threatened discharges of oil at the Site from vessels and/or facilities in violation of
26   Section 311(b) of CWA, 33 U.S.C. § 1321(b), may be an imminent and substantial threat to the public
27   health or welfare of the United States, including fish, shellfish, wildlife, public and private property,
28   shorelines, beaches, habitat, and/or other living and nonliving natural resources under the jurisdiction or
29   control of the United States.
30                 4.        Each Respondent is a "person" as defined in Section 101(21) of CERCLA, 42
31   U.S.C. § 9601(21), and/or Section 311(a)(7) of CWA, 33 U.S.C. § 1321(a)(7), and Section 1001(27) of
32   OPA, 33 U.S.C. § 2701(27).
33                             5.        Each Respondent is a responsible party under Sections 104,
34                             106, 107, and 122 of CERCLA, 42 U.S.C. §§ 9604, 9606, 9607, and 9622. In lieu
35                             of issuing an order to compel Respondents to conduct the RI/FS, or seeking
36                             reimbursement from Respondents for EPA's conduct of the RI/FS, EPA has
37                             entered into this Order through which Respondents have agreed to conduct the
38                             RI/FS.
39                             6.        The actions required by this Consent Order are necessary to
40                             protect the public health and welfare and the environment, are in the public
41                             interest, are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), will
42                             expedite effective remedial action and minimize litigation, 42 U.S.C. § 9622(a),
43                             and are consistent with Section 311 of CWA, OPA., and regulations thereunder.
44

**Portland Harbor Superfund Site RI/FS AOC  - 5**

**VII.WORK TO BE PERFORMED**

1.      All work performed under this Consent Order shall be under the direction and supervision of qualified personnel. Within thirty (30) days of the effective date of this Order, and before the work outlined below begins, Respondents shall notify EPA in writing, of the names, titles, and qualifications of the personnel, including contractors, subcontractors, consultants, and laboratories to be used in carrying out such work. The qualifications of the persons undertaking the work for Respondents shall be subject to EPA review, for verification that such persons meet minimum technical background and experience requirements.

2.      This Order is contingent on Respondents' demonstration to EPA's satisfaction that Respondents are qualified to perform properly and promptly the actions set forth in this Consent Order. If EPA disapproves, in writing, of any person(s)' technical qualifications Respondents shall notify EPA of the identity and qualifications of the replacement(s) within thirty (30) days of the written notice. If EPA subsequently disapproves of the replacement(s), EPA reserves the right to terminate this Order and to conduct a complete RI/FS, and to seek reimbursement for costs and penalties from Respondents. During the course of the RI/FS, Respondents shall notify EPA in writing of any changes or additions in the personnel used to carry out such work, providing their names, titles, and qualifications. EPA shall have the same right to approve changes and additions to personnel as they have hereunder regarding the initial notification.

3.      Respondents shall conduct activities and submit deliverables as provided in the attached SOW. All such work shall be conducted in accordance with CERCLA, the NCP, as now or hereafter amended, and EPA guidance including, but not limited to, the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01), "Guidance for Data Usability in Risk Assessment" (OSWER Directive # 9285.7-05) and guidance referenced therein, and guidance referenced in the SOW, as may be amended or modified by EPA. The general activities that Respondents are required to perform are identified below, followed by a list of deliverables. The tasks that Respondents must perform are described more fully in the SOW.

4.      For the purposes of this Order, day means calendar day unless otherwise noted in this Order. In addition, all deliverables, including progress reports, to be submitted to EPA pursuant to this Consent Order shall also be submitted to the Designated Project Coordinators listed in Section XV of this Order.

A.      Task 1: Shared Server. Within ninety (90) days of the effective date of this Order, Respondents shall develop a shared server as described in the attached SOW to facilitate project management.

B.      Task 2: Scoping. EPA has determined the preliminary Site-specific objectives of the RI/FS and has devised a general management approach for the Site as set forth in the attached SOW. Respondents shall conduct the remainder of scoping activities as described in the SOW and referenced guidance. Within sixty (60) days of the effective date of this Order, Respondents shall meet with EPA and DEQ to determine the most efficient manner for understanding and incorporating EPA and DEQ upland information into the scoping task, and shall document conclusions reached during this meeting in a technical memorandum. Within two hundred ten (210) days of the effective date of this Order, Respondents shall gather, evaluate, and present the existing Site information and data as described in the SOW. During, and at the conclusion of project scoping, Respondents shall submit the following deliverables to EPA for review and approval:

i.      Site Background

1                        a.       Within ninety (90) days of the effective date of this Order, Respondents
2     shall submit a proposal for design of the Site relational database to EPA.  If EPA disapproves of or
3     requires revisions to the proposal for the Site relational database, in whole or in part, Respondents shall
4     amend and submit a revised proposal for design of the Site relational database to EPA which is
5     responsive to the directions in all EPA comments, within sixty (60) days of receiving EPA's comments.
6                        b.       Within ninety (90) days of the effective date of this Order, Respondents
7     shall submit Data Quality Objectives to EPA which specify the usefulness of existing data.  If EPA
8     disapproves of or requires revisions to the Data Quality Objectives, in whole or in part, Respondents
9     shall amend and submit the revised Data Quality Objectives to EPA which are responsive to the
10    directions in all EPA comments, within sixty (60) days of receiving EPA's comments.
11                       c.       Within two hundred ten (210) days of the effective date of this Order, or
12    within sixty (60) days of receiving EPA's comments on the design of the Site relational database,
13    whichever is later, Respondents shall complete the Site relational database.  If EPA disapproves of or
14    requires revisions to the Site relational database, in whole or in part, Respondents shall revise the Site
15    relational database in a manner responsive to the directions of EPA, within thirty (30) days of receiving
16    EPA's comments.  Within one hundred fifty (150) days of Respondents' receipt of a memorandum from
17    EPA describing the requirements of the cultural resources analysis, or such longer time for submittal as
18    EPA may determine, Respondents shall submit this analysis.
19                       d.       Within two hundred ten (210) days of the effective date of this Order,
20    Respondents shall construct and complete a table that identifies data gaps, lists the preferred method of
21    filling those gaps, and specifically addresses how additional data will be used.  The table shall include
22    an analysis identifying additional information and data that will be required to complete the baseline
23    human health and ecological risk assessments, and to identify and screen remedial action alternatives.  If
24    EPA disapproves of or requires revisions to the table, in whole or in part, Respondents shall amend and
25    submit a revised table to EPA which is responsive to the directions in all EPA comments, within thirty
26    (30) days of receiving EPA's comments.
27                       e.       Within ninety (90) days of the effective date of this Order, Respondents
28    shall conduct a Site visit by boat, document collected information in a trip report primarily consisting of
29    a narrated video, and submit a Site visit trip report to EPA.  If EPA disapproves of or requires revisions
30    to the trip report, in whole or in part, Respondents shall amend and submit the revised trip report to EPA
31    which is responsive to the directions in all EPA comments, within sixty (60) days of receiving EPA's
32    comments.
33              ii.     Project Planning.
34                        a.       Within one hundred twenty (120) days of the effective date of this Order,
35    Respondents shall meet with EPA and submit a draft risk assessment scoping memorandum that
36    includes preliminary analytical concentration goals described in the SOW.  If EPA disapproves of or
37    requires revisions to the memorandum, in whole or in part, Respondents shall amend and submit the
38    revised memorandum to EPA which is responsive to the directions in all EPA comments, within thirty
39    (30) days of receiving EPA's comments.
40                        b.       Within two hundred ten (210) days of the effective date of this Order,
41    Respondents shall submit and/or complete deliverables and/or work products described in the attached
42    Stipulated Agreement.  If EPA disapproves of or requires revisions to any deliverable or work product
43    described in the Stipulated Agreement, in whole or in part, Respondents shall amend and submit a
44    revised deliverable or work product to EPA which is responsive to the directions in all EPA comments,
45    within thirty (30) days of receiving EPA's comments.

**Portland Harbor Superfund Site RI/FS AOC  - 7**

c.      Within one hundred fifty (150) days of the effective date of this Order, Respondents shall submit a preliminary conceptual Site model (CSM) to EPA.  If EPA disapproves of or requires revisions to the preliminary CSM, in whole or in part, Respondents shall amend and submit the revised preliminary CSM to EPA which is responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

d.      Within two hundred ten (210) days of the effective date of this Order, Respondents shall submit a draft technical memorandum to EPA identifying potential criteria for identification of candidate early action areas, and which then uses these criteria to identify areas that may be candidates for early action.  If EPA disapproves of or requires revisions to the memorandum, in whole or in part, Respondents shall amend and submit a memorandum to EPA which is responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

e.      Within two hundred ten (210) days of the effective date of this Order, Respondents shall submit draft technical memoranda to EPA that identifies preliminary RAOs, describes the process needed to identify and obtain disposal site options for contaminated sediment, identifies potential sources of sediment capping materials and outlines testing requirements needed to evaluate the acceptability of the material, and identifies the data needed to evaluate natural attenuation. If EPA disapproves of or requires revisions to any one or more of these memoranda, in whole or in part, Respondents shall amend and submit a revised memorandum to EPA which is responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

f.      Within two hundred ten (210) days of the effective date of this Order, Respondents shall submit a draft RI/FS work plan for the Initial Study Area (ISA) and adjacent areas as these areas are described in the SOW to EPA, which shall document the decisions and evaluations completed during the scoping process.  If EPA disapproves of or requires revisions to the draft RI/FS work plan, in whole or in part, Respondents shall amend and submit a revised work plan to EPA which is responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

g.      Within two hundred ten (210) days of the effective date of this Order, Respondents shall submit the sampling & analysis plan (SAP) to EPA.  This plan shall consist of a field sampling plan (FSP) and a quality assurance project plan (QAPP), as described in the SOW and applicable guidance.  If EPA disapproves of or requires revisions to any of these plans, in whole or in part, Respondents shall amend and submit a revised plans to EPA which are responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

h.      Within two hundred ten (210) days of the effective date of this Order, Respondents shall submit a project management plan, a data management plan, and a site health & safety plan to EPA, as described in the SOW.  If EPA disapproves of or requires revisions to any of these plans, in whole or in part, Respondents shall amend and submit revised plans to EPA which are responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.

iii.    Following approval or modification by EPA of deliverables submitted by Respondents, such deliverables shall be incorporated by reference herein.

C.      Task 3: Community Relations Plan.  EPA will prepare an in-water Community Relations/Public Participation Plan, in accordance with EPA guidance and the NCP.  Respondents shall provide information supporting EPA's in-water community relations programs. (See SOW for Task 4.)

D.      Task 5: Site Characterization.  Following EPA approval or modification of the RI/FS work plan described in subparagraph B. Task 2.ii.f, above, and the SAP, or following EPA approval or modification of any required addenda for these plans, Respondents shall implement the

**Portland Harbor Superfund Site RI/FS AOC · 8**

1    provisions of these plans to characterize the Site. Respondents shall complete Site characterization
2    within twelve (12) months of EPA approval or modification of the RI/FS work plan for the ISA and
3    adjacent areas, or in accordance with the approved project schedule. Respondents shall provide EPA
4    with analytical data within sixty (60) days of each sampling activity, in an electronic format showing the
5    location, medium, and results. Respondents shall notify EPA in writing within seven (7) days of
6    completion of field activities. During Site characterization, Respondents shall provide EPA with the
7    following deliverables, as described in the SOW and/or work plan.
8            i.        If EPA determines, or Respondents propose and EPA approves the proposal that
9    modeling is appropriate, within sixty (60) days of approval of the RI/FS work plan described in
10   subparagraph B. Task 2.ii.f, above, Respondents shall submit a technical memorandum on modeling of
11   Site characteristics, as described in the SOW. If EPA disapproves of or requires revisions to the
12   technical memorandum on modeling of Site characteristics, in whole or in part, Respondents shall amend
13   and submit a revised technical memorandum on modeling of Site characteristics to EPA which is
14   responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.
15           ii.       Within one hundred twenty (120) days after completion of field sampling and
16   analysis, as specified in the SOW, for the RI/FS work plan described in subparagraph B. Task 2.ii.f,
17   above, or as may be required for subsequent work plan addenda, Respondents shall submit a Site
18   characterization summary to EPA. If EPA disapproves of or requires revisions to the Site
19   characterization summary, in whole or in part, Respondents shall amend and submit a revised Site
20   characterization summary to EPA which is responsive to the directions in all EPA comments, within
21   thirty (30) days of receiving EPA's comments.
22           E.        Draft Remedial Investigation Report. Within one hundred twenty (120) days after
23   completion of field sampling and analysis, as specified in the SOW, and after completion of work set
24   forth in the RI/FS work plan described in subparagraph B. Task 2.ii.f, above, and any subsequent
25   addenda as determined to be necessary by EPA, Respondents shall submit a draft remedial investigation
26   report (RI report) consistent with the SOW, work plans, and SAP. If EPA disapproves of or requires
27   revisions to the draft RI report, in whole or in part, Respondents shall amend and submit a revised RI
28   report to EPA which is responsive to the directions in all EPA comments, within thirty (30) days of
29   receiving EPA's comments.
30           F.        Task 6: Treatability Studies. Respondents shall conduct treatability studies,
31   except where Respondents can demonstrate to EPA's satisfaction that they are not needed. Major
32   components of the treatability studies include determination of the need for, and scope of, studies, the
33   design of the studies, and the completion of the studies, as described in the SOW. During treatability
34   studies, Respondents shall submit the following deliverables to EPA:
35           i.        An identification of candidate technologies memorandum shall be submitted
36   within sixty (60) days of receipt of EPA's written confirmation notice that treatability studies are
37   required. If EPA disapproves of or requires revisions to the technical memorandum identifying
38   candidate technologies, in whole or in part, Respondents shall amend and submit a revised technical
39   memorandum identifying candidate technologies to EPA which is responsive to the directions in all EPA
40   comments, within thirty (30) days of receiving EPA's comments.
41           ii.       If EPA determines that treatability testing is required, within ninety (90) days of
42   receipt of EPA's written confirmation notice that treatability studies are required or such longer time as
43   EPA may specify, Respondents shall submit a treatability testing statement of work. If EPA disapproves
44   of or requires revisions to the treatability testing statement of work, in whole or in part, Respondents

1     shall amend and submit a revised treatability testing statement of work to EPA which is responsive to the
2     directions in all EPA comments, within thirty (30) days of receiving EPA's comments.
3                 iii.       Within sixty (60) days of receipt of EPA's written comments on the treatability
4     testing statement of work, Respondents shall submit a treatability testing work plan, including a schedule
5     to EPA. If EPA disapproves of or requires revisions to the treatability testing work plan, in whole or in
6     part, Respondents shall amend and submit a revised Treatability Testing Work Plan to EPA which is
7     responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.
8                 iv.       Within sixty (60) days of the identification of the need for a separate or revised
9     QAPP or FSP, Respondents shall submit a treatability study SAP to EPA. If EPA disapproves of or
10    requires revisions to the treatability study SAP, in whole or in part, Respondents shall amend and submit
11    a revised treatability study SAP to EPA which is responsive to the directions in all EPA comments,
12    within thirty (30) days of receiving EPA's comments.
13                v.       Within sixty (60) days of the identification of the need for a revised health &
14    safety plan, Respondents shall submit a treatability study Site health & safety plan to EPA.
15                vi.       Within one hundred twenty (120) days of completion of any treatability testing,
16    Respondents shall submit a treatability study evaluation report as provided in the SOW and/or work plan
17    to EPA. If EPA disapproves of or requires revisions to the treatability study report, in whole or in part,
18    Respondents shall amend and submit a Revised treatability study report to EPA which is responsive to
19    the directions in all EPA comments, within thirty (30) days of receiving EPA's comments.
20           G.       Task 7: Development and Screening of Remedial Alternatives. Respondents shall
21    develop an appropriate range of waste management options that will be evaluated through the
22    development and screening of alternatives, as provided in the SOW. During the development and
23    screening of alternatives, Respondents shall submit the following deliverables to EPA:
24               i.       Within ninety (90) days after receipt of EPA's comments on the draft RI report,
25    Respondents shall refine and document Site-specific RAOs using data collected during site
26    characterization, and using results of the baseline human health and ecological risk assessments; if the
27    risk assessments are not completed and approved by EPA by this time, Respondents shall use whatever
28    draft baseline risk assessment information and data has been generated by the time refined Site-specific
29    RAOs are due to EPA. If the refined RAOs are submitted to EPA prior to approval of the baseline risk
30    assessment reports, after thirty (30) days of such written EPA approval of these reports, Respondents
31    shall submit revised Site-specific RAOs. If EPA disapproves of or requires revisions to the Site-specific
32    RAOs, in whole or in part, Respondents shall amend and submit revised Site-specific RAOs to EPA
33    which are responsive to the directions in all EPA comments, within thirty (30) days of receiving EPA's
34    comments.
35              ii.       Within ninety (90) days after receipt of EPA's comments on the Site-specific
36    RAOs, Respondents shall submit a memorandum summarizing the development and screening of
37    remedial alternatives, including an alternatives array document as described in the SOW, to EPA. If EPA
38    disapproves of or requires revisions to the memorandum summarizing the development and screening of
39    remedial alternatives, in whole or in part, Respondents shall amend and submit a revised memorandum
40    summarizing the development and screening of remedial alternatives to EPA which is responsive to the
41    directions in all EPA comments, within thirty (30) days of receiving EPA's comments.
42          H.   Task 8: Detailed Analysis of Remedial Alternatives. Respondents shall conduct a
43    detailed analysis of remedial alternatives, as described in the SOW. During the detailed analysis of
44    alternatives, Respondents shall provide the following to EPA:

**Portland Harbor Superfund Site RI/FS AOC - 10**

1          i.          Within one hundred twenty (120) days after receipt of EPA's comments on the
2    memorandum summarizing the development and screening of remedial alternatives, Respondents shall
3    submit a report on comparative analyses to EPA summarizing the results of the comparative analyses
4    performed among the remedial alternatives. If EPA disapproves of or requires revisions to the report on
5    comparative analyses, Respondents shall amend and submit a revised report on comparative analyses to
6    EPA which is responsive to the directions in all EPA comments, within thirty (30) days of receiving
7    EPA's comments. Within two (2) weeks of submitting the original report on comparative analyses,
8    Respondents shall make a presentation to EPA during which Respondents shall summarize the findings
9    of the RI and RAOs, and present the results of the nine criteria evaluation and comparative analyses, as
10   described in the SOW.
11         ii.         Within ninety (90) days after receipt of EPA's comments on the report on
12   comparative analyses, Respondents shall submit a draft FS report which reflects the data collected during
13   site characterization, the Site-specific RAOs, and the results of the baseline human health and ecological
14   risk assessments. Respondents shall refer to Table 6-5 of the RI/FS Guidance for report content and
15   format. If EPA disapproves of or requires revisions to the draft FS report, in whole or in part,
16   Respondents shall amend and submit a revised FS report to EPA which is responsive to the directions in
17   all EPA comments, within thirty (30) days of receiving EPA's comments. The report, as amended, and
18   the administrative record, shall provide the basis for the Proposed Plan under CERCLA §§ 113(k) and
19   117(a) by EPA, and shall document the development and analysis of remedial alternatives.
20         iii.        Upon receipt of the draft FS report, EPA will evaluate, as necessary, the estimates
21   of the risk to the public and environment that are expected to remain after a particular remedial
22   alternative has been completed.
23
24                          **VIII. BASELINE RISK ASSESSMENTS**
25         1.          The baseline risk assessments shall be performed as set forth in the SOW.
26         2.          If EPA does not approve of Respondents' qualifications to conduct the baseline
27   risk assessments, EPA will determine the appropriate means of conducting the baseline risk assessments.
28
29                          **IXIX. APPROVALS/MODIFICATIONS**
30         1.          EPA reserves the right to comment on, modify, and direct changes for all
31   deliverables in writing. EPA's review will include consultation with DEQ, Tribes, and Natural
32   Resource Trustees. EPA will meet with the Respondents in an effort to resolve disputes. At EPA's
33   discretion, Respondents must fully correct all deficiencies and incorporate and integrate all information
34   and comments supplied by EPA either in subsequent or resubmitted deliverables within a time frame
35   specified by EPA. EPA will consider input from Respondents in specifying such timeframes.
36         2.          Respondents shall not proceed further with any dependent subsequent activities or
37   tasks until Respondents receive EPA approval for all deliverables identified in Section VII.4, including
38   the following deliverables: draft RI/FS work plan described in subparagraph B. Task 2.ii.f, above, draft
39   RI report, treatability testing work plan, draft FS report, and those deliverables identified by EPA related
40   to the baseline risk assessments. While awaiting EPA approval on these deliverables, Respondents shall
41   proceed with all other tasks and activities which may be conducted independently of these deliverables,
42   in accordance with the schedule set forth in this Consent Order.
43         3.          For all remaining deliverables not enumerated in Section VII.4 above,
44   Respondents shall proceed with all subsequent tasks, activities, and deliverables. EPA reserves the right

**Portland Harbor Superfund Site RI/FS AOC - 11**

1    to stop Respondents from proceeding further, either temporarily or permanently, on any task, activity, or
2    deliverable at any point during the RI/FS.
3                                    4.   If Respondents amend or revise a report, plan, or other submittal in
4                           response to EPA comments, and EPA subsequently disapproves of the revised
5                           submittal, or if such subsequent submittals do not fully reflect EPA's directions for
6                           changes, EPA retains the right to seek penalties, perform its own studies, complete the
7                           RI/FS (or any portion of the RI/FS) under CERCLA and the NCP, and seek
8                           reimbursement from Respondents for costs, and/or seek any other appropriate relief.
9                                    5.   If EPA takes over some of the tasks, but not the preparation of the
10                          RI/FS, Respondents shall incorporate and integrate information supplied by EPA into
11                          the final RI/FS report.
12                 6.       Neither failure of EPA to expressly approve or disapprove of Respondents'
13   submissions within any specified time period(s), nor the absence of comments, shall be construed as
14   approval by EPA.  EPA will provide approvals and disapprovals of deliverables required pursuant to this
15   Order in writing.
16                 7.       Respondents shall, prior to any off-Site shipment of hazardous substances from
17   the Site to an out-of-state waste management facility, provide written notification to the appropriate state
18   environmental official in the receiving state and to EPA's Designated Project Coordinators of such
19   shipment of hazardous substances.  However, the notification of shipments shall not apply to any such
20   off-Site shipments when the total volume of such shipments will not exceed ten (10) cubic yards.  The
21   notification shall be in writing, and shall include the following information, where available:  (1) the
22   name and location of the facility to which the hazardous substances are to be shipped; (2) the type and
23   quantity of the hazardous substances to be shipped; (3) the expected schedule for the shipment of the
24   hazardous substances; and (4) the method of transportation.  Respondents shall notify the receiving state
25   of major changes in the shipment plan, such as a decision to ship the hazardous substances to another
26   facility within the same state, or to a facility in another state.
27
28                          **X.  MODIFICATION OF THE WORK PLAN**
29                 1.       If at any time during the RI/FS process, Respondents identify a need for
30   additional data or need for a change in any element of the work plan, a memorandum documenting the
31   need for additional data or other change shall be submitted to the EPA Project Coordinator within
32   twenty (20) days of identification.  EPA, in its discretion, will determine whether the additional data will
33   be collected by Respondents or the requested change made and whether it will be incorporated into
34   reports and deliverables.
35                 2.       Upon discovery of conditions posing an immediate threat to human health or
36   welfare or the environment, Respondents shall notify EPA immediately.  In the event of unanticipated or
37   changed circumstances at the Site, Respondents shall notify the EPA Project Coordinator by telephone
38   within twenty-four (24) hours of discovery of the unanticipated or changed circumstances.  If EPA
39   determines that the immediate threat or the unanticipated or changed circumstances warrant changes in
40   the work plans, in addition to EPA's authorities in the NCP, EPA may modify or amend the work plans
41   consistent with this Order, in writing.  Respondents shall perform the work plans as modified or
42   amended.
43                 3.       EPA may determine that in addition to tasks defined in the initially approved
44   work plans, other additional work may be necessary to accomplish the objectives of the RI/FS. EPA may
45   require Respondents to perform these response actions in addition to those required by this Order.

**Portland Harbor Superfund Site RI/FS AOC  - 12**

1  Respondents shall confirm their willingness to perform the additional work, in writing, to EPA within
2  seven (7) days of receipt of the EPA request or Respondents shall invoke dispute resolution. Subject to
3  EPA resolution of any dispute, Respondents shall implement the additional tasks which EPA determines
4  are necessary. The additional work shall be completed according to the standards, specifications, and
5  schedule set forth or approved by EPA in a written modification to the work plans or written work plan
6  addenda. EPA reserves the right to conduct the work itself at any point, to seek reimbursement from
7  Respondents, and/or to seek any other appropriate relief.
8        4.      If EPA determines that conditions at the Site are creating or have the potential to
9  create a danger to human health or welfare on-site or in the surrounding area or to the environment, EPA
10  may order Respondents to stop further implementation of this Order for such period of time in the
11  judgment of EPA is needed to abate the danger.
12
13                      **XI.  QUALITY ASSURANCE**
14        1.      Respondents shall assure that work performed, samples taken, and analyses
15  conducted conform to the requirements of the SOW, QAPP, and guidance identified therein.
16  Respondents shall assure that field personnel used by Respondents are properly trained in the use of
17  field equipment and in chain-of-custody procedures.
18
19              **XII. FINAL RI/FS, PROPOSED PLAN, PUBLIC COMMENT,**
20              **RECORD OF DECISION AND ADMINISTRATIVE RECORD**
21
22        1.      EPA retains the responsibilities for release to the public of the RI/FS report and
23  the preparation and release of the Proposed Plan and the Record of Decision, in accordance with
24  CERCLA and the NCP.
25        2.      EPA shall provide Respondents with the Proposed Plan and Record of Decision.
26        3.      EPA will determine the contents of its administrative record file for selection of
27  the remedial action. Respondents must submit documents developed during the course of the RI/FS to
28  EPA upon which selection of the response action may be based. If requested by EPA, Respondents
29  shall provide copies of plans, task memoranda, including documentation of field modifications,
30  recommendations for further action, quality assurance memoranda and audits, validated data, raw data,
31  field notes, laboratory analytical reports, and other reports, concerning the implementation of this Order.
32  Respondents must additionally submit any previous studies conducted under state, local, or other federal
33  authorities relating to selection of the response action, and all communications between Respondents
34  and state, local, or other federal authorities concerning selection of the response action. At EPA's
35  discretion, Respondents may establish a community information repository at or near the Site, to house
36  one copy of the administrative record.
37
38                  **XIII.  PROGRESS REPORTS AND MEETINGS**
39        1.      Respondents shall make presentations at, and participate in, meetings at the
40  request of EPA during the initiation, conduct, and completion of the RI/FS. In addition to discussion of
41  the technical aspects of the RI/FS, topics will include anticipated problems or new issues. Meetings will
42  be scheduled at EPA discretion.
43        2.      In addition to the deliverables set forth in this Order, Respondents shall submit
44  monthly progress reports to EPA by the tenth (10th) day of each month. At a minimum, with respect to
45  the preceding month, these progress reports shall: (1) describe the actions which have been taken to

1   comply with this Consent Order during that month; (2) include all results of sampling and tests and all
2   other data received by Respondents that have been subjected to quality assurance pursuant to the QAPP;
3   (3) describe work planned for the next two (2) months with schedules relating such work to the overall
4   project schedule for RI/FS completion; and (4) describe all problems encountered and any anticipated
5   problems, any actual or anticipated delays, and solutions developed and implemented to address any
6   actual or anticipated problems or delays.
7
8              **XIV. SAMPLING, ACCESS, AND DATA AVAILABILITY/ADMISSIBILITY**
9                   1.       All results of sampling, tests, modeling, or other data generated by Respondents,
10  or on Respondents' behalf, for the implementation of this Consent Order, shall be submitted to EPA
11  monthly as described in the preceding section of this Order. Raw data shall be submitted to EPA upon
12  request. EPA will make validated data generated by EPA or DEQ available to Respondents unless it is
13  exempt from disclosure by federal or state law or regulation. If there is a discrepancy between EPA's
14  QAPP data and the Respondents' QAPP data, EPA will, upon the request of Respondents, make the raw
15  data that was subject to the quality assurance resulting in such a discrepancy available to Respondents.
16                  2.       Respondents shall orally notify EPA at least fifteen (15) days prior to conducting
17  significant field events as described in the SOW, work plans, or SAPs. At EPA's oral or written request,
18  or the request of EPA's oversight assistant, Respondents shall allow split or duplicate samples to be taken
19  by EPA (and/or its authorized representatives) of any samples collected by Respondents in implementing
20  this Order. All split samples of Respondents shall be analyzed by the methods identified in the QAPP.
21                  3.       At all reasonable times EPA, its authorized representatives, DEQ and its
22  authorized representatives, and designated representatives of Tribes and Natural Resource Trustees
23  accompanied by EPA shall have the authority to enter and freely move about any property over which
24  Respondents have possession or control at the Site where work, if any, is to be carried out pursuant to
25  this Order. EPA and DEQ and their authorized representatives shall also have full access for the
26  purposes of inspecting conditions, activities, the results of activities, records, operating logs, and
27  contracts related to this Order; reviewing the progress of the Respondents in carrying out the terms of
28  this Order; conducting tests as EPA or its authorized representatives deem necessary; using a camera,
29  sound recording device, or other documentary type equipment to record matters related to this Order;
30  and verifying the data developed pursuant to this Order and submitted to EPA by Respondents.
31  Respondents shall allow EPA and DEQ and their authorized representatives to inspect and copy all
32  records, files, photographs, documents, sampling and monitoring data, and other writings related to
33  work undertaken in carrying out this Order. Nothing herein shall be interpreted as limiting or affecting
34  the United States' right of entry or inspection authority under federal law. Nothing in this Section shall
35  alter existing access provisions within voluntary agreements between any Respondent and DEQ, which
36  provisions shall continue to govern access for DEQ as Lead Agency for work conducted under those
37  voluntary agreements and shall not govern access for DEQ as a Support Agency under this Order. EPA
38  shall make reasonable efforts to avoid interfering with Respondents' business activities when present at
39  Respondents' properties. All parties with access to the Site under this paragraph shall comply with all
40  approved Health and Safety Plans applicable to the property, as well as applicable laws and regulations.
41  Tribes and their authorized representatives shall be permitted reasonable access to Respondents'
42  properties at the Site without EPA accompaniment as described in an approved work plan for the
43  Cultural Resource Analysis described in the SOW.
44                  4.       Respondents may assert a claim of business confidentiality covering part or all of
45  the information submitted to EPA pursuant to the terms of this Consent Order under 40 C.F.R. 2.203,

**Portland Harbor Superfund Site RI/FS AOC - 14**

1    provided such claim is allowed by Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7).  This claim
2    shall be asserted in the manner described by 40 C.F.R. 2.203(b), and substantiated at the time the claim
3    is made.  Information determined to be confidential by EPA will be given the protection specified in
4    40 C.F.R. Part 2.  If no such claim accompanies the information when it is submitted to EPA, it may be
5    made available to the public by EPA or DEQ without further notice to Respondents.  Respondents agree
6    not to assert business confidentiality claims with respect to any data related to Site conditions, sampling,
7    or monitoring.
8              5.       By entering into this Order, Respondents waive any objections in any proceeding
9    by EPA to any data gathered, generated, or evaluated by EPA, DEQ, or Respondents in the performance
10·  or oversight of the work that has been verified according to the quality assurance/quality control
11   (QA/QC) procedures required by the Consent Order.  If Respondents object to any other data relating to
12   the RI/FS, Respondents shall submit a report to EPA that identifies and explains its objections, describes
13   the acceptable uses of the data, if any, and identifies any limitations to the use of the data.  The report
14   must be submitted to EPA within thirty (30) days of the monthly progress report containing the data.
15             6.       If the Site, or any off-Site area that is to be used for access for purposes of
16   implementing this Order, is owned in whole or in part by parties other than those bound by this Consent
17   Order, Respondents will obtain, or use best efforts to obtain Site access agreements from the present
18   owner(s) within ninety (90) days from the date EPA determines that access is needed.  Such agreements
19   shall provide access for EPA, its contractors and oversight officials, DEQ and its contractors, the
20   designated representatives of the Tribes and Natural Resource Trustees accompanied by EPA, and
21   Respondents or their authorized representatives, and such agreements shall specify that Respondents are
22   not EPA, DEQ's, Tribes' or Natural Resource Trustees' representative with respect to liability associated
23   with Site activities.  Copies of such agreements shall be submitted to EPA prior to Respondents' initiation
24   of field activities.  Respondents' best efforts shall include providing reasonable compensation to any off-
25   Site property owner, unless such owner qualifies as a potentially responsible party under Section 107(a)
26   of CERCLA.  If access agreements are not obtained within the time referenced above, Respondents shall
27   immediately notify EPA of their failure to obtain access and EPA and Respondents will discuss a
28   strategy for gaining access to such properties in the most expeditious and cost effective manner.  EPA
29   may obtain access for Respondents or perform those tasks or activities with EPA contractors.  If EPA
30·  performs those tasks or activities with EPA contractors, Respondents shall perform all other activities not
31   requiring access to that portion of the Site, and shall reimburse EPA for all costs incurred in accordance
32   with this Order, which are not inconsistent with the NCP in performing such activities.  Respondents
33   shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.
34   Respondents also agree to indemnify the United States as specified in Section XXIV of this Order.
35
36                         **VIII. DESIGNATED PROJECT COORDINATORS**
37             1.       Deliverables submitted under this Consent Order, shall be sent by certified mail,
38   return receipt requested, to the following addressees or to any other addressees which EPA may
39   designate in writing:
40             (a) five copies to EPA:
41                  Wallace Reid
42                  EPA Project Coordinator,
43                  U.S. Environmental Protection Agency
44                  1200 Sixth Avenue, M/S ECL-115
45                  Seattle, WA  98101

| | |
|---|---|
| 1 | ph: 206-553-1728 |
| 2 | fax: 206-553-0124 |
| 3 | [reid.wallace@epa.gov] |
| 4 | |
| 5 | (b) one copy to DEQ: |
| 6 | Eric Blischke |
| 7 | Oregon DEQ |
| 8 | 2020 SW 4th Ave. #400 |
| 9 | Portland, OR 97201 |
| 10 | ph: 503-229-5648 |
| 11 | fax: 503-229-6899 |
| 12 | [blischke.eric@deq.state.or.us] |
| 13 | |
| 14 | (c) one copy to Oregon Department of Fish & Wildlife: |
| 15 | Rick Kepler |
| 16 | Oregon Department of Fish & Wildlife |
| 17 | 2501 SW First Ave. |
| 18 | Portland, OR 97207 |
| 19 | ph: 503-872-5255 x.5426 |
| 20 | fax: 503-872-5269 |
| 21 | [rick.j.kepler@state.or.us] |
| 22 | |
| 23 | (d) one copy to NOAA: |
| 24 | Helen Hillman |
| 25 | NOAA Resources Coordinator |
| 26 | c/o EPA Region 10 |
| 27 | 1200 Sixth Avenue (M/S ECL-117) |
| 28 | Seattle, WA 98101 |
| 29 | ph: 206-553-2101 |
| 30 | fax: 206-553-0124 |
| 31 | [hillman.helen@noaa.gov] |
| 32 | |
| 33 | (e) one copy to the U.S. Department of Interior |
| 34 | Preston Sleeger |
| 35 | Regional Environmental Officer |
| 36 | Pacific Northwest Region |
| 37 | 500 NE Multnomah St. |
| 38 | Suite 356 |
| 39 | Portland, OR 97232 |
| 40 | ph: 503-321-6157 |
| 41 | fax: 503-231-2361 |

**Portland Harbor Superfund Site RI/FS AOC - 16**

1             [preston_sleeger@ios.doi.gov]

2

3          (f) one copy to the Confederated Tribes of the Warm Springs Reservation of Oregon

4             Brad Nye

5             Natural Resources Department

6             P.O. Box C

7             Warm Springs, OR 97761

8             ph: 541-553-2041

9             fax: 541-553-1994

10            [bnye@wstribes.org]

11

12         (g) one copy to the Confederated Tribes and Bands of the Yakama Nation:

13            Lynn Hatcher

14            Yakama Nation

15            Fisheries Management Program

16            P.O. Box 151

17            4690 SR 22

18            Toppenish, WA 98948

19            ph: 509-865-6262

20            fax: 509-865-6293

21            [lynn@yakama.com]

22

23         (h) one copy to the Confederated Tribes of the Grand Ronde Community of Oregon:

24            Kathleen Feehan

25            Confederated Tribes of the Grand Ronde Community of Oregon

26            47010 SW Hebo Road

27            Grand Ronde, OR 97347

28            ph: 503-879-2395

29            fax: 503-879-5622

30            [kathleen.feehan@grandronde.org]

31

32         (i) one copy to the Confederated Tribes of the Siletz Indians:

33            Tom Downey

34            Environmental Specialist

35            Confederated Tribes of the Siletz Indians

36            P.O. Box 549

37            Siletz, OR 97380

38            ph: 541-444-8226

39            fax: 541-444-9688

1       [tomd@ctsi.nsn.us]
2

3       (j) one copy to the Confederated Tribes of the Umatilla Indian Reservation:

4           Audie Huber
5               Confederated Tribes of the Umatilla Indian Reservation
6               Department of Natural Resources
7               73239 Confederated Way
8               Pendelton, OR 97801
9               ph:  541-966-2334
10              fax: 503-276-3317
11              [audiehuber@ctuir.com]
12

13      (k) one copy to the Nez Perce Tribe:

14          Patti Howard
15          Water Resources Division
16          Nez Perce Tribe
17          P.O. Box 365
18          Lapwai, ID  83540
19          ph:  208-843-7368
20          fax: 208-843-7371
21          [pattih@nezperce.org]
22
23      (1) one copy each to Respondents' Co-Project Coordinators

24          Robert Wyatt
25          Northwest Natural
26          220 NW Second Avenue
27          Portland, OR  97209
28          ph:  503-226-4211 x5425
29          fax: 503-273-4815
30          [rjw@nwnatural.com]
31
32          Trey Harbert
33          Port of Portland
34          P.O. Box 3529
35          Portland, OR  97208
36          ph:  503-944-7325
37          fax: 503-944-7354
38          [harbet@portptld.com]
39

**Portland Harbor Superfund Site RI/FS AOC  - 18**

1          2.      On or before the effective date of this Order, EPA and Respondents shall each
2  designate their own Project Coordinator.  Each Project Coordinator shall be responsible for overseeing
3  the implementation of this Consent Order.  To the maximum extent possible, written communications
4  between Respondents and EPA shall be directed to the Project Coordinator by mail or electronic mail,
5  with copies to such other persons as EPA may designate.
6          3.      EPA and Respondents have the right to change their respective Project
7  Coordinator upon at least ten (10) days notice in writing prior to the change.
8          4.      EPA's Project Coordinator shall have the authority lawfully vested in a Remedial
9  Project Manager (RPM) and On-Scene Coordinator (OSC) by the NCP.  EPA's Project Coordinator shall
10  have the authority consistent with the NCP, to halt any work required by this Consent Order, and to take
11  any necessary response when he or she determines that conditions at the Site may present an immediate
12  endangerment to public health or welfare or the environment.  The absence of the EPA Project
13  Coordinator from the Site pursuant to this Consent Order shall not be cause for the stoppage or delay of
14  any work.
15          5.      EPA shall arrange for a qualified person to assist in its oversight and review of
16  the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. § 9604(a).  The
17  oversight assistant may observe work and make inquiries in the absence of EPA, but is not authorized to
18  modify any approved deliverable.
19
20                            **IX.OTHER APPLICABLE LAWS**
21          1.      Respondents shall comply with all applicable laws and regulations in
22  implementing this Order.  No local, state, or federal permit shall be required for any portion of any
23  action conducted entirely on-Site, including studies, where such action is selected and carried out in
24  compliance with Section 121 of CERCLA, 42 U.S.C. § 9621.
25
26                            **XVII.  RECORD PRESERVATION**
27          1.      All records and documents in Respondents', their employees', contractors',
28  consultants', agents', accountants', or attorneys' possession, whether they have been submitted to EPA
29  or not, that concern the implementation of this Order, including those documents relevant to the
30  performance of Task 2.a. of the SOW (Data Compilation/Site Background), and/or those documents
31  related to the release or threatened release of hazardous substances, pollutants, or contaminants to the
32  sediments in the Lower Willamette River, shall be preserved during the conduct of this Consent Order
33  and for a minimum of ten (10) years after the completion of remedial action at the Site, unless
34  permission has been sought and obtained in writing from EPA and DEQ prior to destruction of such
35  documents.  Respondents reserve the right to claim the attorney-client privilege and/or attorney work
36  product immunity in accordance with FRCP 26, for such documents, and EPA reserves the right to
37  challenge any such claims by Respondents.  After this 10-year period, Respondents shall notify EPA
38  and DEQ at least ninety (90) days before the documents are scheduled to be destroyed.  If EPA or DEQ
39  requests that the documents be saved, Respondents shall, at no cost to EPA or DEQ, give the requesting
40  agency the documents or copies of the documents.
41

## XVIII. DISPUTE RESOLUTION

1.    Any disputes concerning activities or deliverables required under this Order may be resolved as follows: If Respondents object to any EPA notice of disapproval or requirement made pursuant to this Consent Order, Respondents shall notify the EPA Project Coordinator in writing of their objection(s) within fourteen (14) days of receipt of the disapproval notice or requirement. Respondents' written objection(s) shall define the dispute, state the basis of Respondents' objection(s), and be sent certified mail, return receipt requested. EPA and Respondents then have an additional fourteen (14) days from Respondents' receipt of the return receipt to reach agreement. If an agreement is not reached within fourteen (14) days, Respondents may request a determination by EPA's Environmental Cleanup Office (ECL) Director. The ECL Director's determination is EPA's final decision. Respondents shall proceed in accordance with EPA's final decision regarding the matter in dispute, regardless of whether Respondents agree with the decision. If Respondents do not agree to perform or do not actually perform the work in accordance with EPA's final decision, EPA reserves the right in its sole discretion to conduct the work itself, to seek reimbursement from Respondents, to seek enforcement of the decision, to seek penalties, and/or to seek any other appropriate relief.

2.    Respondents are not relieved of any obligations to perform and conduct activities and submit deliverables on the schedule set forth in the SOW or work plan, while a matter is pending in dispute resolution. The invocation of dispute resolution does not stay stipulated penalties under this Order.

## XIX. DELAY IN PERFORMANCE/STIPULATED PENALTIES

1.    Unless there is a Force Majeure event as defined in Section XX below, for each day that Respondents fail to complete a deliverable in a timely manner or fail to produce a deliverable of acceptable quality, or otherwise fail to perform in accordance with the requirements of this Order, Respondents shall be liable for stipulated penalties. DEQ may identify a violation of the Order and recommend to EPA that EPA impose stipulated penalties for such violation. Penalties begin to accrue on the day that performance is due or a violation occurs, and extend through the period of correction. Where a revised submission by Respondents is required, stipulated penalties shall continue to accrue until a satisfactory deliverable is produced. EPA will provide written notice for violations that are not based on timeliness; nevertheless, penalties shall accrue from the day a violation commences. EPA may, at its discretion, waive imposition of stipulated penalties if it determines that Respondents have attempted in good faith to comply with this Order, or have timely cured defects in initial submissions. Payment shall be due within thirty (30) days of receipt of a demand letter from EPA, unless otherwise agreed to by EPA.

2.    Unless EPA has agreed to a longer period of time for payment pursuant to paragraph 1, above, Respondents shall pay interest on the unpaid balance, which shall begin to accrue at the end of the 30-day period, at the rate established by the Department of Treasury pursuant to 30 U.S.C. § 3717. Respondents shall further pay a handling charge of one percent (1%), to be assessed at the end of each thirty-one (31) day period, and a six percent (6%) per annum penalty charge, to be assessed if the penalty is not paid in full within ninety (90) days after it is due.

3.    Respondents shall make all payments by check to: U.S. Environmental Protection Agency, Superfund Accounting,   P.O. Box 360903M, Pittsburgh, Pennsylvania 15251.

**Portland Harbor Superfund Site RI/FS AOC  - 20**

1    Checks should identify the name of the Site, the Site identification number, the account number and the
2    title of this Order.  A copy of the check and/or transmittal letter shall be forwarded to the EPA Project
3    Coordinator.
4                    4.    For the following deliverables, stipulated penalties shall accrue in the amount of
5    $500 per day, per violation, for the first seven days of noncompliance; $1,000 per day, per violation, for
6    the 8th through 14th day of noncompliance; $2,500 per day, per violation, for the 15th day through the
7    30th day; and $5,000 per day per violation for the 30th day through the 90th day.
8                    a)    An original and any revised deliverables and/or work products described in the
9    Stipulation and Agreement.
10                   b)    An original and any revised RI/FS work plan, including addenda.
11                   c)    An original and any revised SAP.
12                   d)    An original and any revised Site health & safety plan.
13                   e)    An original and any revised RI report.
14                   f)    An original and any revised treatability statement of work.
15                   g)    An original and any revised treatability testing work plan.
16                   h)    An original and any revised treatability study sampling & analysis plan.
17                   i)    An original and any revised treatability study health & safety plan.
18                   j)    An original and any revised risk assessment scoping memorandum; the original
19   risk assessment scoping memorandum shall be the version submitted in response to EPA's first round of
20   comments on Respondents' draft memorandum submitted to EPA pursuant to this Order within 120
21   days after the effective date.
22                   k)    An original and any revised FS report.
23                   l)    An original and any revised baseline risk assessment report.
24                   5.    For the following interim deliverables, stipulated penalties shall accrue in the
25   amount of $250 per day, per violation, for the first week of noncompliance; $500 per day, per violation,
26   for the 8th through 14th day of noncompliance; $1,500 per day, per violation, for the 15th day through
27   the 30th day of noncompliance; and $2,500 per day per violation for the 30th day through the 90th day
28   of noncompliance.
29                   a)    An original and any revised Data Quality Objectives submitted with the RI/FS
30   work plan for the ISA and adjacent areas, including addenda.
31                   b)    An original and any revised completed Site relational database.
32                   c)    An original and any revised data gaps table submitted with the RI/FS work plan
33   described in subparagraph B. Task 2.ii.f, above, including addenda.
34                   d)    An original and any revised Site trip report submitted with the RI/FS work plan
35   described in subparagraph B. Task 2.ii.f, above, including addenda.
36                   e)    An original and any revised preliminary analytical goals submitted with the RI/FS
37   work plan described in subparagraph B. Task 2.ii.f, above, including addenda.
38                   f)    An original and any revised preliminary CSM submitted with the RI/FS work
39   plan described in subparagraph B. Task 2.ii.f, above, including addenda.
40                   g)    An original and any revised technical memorandum identifying potential criteria
41   for identification of candidate early action areas, and any deliverable using these criteria to identify
42   areas that may be candidates for early action.
43                   h)    An original and any revised technical memorandum on modeling of Site
44   characteristics submitted with the RI/FS work plan described in subparagraph B. Task 2.ii.f, above,
45   including addenda.

1          i)    '   An original and any revised Site characterization summary.
2          j)    ·     An original and any revised identification of candidate technologies
3   memorandum.
4                                   k)    An original and any revised technical memorandum
5                               identifying preliminary RAOs.
6                                   l)    An original and any revised technical memorandum
7                               describing process(es) to identify and obtain disposal site options for
8                               contaminated sediment.
9                                   m)    An original and any revised technical
10                              memorandum identifying potential sources of sediment capping materials
11                              and/or outlining testing requirements needed to evaluate the acceptability
12                              of any such material.
13                                  n)    An original and any revised technical memorandum
14                              identifying the data to evaluate natural attenuation options.
15         o)    An original and any revised treatability testing evaluation report.
16         p)    An original and any revised treatability study evaluation report.
17         q)    .    An original and any revised Site-specific remedial action objectives refined and
18  documented pursuant to this Order (due ninety (90) days after Respondents' receipt of EPA's comments
19  on the draft RI report).
20         r)    Memoranda on development and preliminary screening of alternatives, assembled
21  alternatives screening results, and final screening.
22         s)    Comparative analyses of remedial alternatives report.
23         t)    An original and any revised cultural resource analysis.
24         6.    For the monthly progress reports, stipulated penalties shall accrue in the amount
25  of $200 per day, per violation, for the first week of noncompliance; $500 per day, per violation, for the
26  8th through 14th day of noncompliance; $1,000 per day, per violation, for the 15th day through the 30th
27  day; and $2,000 per day, per violation, for the 30th day through the 90th day. Stipulated penalties for
28  monthly progress reports shall not accrue during the first two hundred ten (210) days after the effective
29  date of this Order.
30         7.    Respondents may dispute EPA's right to the stated amount of penalties by
31  invoking the dispute resolution procedures under Section XVIII herein. Penalties may, at EPA's
32  discretion, accrue, but need not be paid, during the dispute resolution period. If Respondents do not
33  prevail upon resolution, all penalties shall be due to EPA within thirty (30) days of resolution of the
34  dispute, unless otherwise agreed to by EPA. If Respondents prevails upon resolution, no penalties shall
35  be paid.
36         8.    If EPA requires corrections to be reflected in the next deliverable and does not
37  require resubmission of that deliverable, stipulated penalties for that interim deliverable shall cease to
38  accrue on the date of such decision by EPA.
39         9.    The stipulated penalties provisions do not preclude EPA from pursuing any other
40  remedies or sanctions which are available to EPA because of Respondents' failure to comply with this
41  Consent Order, including, but not limited to, conduct of all or part of the RI/FS by EPA. Payment of
42  stipulated penalties does not alter Respondents' obligation to complete performance under this Consent
43  Order.
44         10.    Respondents are each jointly and severally liable to comply with this Order.
45  Failure to comply by one Respondent does not excuse performance by any other Respondents.

**Portland Harbor Superfund Site RI/FS AOC  - 22**

1
2                                    **XX.FORCE MAJEURE**
3                  1.       "Force Majeure," for purposes of this Consent Order, is defined as any event
4    arising from causes ~~entirely~~ beyond the control of Respondents and of any entity controlled by
5    Respondents, including their contractors and subcontractors, that delays the timely performance of any
6    obligation under this Consent Order notwithstanding Respondents' best efforts to avoid the delay.  The
7    requirement that the Respondents exercise "best efforts to avoid the delay" includes using best efforts to
8    anticipate any potential Force Majeure event and best efforts to address the effects of any potential
9    Force Majeure event (1) as it is occurring, and (2) following the potential Force Majeure event, such that
10   the delay is minimized to the greatest extent practicable.  Examples of events that are not Force Majeure
11   events include, but are not limited to, increased costs or expenses of any work to be performed under
12   this Order or the financial difficulty of Respondents to perform such work.
13                 2.       If any event occurs or has occurred that may delay the performance of any
14   obligation under this Order, whether or not caused by a Force Majeure event, Respondents shall notify,
15   by telephone, the EPA RPM or, in his or her absence, the ECL Director, within forty-eight (48) hours of
16    when Respondents knew or should have known that the event might cause a delay.  Within seven (7)
17   business days thereafter, Respondents shall provide, in writing, the reasons for the delay, the anticipated
18   duration of the delay, all actions taken or to be taken to prevent or minimize the delay, a schedule for
19   implementation of any measures to be taken to mitigate the effect of the delay, and a statement as to
20   whether, in the opinion of Respondents, such event may cause or contribute to an endangerment to
21   public health, welfare, or the environment.  Respondents shall exercise best efforts to avoid or minimize
22   any delay and any effects of a delay.  Failure to comply with the above requirements shall preclude
23   Respondents from asserting any claim of Force Majeure.
24                 3.       If EPA agrees that the delay or anticipated delay is attributable to Force Majeure,
25   the time for performance of the obligations under this Order that are directly affected by the Force
26   Majeure event shall be extended by written agreement of the parties, for a period of time not to exceed
27   the actual duration of the delay caused by the Force Majeure event.  An extension of the time for
28   performance of the obligation directly affected by the Force Majeure event shall not extend the time for
29   performance of any subsequent obligation.
30                 4.       If EPA does not agree that the delay or anticipated delay has been or will be
31   caused by a Force Majeure event, or does not agree with Respondents on the length of the extension, the
32   issue shall be subject to the dispute resolution procedures set forth in Section XVII of this Order.  In any
33   such proceeding, to qualify for a Force Majeure defense, Respondents shall have the burden of ·
34   demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be
35   caused by a Force Majeure event, that the duration of the delay was or will be warranted under the
36   circumstances, that Respondents did exercise or are exercising due diligence by using their best efforts
37   to avoid and mitigate the effects of the delay, and that Respondents complied with the requirements of
38   this Section.
39                 5.       Should Respondents carry the burden set forth in the preceding paragraph, the
40   delay at issue shall be deemed not to be a violation of the affected obligation of this Consent Order.
41

**Portland Harbor Superfund Site RI/FS AOC  - 23**

1            **X. RESERVATIONS OF RIGHTS**
2            1.        EPA reserves the right to bring an action against Respondents under Section 107
3    of CERCLA, 42 U.S.C. § 9607, for recovery of all response costs including oversight costs, incurred by
4    the United States, and by DEQ as support agency, for activities relating to this RI/FS, at the Site that are
5    not reimbursed by Respondents, any costs incurred if EPA performs the RI/FS or any part thereof, and
6    any future costs incurred by the United States in connection with response activities conducted under
7    CERCLA at the Site.  Respondents reserve all rights consistent with this Order to defend against any
8    such action.  EPA will not bring an action against Respondents to recover response costs incurred prior
9    to January 26, 2001 while this Consent Order is in effect.
10            2.        EPA reserves the right to bring an action against Respondents to enforce the
11   response and oversight cost reimbursement requirements of this Consent Order, to collect stipulated
12   penalties assessed pursuant to this Consent Order, and to seek penalties pursuant to Section 109 of
13   CERCLA, 42 U.S.C. § 9609.  Respondents reserve all rights consistent with this Order to defend against
14   any such action by EPA, though Respondents waive any defenses to such actions on the basis of claim-
15   splitting or any applicable statute of limitations or laches while this Consent Order is in effect.
16            3.        EPA or Respondents' failure to specifically reserve a particular right herein shall
17   not be construed as a waiver of that right.  Except as expressly provided in this Order, each party
18   reserves all rights and defenses it may have.  Nothing in this Consent Order shall affect EPA's removal
19   authority or EPA's response or enforcement authorities including, but not limited to, the right to seek
20   injunctive relief, stipulated penalties, statutory penalties, and/or punitive damages.
21            4.        Following satisfaction of the requirements of this Consent Order, Respondents
22   shall have resolved their liability to EPA for the work performed by Respondents pursuant to this
23   Consent Order.  Respondents are not released from liability, if any, for any response actions taken
24   beyond the scope of this Order regarding removals, other operable units, remedial design/remedial
25   action, or activities arising pursuant to Section 121(c) of CERCLA, 42 U.S.C. § 9621(c).
26            5.        Respondents reserve the right to claim the attorney-client privilege and/or
27   attorney work product immunity in accordance with FRCP 26, for documents, and EPA reserves the
28   right to challenge any such claim by Respondents.
29            6.        EPA recognizes that Respondents are entering into this Order notwithstanding
30   that contamination at the Site may have been caused by entities other than Respondents.  In actions
31   concerning the Site, EPA agrees to apply the EPA Orphan Policy, Attachment C hereto.
32
33           **XXII.  REIMBURSEMENT OF EPA RESPONSE COSTS**
34            1.        Following the issuance of this Consent Order, EPA shall submit an accounting to
35   Respondents on a periodic basis of all response and oversight costs incurred by the United States in the
36   implementation and oversight of this Order.  Such response costs may include, but are not limited to,
37   costs incurred by the United States in overseeing Respondents' implementation of the requirements of
38   this Consent Order and activities performed by the United States as part of this RI/FS, including any
39   costs incurred to obtain access for Respondents pursuant to this Consent Order, in connection with
40   preparation of the risk assessment for the site, and for community relations activities for this RI/FS.
41   However, where consistent with any access strategy developed by the parties pursuant to Section XIV.6,
42   EPA may, in its discretion, use its enforcement authority to obtain access and seek cost recovery from
43   any party who denies access.  Costs shall include all direct and indirect costs, including, but not limited
44   to, time and travel costs of EPA personnel and associated indirect costs, coordination between DEQ and
45   EPA regarding uplands source identification and control and in-water investigation, contractor costs,

1  cooperative agreement costs, compliance monitoring, including the collection and analysis of split
2  samples, inspection of RI/FS activities, site visits, discussions regarding disputes that may arise as a
3  result of this Consent Order, review and approval or disapproval of reports, and costs incurred by EPA
4  of redoing any of Respondents' tasks. Any necessary summaries, including, but not limited to EPA's
5  certified Agency Financial Management System summary data (SCORES Reports), or such other
6  summary as certified by EPA, shall serve as basis for payment demands. However, Respondents may
7  review the following underlying EPA oversight cost documentation: EPA personnel time sheets, travel
8  authorizations and vouchers; EPA contractor monthly invoices; and all applicable contract laboratory
9  program (CLP) invoices. Costs reimbursable under this Order shall not include costs incurred prior to
10 January 26, 2001.
11           2.    Respondents shall, within 30 days of receipt of each accounting, remit a certified
12 or cashier's check for the amount of the costs set forth in the accounting. If payment of such costs is not
13 made within 30 days of receipt of the accounting, interest shall accrue from the date of receipt of the
14 accounting through the date of payment. The interest rate is the rate of interest on investments for the
15 Hazardous Substances Superfund in section 107(a) of CERCLA, compounded annually on October 1.
16           3.    Checks shall be made payable to the Hazardous Substances Superfund and should
17 include the name of the site, the site identification number (103R), and the title of this Consent Order.
18 Checks shall be forwarded to: Mellon Bank, EPA-Region 10, Superfund Accounting, P.O. Box
19 360903M, Pittsburgh, PA 15251.
20           4.    Copies of the transmittal letter and check should be sent simultaneously to the
21 EPA Project Coordinator.
22           5.    Respondents agree to limit any disputes concerning costs to accounting errors and
23 the inclusion of costs outside the scope of this Consent Order, including, but not limited to, costs for
24 work which is inconsistent with this Order. Respondents shall identify any contested costs and the basis
25 of their objection. All undisputed costs shall be remitted by Respondents in accordance with the
26 schedule set forth above. Disputed costs shall be paid by Respondents into an escrow account while the
27 dispute is pending. Respondents bear the burden of establishing an EPA accounting error or the
28 inclusion of costs outside the scope of this Order, or that such costs do not meet the standard for
29 recovery of costs set forth in Section 107(a)(4)(A) of CERCLA.
30
31                  **XXIII. REIMBURSEMENT OF DEQ RESPONSE COSTS**
32           1.    Following the issuance of this Consent Order, DEQ will submit an accounting to
33 Respondents on a monthly basis of all Support Agency oversight costs incurred by DEQ in
34 implementation and oversight of this Order. Respondents shall pay all direct and indirect Support
35 Agency costs incurred by DEQ consistent with this Consent Order, including but not limited to DEQ's
36 costs of coordinating with EPA regarding uplands source identification and control and in-water
37 investigations, identifying state ARARs and reviewing data and documents in relation to state ARARs,
38 including but not limited to ORS 465 and state laws pertaining to releases of petroleum. Respondents
39 are not responsible under this Order for DEQ's Lead Agency response costs incurred in conducting or
40 overseeing site assessments and RI/FSs pursuant to ORS Chapter 465, which include source
41 identification and source control. Respondents shall not be obligated to pay under this Order any
42 assessment under ORS 465.333, although DEQ may continue to recover such assessments under its
43 negotiated cost recovery agreements or, where applicable, through other independent legal means.
44 Costs reimbursable under this Order shall not include costs incurred prior to January 26, 2001.

**Portland Harbor Superfund Site RI/FS AOC - 25**

1          2.      Respondents shall, within 30 days of receipt of each DEQ invoice, remit a check
2   payable to "State of Oregon, Hazardous Substance Remedial Action Fund", mailed to Oregon
3   Department of Environmental Quality, Accounting, 811 S.W. Sixth Ave., Portland, OR 97204.
4   Respondents shall pay simple interest of 9% per annum on the balance of any unpaid DEQ costs, which
5   interest shall begin to accrue at the end of the 30-day payment period.
6          3.      DEQ invoices will include a summary of costs billed to date.  Upon request to
7   DEQ, Respondents may review underlying documentation including but not limited to:  DEQ personnel
8   time sheets; travel authorizations and vouchers; DEQ contractor monthly invoices; and all applicable
9   laboratory invoices.  Respondents agree to limit any disputes concerning costs to accounting errors and
10  the inclusion of costs outside the scope of this Consent Order, including, but not limited to, costs for
11  work which is inconsistent with this Order.  Respondents shall identify any contested costs and the basis
12  for their objection.  All undisputed costs shall be remitted by Respondents in accordance with the
13  schedule set forth above.  Respondents bear the burden of establishing a DEQ accounting error or the
14  inclusion of costs outside the scope of this Order, or that such costs do not meet the standard for
15  recovery of costs set forth in ORS 465.200(23).
16
17                          **XXIVDISCLAIMER**

18          1.      In entering into this Consent Order, Respondents neither admit nor deny EPA's
19  Findings of Fact and Conclusions of Law.  Respondents' participation in this Order shall not be
20  considered an admission of liability and is not admissible in evidence against Respondents in any
21  judicial or administrative proceeding other than a proceeding by the United States, including EPA, to
22  enforce this Consent Order or a judgment relating to it.  Respondents retain their rights to assert claims
23  against other potentially responsible parties at the Site.  However, Respondents agree not to contest the
24  validity or terms of this Order, or the procedures underlying or relating to it in any action brought by the
25  United States, including EPA, to enforce this Order.
26
27                         **XXV.  OTHER CLAIMS**
28          1.      In entering into this order, Respondents also waive any right to seek
29  reimbursement under Section 106(b) of CERCLA, 42 U.S.C. §9606(b).  Respondents also waive any
30  right to present a claim under Section 111 or 112 of CERCLA, 42 U.S.C. §§ 9611 or 9612.  This Order
31  does not constitute any decision on preauthorization of funds under Section 111(a)(2) of CERCLA,
32  42 U.S.C. § 9611(a)(2).  Respondents further waive all other statutory and common law claims against
33  EPA relating to or arising out of conduct of the RI/FS, including, but not limited to, contribution and
34  counterclaims.
35          2.      Nothing in this Order shall constitute or be construed as a release from any
36  claim, cause of action, or demand in law or equity against any person, firm, partnership, subsidiary, or
37  corporation not a signatory to this Consent Order for any liability it may have arising out of, or relating
38  in any way to, the generation, storage, treatment, handling, transportation, release, or disposal of any
39  hazardous substances, pollutants, or contaminants found at, taken to, or taken from the Site.  If any
40  Section or portion of this Order is invalidated for any reason, all remaining Sections or portions shall
41  remain in full force and effect.
42

## XXVI. FINANCIAL ASSURANCE/INSURANCE/INDEMNIFICATION

1.     Respondents shall establish and maintain a financial instrument or trust account or other financial mechanism acceptable to EPA, including a demonstration that one or more of the Respondents satisfy the requirements of 40 C.F.R. 264.143(f) to perform the work and any other obligations required under this Consent Order, including a margin for cost overruns. Within forty-five (45) days after the effective date of this Consent Order, Respondents shall make the demonstration or fund the financial instrument or trust account sufficiently to perform the work required under this Consent Order projected for the period beginning with the effective date of the Order through December 31, 2001. Beginning January 1, 2002, and on or before the 15th day of January of each calendar year thereafter, Respondents shall make the demonstration or fund the financial instrument or trust account sufficiently to perform the work and other activities required under this Order projected for the succeeding calendar year quarter.

2.     To the extent that financial assurance is provided by financial instrument or trust account, if at any time the net worth of the financial instrument or trust account is insufficient to perform the work and other obligations under this Order for the upcoming quarter, Respondents shall provide written notice to EPA within seven (7) days after the net worth of the financial instrument or trust account becomes insufficient. The written notice shall describe why the financial instrument or trust account is funded insufficiently and explain what actions have been or will be taken to fund the financial instrument or trust account adequately.

3.    (a)    Prior to commencement of any work under this Order, Respondents shall either make the demonstration required in paragraph 3(d) below, or shall secure, and shall maintain in force for the duration of this Order, and for two (2) years after the completion of all activities required by this Consent Order the following insurance policies naming the United States as an additional insured:

        i.    Comprehensive General Liability (CGL) in the amount of at least $1 million combined single limit, $2 million aggregate, including Contractual Liability Insurance in the amount of one million dollars per occurrence;

        ii.    Automobile insurance, with limits of $1 million, combined single limit, and

        iii.    Umbrella Liability Insurance in excess of CGL and automobile liability coverage in the amount of $5 million per occurrence.

        (a)    Respondents shall also either make the demonstration required in paragraph 3(d) below or shall secure, and maintain in force for the duration of this Order and for two (2) years after the completion of all activities required by this Consent Order the following:

        i.    Professional Errors and Omissions Insurance in the amount of at least two million dollars per occurrence.

**Portland Harbor Superfund Site RI/FS AOC - 27**

1    ii.    Pollution Liability Insurance in the amount of at least two million dollars
2 per occurrence, covering as appropriate both general liability and professional liability arising from
3 pollution conditions.
4    (c)    For the duration of this order, Respondents shall satisfy, or shall ensure
5 that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the
6 provision of employer's liability insurance and workmen's compensation insurance for all persons
7 performing work on behalf of the Respondents, in furtherance of this Order.
8    (d)    If Respondents demonstrate by evidence satisfactory to EPA that any
9 contractor or subcontractor maintains insurance equivalent to that described above, or insurance
10 covering the same risks but in a lesser amount, then with respect to that contractor or subcontractor
11 Respondents need provide only that portion of the insurance described above which is not maintained by
12 the contractor or subcontractor.
13    (e)    Prior to commencement of any work under this Order, and annually
14 thereafter on the anniversary of the effective date of this Order, Respondents shall provide certificates of
15 such insurance and a copy of each insurance policy to EPA.
16    4.    At least seven (7) days prior to commencing any work under this Consent Order,
17 Respondents shall certify to EPA that the required insurance has been obtained by that contractor.
18    5.    Respondents agree to indemnify and hold the United States, its agencies,
19 departments, agents, and employees harmless from any and all claims or causes of action arising from or
20 on account of acts or omissions of Respondents, their employees, agents, servants, receivers, successors,
21 assignees, or any persons including, but not limited to, firms, corporations, subsidiaries, and contractors,
22 in carrying out activities under this Consent Order. The United States or any agency or authorized
23 representative of the United States shall not be held as a party to any contract entered into by
24 respondents in carrying out activities under this Consent Order.
25
26    **XXVII.  EFFECTIVE DATE AND SUBSEQUENT MODIFICATIONS**
27    1.    The effective date of this Consent Order shall be the date it is signed by EPA.
28    2.    This Consent Order may be amended by mutual agreement of EPA and
29 Respondents. Amendments shall be in writing and shall be effective when signed by EPA's delegated
30 authority. EPA Project Coordinators may adjust schedules but do not have the authority to sign
31 amendments to this Consent Order.
32    3.    No informal advice, guidance, suggestions, or comments by EPA regarding
33 reports, plans, specifications, schedules, and any other writing submitted by Respondents will be
34 construed as relieving Respondents of their obligation to obtain such formal approval as may be
35 required by this Order. Any deliverables, plans, technical memoranda, reports (other than progress
36 reports), specifications, schedules, and attachments required by this Consent Order or EPA are
37 incorporated into this Order upon approval by EPA.
38
39    **XXXVIII.  TERMINATION AND SATISFACTION**
40    1.    This Consent Order shall terminate when Respondents demonstrate, in writing,
41 and certify to the satisfaction of EPA that all activities required under this Consent Order, as amended
42 by any modifications, including any additional work, payment of oversight costs, and any stipulated
43 penalties demanded by EPA, have been performed and EPA has approved the certification. This notice
44 shall not, however, terminate Respondents' obligation to comply with Sections XVII and XXII of this
45 Consent Order.

**Portland Harbor Superfund Site RI/FS AOC  - 28**

1    2.    The certification shall be signed by a responsible official representing each
2  Respondent. Each representative shall make the following attestation: "I certify under penalty of
3  perjury under the laws of the United States that the information contained in or accompanying this
4  certification is true, accurate, and complete." For purposes of this Consent Order, a responsible official
5  is a corporate official who is in charge of a principal business function.
6
7                    Issued this _____ day of _____ , 2001
8                    U.S. EPA, Region X, Office of Environmental Cleanup
9
10                   BY: _____
11                       Amber L. Wong, Manager, Site Assessment & Cleanup Unit
12
13
14
15
16
17
18
19
20
21
22
23
24  For
25
26
27
28            BY: _____    DATE: _____
29
30            _____

**Portland Harbor Superfund Site RI/FS AOC - 29**

1                    (title)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Portland Harbor Superfund Site RI/FS AOC  - 30**