# Exhibit 19

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated solely for reference purposes as of September 10, 2012 is made by and between Linnton Plywood Association, an Oregon cooperative corporation ("**Seller**"), and SN BARNES MANAGEMENT, LLC, a California limited liability company ("**Buyer**"). The date on which this Agreement has last been executed by both Buyer or Seller, as indicated on the signature page hereto, shall be referred to herein as the "**Effective Date**."

1.    **PURCHASE AND SALE**

Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the Property on the terms and subject to the conditions set forth in this Agreement. As used in this Agreement, the term "Property" shall include that certain real property more particularly described in the attached Exhibit A (and incorporated herein by this reference), together with all buildings, structures and other improvements located on the Property, all water rights, surface and subsurface mineral rights of any nature, including minerals, oil, gas, or other hydrocarbon substances, all farming rights, easements, and any and all transferable permits, licenses, certificates, consents and approvals issued by any governmental or quasi-governmental agency, development agreements, zoning agreements, maps, improvement plans and other engineering work, permits, maps, approvals, entitlements, credits, reimbursements, third-party warranties and indemnities, and other rights, privileges, and benefits relating or appurtenant to the Property; provided, however, the term "Property" shall not include Seller's rights or obligations under any leases of submerged or submersible lands from the State of Oregon, Department of State Lands ("DSL"). Buyer intends to construct a restoration project on the Property in the nature of an intertidal and estuarine marsh complex including a vegetative buffer ("Restoration Project").

2.    **PURCHASE PRICE; DEPOSIT; ESCROW**

(a)    The purchase price ("**Purchase Price**") for the Property shall be five million seven hundred fifty thousand and No/100ths Dollars ($5,750,000.00), and shall be paid as set forth in this Section 2 below.

(b)    Within three (3) business days following the Effective Date, Buyer shall deposit in escrow with Chicago Title Company (1211 SW Fifth Avenue, Suite 2130, Portland, Oregon 97204, Attention: Jennifer Lyke) (the "**Escrow Holder**"), as an initial deposit hereunder, the sum of twenty five thousand and No/100ths Dollars ($25,000.00) (the "**Cash Deposit**"). Buyer shall thereafter make Periodic Deposits as more specifically set forth hereafter (such Cash Deposit and Periodic Deposits, collectively, the "**Deposit**.") The Deposit shall at all times before the Closing be invested in an interest-bearing account. Buyer shall provide the Escrow Holder with its taxpayer identification number, and all interest earned on the Deposit shall be reported to the appropriate tax authorities using Buyer's taxpayer identification number. At the expiration of the Investigation Period, provided Buyer delivers to both Seller and Escrow Holder the Investigation Matters Approval Notice pursuant to Section 3.4, the Deposit shall be non-refundable, except in the event of Seller's Default, in which case the Deposit shall be

1

refundable. If an Investigation Matters Approval Notice is not timely delivered by Buyer, this Agreement shall be terminated and the Deposit returned to Buyer.

(c)     Buyer agrees to make certain Periodic Deposits. The first of these shall be made on or before September 14, 2012. The amount of this Periodic Deposit shall be the full amount of Seller's 2008 ad valorem real property tax payment for the Property, which is for purposes of this Agreement estimated to be in the amount of $140,000. Buyer and Seller agree that this amount shall be released by means of a direct payment out of escrow to the Multnomah County Assessor. Said $140,000 payment shall be refundable until Buyer provides to Seller Buyer's Investigation Matters Approval Notice. If the Closing Date is extended for one year pursuant to the provisions of Section 9.1 or as otherwise permitted under this Agreement or by agreement of the Parties such that Closing has not occurred prior to August 12, 2013, then Buyer shall deposit and release the full amount of the 2009 ad valorem real property taxes due on the Property, which for purposes of this Agreement are estimated to be in the amount of $133,000, by means of a direct payment out of escrow to the Multnomah County Assessor. Such additional deposit amount shall be nonrefundable, except in the event of Seller's Default or as otherwise provided in this Agreement, and shall be applied towards the Purchase Price.

(d)     On October 1, 2012, and the first day of each month thereafter until Closing, Buyer shall deposit with Escrow Holder additional Periodic Deposits in the amount of the reasonable carry costs for the Property (the "Carry Costs"), which are currently estimated at $12,395 per month; in no event shall Periodic Deposits to cover Carry Costs exceed such amount. Such Periodic Deposits shall be released to Seller and shall be refundable until Buyer provides to Seller Buyer's Investigation Matters Approval Notice, after which time said Periodic Deposits shall become nonrefundable, except in the event of Seller Default or in accordance with Section 8.1 below. For the months of October and November 2012, such amount of the Cash Deposit shall be released in satisfaction of the deposit of such Periodic Deposit amounts to cover Carry Costs for such months. All Periodic Deposits shall be applied toward the Purchase Price at Closing. The Parties acknowledge that the initial amount of $12,395 per month reflects Seller's current carry cost for the Property; *provided, however*, that Buyer may review such costs at any time and provide to Seller third party bids or assessments for reasonable reductions in such Carry Costs (including a reduction in the level of services provided, as is reasonable given the use of the Property during the Term and the reasonably anticipated use of the Property upon expiration of the Term), and Seller shall consider such reductions in good faith and if such reductions are reasonable, Seller shall elect whether to implement such cost reductions and such amounts or, if such suggested reductions are reasonable and Seller elects not to implement such cost reductions, Buyer's Periodic Deposits shall be reduced to reflect such reductions and Seller shall fund the amount of such proposed reductions directly; *provided further*, than any revenue obtained by Seller in connection with the operation, lease or rental or other use of the Property or any improvements thereon shall be first applied to payment of the Carry Costs; if such revenue plus the Periodic Deposit exceeds the Carry Costs, then Buyer's next Periodic Deposit shall be correspondingly reduced.

(e)     At the Closing, Buyer may, but shall not be obligated to, remit the full Purchase Price, minus the Deposit, and subject to a discount for early payment. Such discount shall be $250,000. The discounted Purchase Price for such early payment shall

2

therefore be five million five hundred thousand dollars ($5,500,000), minus the Deposit ("Discounted Purchase Price").

(f)    In the event Buyer does not, in its sole discretion, choose to pay the Discounted Purchase Price at Closing, Buyer shall pay the Purchase Price as follows:

(i)    A payment in the amount of two million five hundred thousand and No/100 dollars ($2,500,000), less the Deposit, shall be deposited with Escrow Holder by Buyer on or before the Closing by wire transfer of immediately available funds, for disbursement pursuant to the terms hereof, with the transfer of funds to Seller to be completed on the day of the Closing (**"Closing Payment"**).

(ii)    Buyer shall also furnish its secured promissory note ("Deferred Purchase Price Promissory Note") for the balance of the Purchase Price (**"Deferred Purchase Price"**).

(iii)    The Deferred Purchase Price Note shall be payable in monthly installments of interest only at the rate of 6% per annum (**"Note Payments"**) and with payment in full (**"Final Note Payment"**) to be made upon the first to occur of the accelerating events set forth below in Subparagraph (A).

(A)    The Deferred Purchase Price Note shall be in the principal amount of the Deferred Purchase Price. The principal amount of the Promissory Note shall accrue interest at the rate of six percent (6%) per annum for the entire term of the Promissory Note. There shall be no prepayment penalty. The Promissory Note shall contain acceleration conditions that require Buyer to pay the Deferred Purchase Price Note in full, together with accrued interest, upon the first occurrence of one of the following accelerating events:

(i)    Buyer commences material physical construction of its Restoration Project to the extent that the physical condition of the Property is materially altered and the fair market value of the Property is materially diminished, provided that Buyer presently contemplates construction of the following type which the Parties acknowledge would not diminish the Property's fair market value and thus not result in acceleration under this subsection (i): for illustrative purposes only, and not by way of limitation, test pits to determine soil quality/confirm utilities, demolition of unsafe or high-maintenance buildings (as to which Buyer shall first confer to secure Seller's approval which shall not be unreasonably withheld), improvement of infrastructure for soil transport (e.g. better facilities for barges in the event we elect to transport soil by barge), installation or destruction of on-site test wells;

(ii)    two (2) years after Closing if Closing occurs in 2013, or one year after Closing if Closing occurs in August 2014;

(iii)    the sale of discounted service acre year credits ("DSAY") or other similar environmental credits generated from the site in the amount of the Purchase Price;

3

(iv)   ninety (90) calendar days following the entry in the Federal Register of a Record of Decision ("ROD") regarding natural resource damages assessments for the Portland Harbor Superfund Site; or,

(v)   Buyer receives income in connection with the transfer, sale, or conveyance of a material interest in the Property, except for any sale of a portion of land to BP to create a "buffer zone."

(B)   The Promissory Note shall be secured by, (1) a Trust Deed, including an assignment of leases, and rents, executed by Buyer in favor of Seller (the "Trust Deed"), and (2) a Security Agreement, including (i) a grant to Seller of a first lien security interest in all DSAYs, 404 and ESA credits generated from Buyer's Restoration Project, and (ii) an agreement that Seller may file a UCC-1 Financing Statement ("Financing Statement") and any extensions, renewals or amendments thereof in such locations and forms as Seller may require to perfect a security interest (the "Security Agreement"). The Trust Deed shall be recorded upon the issuance of the Deferred Purchase Price Promissory Note, and shall encumber all of Buyer's right, title and interest in the Property, and shall be superior to all monetary encumbrances other than liens for non-delinquent real estate taxes and assessments. The form of the Promissory Note, the Trust Deed, the Security Agreement and the Financing Statement shall be that which is generally recognized as standard in this type of transaction and which are reasonably acceptable to each party. These documents shall be completed within the Investigation Period and attached as exhibits to this Agreement and shall be incorporated herein by this reference. The Trust Deed, Security Agreement and Financing Statement are collectively referred to herein as the "Security Documents."

(g)   Within two (2) business days following the Effective Date, Seller shall deliver a copy of this Agreement to the Escrow Holder. This Agreement shall serve as the initial escrow instructions. Buyer and Seller may execute further escrow instructions necessary or desirable, and consistent with the terms hereof, in connection with the escrow established for this transaction by the Escrow Holder (the "**Escrow**"), provided that such supplementary escrow instructions shall not be effective unless executed by both parties. Escrow Holder shall be the "**Reporting Person**" pursuant to Internal Revenue Code Section 6045(e) with respect to the transaction contemplated by this Agreement.

(h)   Seller acknowledges that Buyer has incurred and will continue to incur substantial costs in preparation for and entering into this Agreement and in diligence and planning activities undertaken in contemplation of this Agreement and which it will continue hereunder, and that such costs have been and will continue to be incurred in reliance on the prior agreement between the Parties and the willingness of Seller to enter into this Agreement. Among other things: (i) Buyer is depositing funds into escrow, for which interest accruing in escrow will not match the return Buyer expects from its use of available funds; (ii) Buyer has or will promptly order the Title Report and engage in additional diligence activities; (iii) Buyer and Seller are each committing to pay the Title Company's and Escrow Holder's fees except in the case of a default hereunder by the other, which shall constitute a cost to each party regardless of whether the Closing occurs; (iv) Buyer shall be bound by confidentiality obligations with respect to documents that have been or will be provided to it by Seller; and (v) Buyer will pay One Hundred Dollars ($100) for the benefit of Seller if this agreement is terminated. Seller and

4

Buyer each acknowledge that the contingencies in favor of Buyer in Section 3 are a normal part of the sales process and are not intended to create, and do not create, an option in favor of Buyer in light of all circumstances, and that neither Buyer nor Seller intends that this Agreement, or any contingencies to Buyer's obligations herein, to constitute an option.    Further, Seller acknowledges the adequacy of the consideration received by it in entering into this Agreement.

3.    **MEMORANDUM**

Concurrently with the execution of this Agreement, the Parties shall execute, acknowledge and deliver to Escrow Holder the "Memorandum of Purchase Agreement," a copy of which is attached hereto as Exhibit B and incorporated herein by this reference.    The Memorandum of Purchase Agreement shall be recorded concurrently with, and as a condition to, the release of any portion of the Deposit to Seller. In the event that this Agreement terminates, Buyer shall execute and deliver to Seller a Quitclaim Deed, in recordable form, for the purpose of removing the Memorandum of Purchase Agreement from the public records within five (5) days after the termination of this Agreement, provided that the Refundable Portion of the Deposit has been refunded to Buyer (to the extent that the Refundable Portion of the Deposit is required to be refunded to Buyer pursuant to the terms and conditions of this Agreement).

4.    **BUYER'S INVESTIGATION**

4.1    ***Scope of Investigation***

Buyer shall have the period commencing on the Effective Date and ending at 5:00 pm on the 90th day after the Effective Date (the "**Investigation Period**") to review and approve all matters relating to the Property, including the following matters (collectively, the "**Investigation Matters**"):

(a)    All matters relating to any governmental and other legal requirements relating to the Property, such as taxes, assessments, zoning, use permit requirements and building codes, including any certificates of occupancy, other governmental permits and plans and specifications for the Property.

(b)    The physical condition of the Property, including the interiors, exteriors, structures, pavements, utilities, and all other physical and functional aspects of the Property.

(c)    Any easements and/or access rights affecting the Property.

(d)    To the extent in Seller's possession or control, the following written materials relating to the Property, originals or true and complete copies of which shall be delivered or made available to Buyer, within five (5) business days after the Effective Date:

(i)    The Leases, any other leases and occupancy agreements affecting the Property and all amendments thereto;

5

(ii)     All service, management and other agreements, all warranties and guarantees, and permits, certificates of occupancy, governmental approvals, plans and specifications relating to the Property;

(iii)     Real estate tax and utility bills relating to the Property;

(iv)     Such other documents relating to the Property in Seller's possession or control as Buyer may reasonably request;

(v)     All soils, seismic, structural, mechanical, engineering, property inspection, surveys, hazardous/toxic materials, environmental impacts and other written reports and documents relating to the Property; and

(vi)     Seller's No Further Action letter ("**NFA**") and Source Control Determination from the State of Oregon Department of Environmental Quality regarding potential environmental conditions at the Property.

(e)     All matters relating to the feasibility of Buyer's proposed ownership of the Property.

(f)     Natural hazards disclosure statements for the Property, to the extent required under Oregon law, to be delivered to Buyer within fifteen (15) days after the Effective Date.

4.2     ***Entry; Insurance; Indemnity***

Between the Effective Date and the Closing Date, Buyer, its agents, contractors, and subcontractors (collectively "**Buyer's Agents**"), shall have the right to enter upon the Premises at reasonable times during ordinary business hours upon notice to Seller at least one (1) business day prior to entry, or at any other times approved by Seller, to make such inspections, studies and assessments of the Premises as the Buyer may desire or to conduct any physical testing, boring, sampling or removal of any portion of the Premises.

If requested by Seller, prior to entry on to the Premises by Buyer or any Buyer's Agents, Buyer shall deliver to Seller an endorsement to a commercial general liability insurance policy which evidences that Buyer or Buyer's Agent, as applicable, is carrying a commercial general liability insurance policy with a financially responsible insurance company, covering the activities of Buyer or Buyer's Agent, as applicable, on or upon the Premises. Such insurance shall be in the amount of One Million Dollars ($1,000,000) combined single limit for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence. Except to the extent arising from the negligence or willful misconduct of Seller or Seller Related Parties (as defined below), Buyer shall indemnify, defend and hold Seller, its shareholders, directors, employees and representatives (collectively, "**Seller Related Parties**") and the Property harmless from any and all damages, claims, liabilities or expenses (including reasonable attorneys' fees) arising solely as a result of the entry onto or activities upon the Premises by Buyer and Buyer's Agents or liens arising from Buyer's due diligence review of the Property, except liability which results from the discovery or release of

6

preexisting toxic or hazardous materials on or about the Premises.  The provisions of this Section shall survive the termination of this Agreement and Closing.

### 4.3    *Restoration of Property*

If this Agreement terminates prior to the Close of Escrow, except as a result of Seller default, Buyer shall: (i) repair any damages resulting to the Property due to the activities of Buyer and/or Buyer's Agents and cause the Property to be returned to substantially the same condition as it was prior to any testing done by Buyer or Buyer's Agents on or with respect to the Property; (ii) deliver to Seller, without representation or warranty, copies of all tests, reports or inspections that Buyer and/or Buyer's Agents have conducted on or with respect to the Property (except for environmental tests, unless expressly requested by Seller); and (c) return to Seller all Documents and Materials delivered to Buyer by Seller.

### 4.4    *Investigations Concerning Environmental Condition of the Property*

Subject to Section 17.12, Buyer and Seller shall coordinate with each other on Buyer's efforts to investigate the environmental condition of the Property, including Buyer providing a plan summarizing its due diligence investigation for Seller's written approval.  Such written approval shall be provided with three (3) business days of receipt of the plan by Seller and such approval shall not be unreasonably withheld or conditioned, and in the event that Seller does not approve of such plan, Seller shall provide written explanation setting forth in reasonable detail the basis for such disapproval; *provided further*, that Seller acknowledges that Buyer may materially amend such plan at any time, and that any such material amendment shall be provided to Seller for review and approval, which approval shall be provided within two (2) business days, and in the event that Seller does not approve of such plan, Seller shall provide written explanation setting forth in reasonable detail the basis for such disapproval.  In this regard, subject to any Property leases, (a) Seller agrees to initiate commercially reasonable efforts to remove or relocate, or shall cause its tenants to remove or relocate, personal property located within the buildings or elsewhere on the Property that may interfere with Buyer's efforts to thoroughly investigate the environmental condition of the Property; (b) upon Seller's request, Buyer shall have split samples taken for Seller at no additional expense to Buyer; (c) the Parties shall coordinate the reporting of Buyer's findings; (d) Buyer shall provide Seller (without representation or warranty) copies of all tests, studies, assessments, reports and other documents prepared by Buyer's consultants in connection with Buyer's investigation of the environmental condition of the Property; and (e) Seller shall provide, at Buyer's expense, documents and information it has concerning the environmental condition of the Property and/or any information concerning the environmental condition of the adjacent properties.

### 4.5    *Presence of Structures and Fixtures*

Buyer acknowledges the presence of structures and fixtures on the Property. Seller shall have no obligation to remove or demolish such structures or fixtures  currently located on the Property or to pay any portion of the costs associated therewith or any resulting environmental remediation costs directly associated with the structures and fixtures themselves, such as lead paint or asbestos potentially in or on the structures or fixtures.

7

4.6    *Title Matters; Buyer's Objections; Seller's Right to Cure*

(a)    **Disapproved Matters**.

(i)    For the period commencing on the Effective Date and ending at 5:00 p.m. on the 60th day after the Effective Date (the "**Title Review Period**") Buyer shall have the right, by written notice to Seller (a "**Disapproval Notice**"), to disapprove any matter relating to title of the Property, including (i) matters disclosed by that certain preliminary report to be delivered by Seller within two (2) business days after the Effective Date, or by any underlying exception document referred to therein (collectively, the "**Title Report**"), issued by Chicago Title Insurance Company (the "**Title Company**"), or disclosed by any updates thereof or supplements thereto, and (ii) matters disclosed by any survey of the Property. Buyer may obtain, at Buyer's sole cost and expense, an ALTA survey of the Property, in form sufficient to satisfy the requirements of the Title Company for the issuance of an ALTA owner's policy of title insurance. If Seller fails to deliver, or to cause the Title Company to deliver, to Buyer a current Title Report (including legible copies of any exception documents referred to therein) within two (2) business days after the Effective Date, then the Title Review Period shall be extended by one (1) day for each day (or part thereof) thereafter that Seller fails to deliver a current Title Report to Buyer.

(ii)    If any material matter relating to title of the Property first arises after the expiration of the Title Review Period, or the Title Report is updated to disclose additional exceptions not set forth in the Title Report delivered by Seller to Buyer under Section 4.6(a)(i) above, and is not created or caused by Buyer, then Buyer shall have the right to disapprove such matter by delivering a Disapproval Notice to Seller within the later of five (5) business days after Buyer first becomes aware of such matter expiration of the Title Review Period.

(iii)    All matters relating to title to the Property to which Buyer objects pursuant to Section 4.6(a)(i) or 4.6(a)(ii) above shall be referred to as "**Disapproved Matters**." All matters relating to title to the Property which are not Disapproved Matters shall be deemed approved by Buyer.

(b)    **Seller's Right to Undertake Curative Action**. Within five (5) days after Seller's receipt of a Disapproval Notice, Seller may give written notice to Buyer (a "**Cure Notice**") of (i) any Disapproved Matters set forth in such Disapproval Notice with respect to which Seller is willing to undertake any curative action before the Closing, and (ii) the nature of each such curative action that Seller is willing to undertake (individually and collectively, "**Curative Action**"). Except as expressly set forth in any Cure Notice, Seller shall be deemed to have elected not to undertake any Curative Action with respect to any Disapproved Matters, provided, however, that notwithstanding anything in this Agreement to the contrary, Seller shall cure at Closing all exceptions relating to deeds of trust, mortgages, or mechanics' liens (not attributable to Buyer or Buyer's actions on the Premises), taxes which are due and payable, or delinquent (and any associated fines or penalties) that can be removed by the payment of money ("**Monetary Liens**") and such matters shall be deemed Disapproved Matters, which Buyer and Seller agree shall be resolved by Seller at Closing through the application of Purchase Price proceeds. If (1) the Curative Action set forth by Seller in any Cure Notice consists of anything

8

less than the complete and unconditional cure of all Disapproved Matters set forth in the Disapproval Notice to which such Cure Notice relates, or (2) Seller does not reply to a Disapproval Notice within five (5) days after Seller's receipt thereof, then Buyer may terminate this Agreement by giving written notice to Seller no later than 5:00 p.m. California time on the third (3rd) business day after receipt of such Cure Notice or the expiration of such five (5)-day period without reply from Seller, as the case may be. If Buyer does not so elect to terminate this Agreement, then Buyer shall be deemed to have waived its disapproval of all Disapproved Matters set forth in such Disapproval Notice except to the extent of Seller's agreement pursuant to the Cure Notice to undertake Curative Action with respect thereto. Unless Buyer terminates this Agreement pursuant to the foregoing, if Seller gives Buyer one or more Cure Notices, then (A) Seller shall use commercially reasonably efforts to complete the Curative Action set forth therein on or before the Closing Date, and (B) it shall be a condition to Buyer's obligation to purchase the Property hereunder, and a covenant of Seller, that all Curative Action shall actually be performed on or before the Closing Date.

(c)    **Extension of Closing Date**. If any situation described in Section 3.4(a)(ii) above occurs, and the respective time periods afforded Buyer and Seller to make any elections and give notices with respect thereto as permitted under Sections 4.6(a) and (b) will extend beyond the fifth (5th) day before the Closing Date, then the Closing Date shall be postponed until five (5) days after the disposition of such matter is determined in accordance with the provisions of this Section 4.6.

(d)    **Permitted Exceptions**. The Deed shall be subject to the following matters (the "**Permitted Exceptions**"):

(i)    General real estate taxes not yet due and payable as of the date of Closing;

(ii)    Leases, if any;

(iii)    the Miscellaneous Agreements assumed by Buyer at Closing;

(iv)    All title matters relating to the Property, other than Disapproved Matters, that are (1) discoverable by means of an accurate survey or inspection of the Property or by making inquiry of persons in possession, or (2) disclosed to Buyer in writing before the Closing;

(v)    All Disapproved Matters Seller has not completely and unconditionally agreed to cure, except to the extent, if any, Seller has agreed to undertake Curative Action pursuant to a Cure Notice; and

(vi)    All other exceptions created or agreed to by Buyer.

4.7    *Buyer's Right to Terminate*

Not later than 5:00 p.m. California time on the last day of the Investigation Period, Buyer shall deliver to Seller and Escrow Holder written notice that Buyer approves of the

9

Investigation Matters (the "**Investigation Matters Approval Notice**").  If Buyer fails to timely deliver such Investigation Matters Approval Notice to Seller and Escrow Holder, or if Buyer timely delivers notice to the Escrow Holder and Seller that Buyer disapproves of such Investigation Matters, then this Agreement shall be deemed terminated upon expiration of the Investigation Period and the Deposit shall be returned to Buyer and the parties shall have no further obligations to each other except for such obligations which expressly survive termination of this Agreement.  Buyer may elect to terminate this Agreement pursuant to this Section 4.7 for any reason based on Buyer's sole and absolute discretion, or for no reason at all.  In the event Buyer terminates this Agreement pursuant to this Section 4.7 or pursuant to any provision of Section 4.6(b), the Deposit (and any interest accrued thereon) shall be returned promptly to Buyer and, except for any provisions of this Agreement which expressly state that they shall survive the termination of this Agreement, this Agreement shall be terminated and canceled in all respects and neither Buyer nor Seller will have any further rights or obligations hereunder.

        4.8    *Certain Miscellaneous Agreements*

        At the Closing, Seller's rights and obligations under those agreements to be set forth on **Exhibit C** and to be attached hereto on or before the end of the Inspection Period, shall be assigned to and assumed by Buyer, except for any specific agreements which Buyer notifies Seller in writing prior to the expiration of the Investigation Period that Buyer elects not to assume ("**Rejected Agreements**").  Seller shall terminate all Rejected Agreements, if any, by the Closing Date.  Notwithstanding anything contained herein to the contrary, Buyer hereby agrees to accept and assume all agreements which cannot be terminated by Seller (i) without cause, or (ii) upon thirty (30) days' (or less) notice

    5.    **BUYER'S PROCESS AND TIMELINE FOR ACHIEVING CLOSING.**

        5.1    Buyer's Good Faith Obligation.  Following the expiration of the Investigation Period, subject to Section 12(a), Buyer shall use its  good faith, commercially reasonable efforts to  secure the following approvals or agreements that are Conditions to Buyer's Obligation to Close: (1) Section 7.1 (d) Prospective Purchaser Agreement ("PPA") to be issued by Oregon Department of Environmental Quality ("ODEQ"); (2) Section 7.1(e ) Solid Waste Letter of Authorization ("SWLA") from applicable agencies; (3) Section  7.1(f) Termination/Disposition of DSL Lease; and (4) Section 7.1(i) Agreement with BP resolving issues regarding potential environmental contamination originating from the adjacent BP/Arco facility.

        5.2    Coordination Agreement.  Subject to Section 17.12, Buyer and Seller shall use commercially reasonable efforts to coordinate with each other in all communications with the Environmental Agencies concerning the environmental condition of the Property and their pursuit of approvals of agreements that are Condition to Buyer's Obligation to Close.  In this regard, Buyer and Seller shall provide each other with timely updates concerning the status of their negotiations and communications with the Environmental Agencies, and shall provide each other with copies of any and all agreements, material correspondence, notices, documents and other materials that are exchanged with the Environmental Agencies. Each Party shall be solely responsible for all costs and expenses incurred by it with respect to their negotiations with the

Environmental Agencies. In the event that a Party ceases its negotiations with an Environmental Agency, such Party shall promptly notify the other Party of such matter.

      5.3   Timeline for Obtaining Section 7.1 PPA and Section 7.2 SWLA. Buyer agrees to use commercially reasonable efforts to meet the following timelines in obtaining the PPA and the SWLA:

      (i)   Complete site characterization required by applicable agencies no later than that commercially reasonable date upon which the parties mutually agree at the conclusion of Buyer's Investigation Period based upon an analysis of regulatory data gaps required by DEQ to be filled;

      (ii)   Submit the requisite application(s) no later than thirty (30) days following completion of the aforementioned site characterization;

      (iii)   Agree to meetings with applicable agencies when requested within 30 calendar days of such requests; and,

      (iv)   Respond to agency requests for information, where technically and economically feasible, within 30 calendar days of such requests.

## 6.    REPRESENTATIONS AND WARRANTIES.

### 6.1    *Representations and Warranties of Seller*

      Seller represents and warrants to Buyer as of the Effective Date and the Closing, as follows:

      (a)   Seller is a cooperative corporation, duly organized, validly existing and in good standing under the laws of the state of its formation, is authorized to do business in the State of Oregon. Seller has the power and authority to enter into this Agreement and convey the Property to Buyer and to execute and deliver the other documents referred to herein and to perform hereunder and thereunder on behalf of Seller. This Agreement has been duly authorized, executed and delivered by Seller.

      (b)   Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, nor the compliance with the terms and conditions hereof will violate, in any material respect, any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restrictions of any government, governmental agency or court to which Seller is subject.

      (c)   Seller has the authority to enter into this Agreement and to close this transaction and is not required to obtain the consent or approval of any government agency, department or other government body, or any other third party, trustee or trust beneficiary, to enter into this Agreement or if required, any such required consents or approvals have been obtained.

11

(d)    Seller has not (i) made a general assignment for the benefit of creditors; (ii) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by its creditors; (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets; (iv) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; (v) admitted in writing its inability to pay its debts as they come due; or (vi) made an offer of settlement, extension or composition to its creditors generally.

(e)    Seller has not received any actual (as opposed to constructive) notice of pending or threatened litigation which would materially and adversely affect the Property except as set forth on Schedule 6.1(e).

(f)    There is no pending or, to Seller's knowledge threatened, condemnation, zoning or other land-use regulation proceeding against the Property or any portion thereof. Seller has no knowledge or notice of any public request, plans or proposals for changes in access or other municipal improvements that may affect the Property or result in a tax, levy or assessment against the Property or otherwise detrimentally affect the use, operation or value of the Property.

(g)    To Seller's actual knowledge, there are no underground storage tanks located on the Property.

(h)    The copies of Leases, Miscellaneous Agreements and Other Due Diligence Materials to be provided by Seller to Buyer for its review shall be true, correct and complete copies of such documents as are in Seller's possession or control.

### 6.2    *Survival of and Limitations on Seller's Representations and Warranties*

The representations and warranties of Seller set forth in Section 4.1 shall survive the Closing of the transaction contemplated in this Agreement and the delivery of the Deed from Seller to Buyer for a period of one (1) year from and after the Closing Date (the "**Survival Period**").

### 6.3    **PROPERTY AS-IS WHERE IS CONDITION**

(a)    As-Is, Where-Is. Except for any of Seller's obligations to satisfy or offset the cost of any restoration obligations imposed by DSL in connection with any termination of the DSL Lease, and the representations and warranties made by Seller under this Agreement, Buyer is purchasing the Property "AS IS WHERE IS" IN ITS PRESENT CONDITION, WITH ALL FAULTS, IF ANY, AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, including, but not limited to the presence of structures and fixtures on the Property as Buyer acknowledged in Section 4.5 above . As of the Close of Escrow, Buyer will have inspected the Property and all Documents and Materials provided by Seller to Buyer as provided herein.

(b)    Disclaimer by Seller of Any and All Warranties and Representations. Except as expressly set forth in this Agreement and the warranties set forth or implied in the Warranty Deed, Seller makes no representations or warranties, express or implied, with respect to: (a) the condition of the Property or any buildings, structure or improvements thereon or the suitability of the Property for habitation or for Buyer's intended use; (b) any

12

applicable building, zoning or fire laws or regulations or with respect to compliance therewith or with respect to the existence of or compliance with any required permits, if any, of any governmental agency; (c) the availability or existence of any water, sewer or utilities, any rights thereto, or any water, sewer or utility districts; (d) access to any public or private sanitary sewer or drainage system; or (e) the presence of any Hazardous Materials at the Property or in any improvements on the Property or the presence of any environmentally hazardous wastes or materials in, on, or under the Property. Buyer acknowledges that, as of the Close of Escrow, Buyer will have fully inspected the Property. The provisions of this paragraph shall survive Closing and the recording of the Warranty Deed and the provisions of this paragraph shall not merge into the Warranty Deed.

        (c)     Hazardous Materials Defined.  For purposes of this Agreement, "Hazardous Materials" means any chemical, element, compound, material, mixture, waste or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any Environmental Laws as a "hazardous material," "hazardous substance," "hazardous waste," "extremely hazardous waste," "dangerous waste," "infectious waste," "toxic substance," "toxic pollutant," "pollutant," "regulated emission," or any other words of similar import intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, or toxicity, or as a nuisance, including without limitation polychlorinated biphenyls, dioxins and furans, lead paint, asbestos or asbestos-containing materials, urea formaldehyde, radioactive materials, mold any petroleum or petroleum product, radon gas, natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas in such synthetic gas), ash, municipal solid waste steam, drilling fluids, or produced waters and other wastes associated with the exploration, development and production of crude oil, natural gas or geothermal resources.

        (d)     For purposes of this Agreement, "Environmental Laws" mean and include, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. § 6901 et seq.; the Federal Clean Air Act, 42 U.S.C. § 7401-7626; the Federal Water Pollution Control Act and Federal Clean Water Act of 1977, as amended, 33 U.S.C. § 1251 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 135 et seq.; the Federal Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Federal Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the National Environmental Policy Act (NEPA), 42 U.S.C. §4321; the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.; the Endangered Species Act of 1973, 16 U.S.C. 1531 et seq.;  the Oil Pollution Act of 1990, 33 U.S.C. 2701 et seq.,  the State of Oregon's Air Pollution Control Act, ORS 468A.005, et seq.; Noise Control Act, ORS 467.010, et seq.; Water Pollution Control Act, ORS 468B.005, et seq.; Oil or Hazardous Material Spillage Act, ORS 468B.300, et seq.; Community Information on Hazardous Substances Act, ORS 453.307, et seq.; Radiation Sources Act, ORS 453.605, et seq.; Transportation of Hazardous Substances and Radioactive Materials Act, ORS 453.825, et seq.; Cleanup of Toxic Contamination from Illegal Drug Manufacturing Act, ORS 453.855, et seq.; Solid Waste Management Act, ORS 459.005, et seq.; Reduction of Use of Toxic Substances and Hazardous Waste Generation Act, ORS 465.003, et seq.; Removal or Remedial Action Act ("Environmental Cleanup Law"), ORS 465.200, et seq.; Storage, Treatment, and Disposal of

13

Hazardous Waste and PCB Act (state's companion to RCRA), ORS 466.005, et seq.; Notice of Environmental Hazards Act, ORS 466.360, et seq.; Use of PCB Act, ORS 466.505, et seq.; Spill Response and Cleanup of Hazardous Materials Act, ORS 466.605, et seq.; Oil Storage Tanks Act, ORS 466.706, et seq.; Pesticide Control Act, ORS 634.006, et seq., all as amended now or in the future, and all other federal, state, local and foreign statutes, regulations and ordinances concerning public health and safety, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes (including petroleum products or byproducts), together with all applicable common law pertaining to actions for personal injury and property damage resulting from Hazardous Materials with respect to both on-site and off-site contamination.

6.4     *Representations and Warranties of Buyer*

Buyer represents and warrants to Seller as follows:

(a)     Buyer has the power and authority to enter into this Agreement and to execute and deliver the other documents referred to herein and to perform hereunder and thereunder on behalf of Buyer.   This Agreement has been duly authorized, executed and delivered by Buyer.

(b)     Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, nor the compliance with the terms and conditions hereof will violate, in any material respect, any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restrictions of any government, governmental agency or court to which Buyer is subject.

(c)     Buyer is not required to obtain the consent or approval of any government agency, department or other government body to enter into this Agreement or if required, any such required consents or approvals have been obtained.

(d)     There are no general assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy, existing, pending or, to Buyer's knowledge, threatened against Buyer.

(e)     Buyer and, to Buyer's actual knowledge, each person or entity owning an interest in Buyer is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list, (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an "Embargoed Person" to Buyer's actual knowledge, none of the funds or other assets of Buyer constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Buyer's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Buyer (whether directly or indirectly).

14

(f)    Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of the state of its formation, and is authorized to do business in the State of Oregon.

(g)    Neither Buyer nor any affiliate of or principal of Buyer is other than a citizen of, or partnership, corporation or other form of legal person domesticated in the United States of America.

### 6.5    *Survival of Buyer's Representations and Warranties*

All representations and warranties of Buyer set forth in Section 4.3 are made as of the Effective Date.  The representations and warranties of Buyer set forth in Section 4.3 shall survive the Closing of the transaction contemplated in this Agreement and the delivery of the Deed from Seller to Buyer for the Survival Period.

### 7.    **INTERIM OPERATION OF THE PROPERTY**

### 7.1    *Seller's Operation of the Property*

From the Effective Date hereof until the Closing or earlier termination of this Agreement, Seller shall use reasonable efforts to operate and maintain the Property in a manner generally consistent with the manner in which Seller has operated and maintained the Property prior to the date hereof.  Without the prior written consent of Buyer, Seller shall not (i) materially modify or amend any of the Leases; (ii) extend or grant any concessions with respect to any of the Leases, or accept any prepayment of rent under the Leases other than one (1) month in advance; (iii) extend any existing lease for space at the Property; or (iv) enter into any new service, supply, maintenance or other contract pertaining to the Property or the operation of the Property, which contract is not cancelable at the Closing.  Seller shall give immediate notice to Buyer in the event Seller receives notice or obtains knowledge of the filing or threat to file an action, claim or proceeding in any court or administrative agency against Seller which may affect the Property.  Seller shall maintain insurance on the Property as required under the Leases and in accordance with its prior operating practices.

### 7.2    *Buyer's Operation of the Property*

From the Closing until Seller's receipt of the Final Payment, Buyer shall use reasonable efforts to operate and maintain the Property in a manner generally consistent with the manner in which Seller has operated and maintained the Property prior to the date hereof. Without the prior written consent of Seller, Buyer shall not materially alter the Land, including but not limited to demolition of the Improvements or commencement of construction of habitat restoration project(s) on the Land.  Buyer shall give immediate notice to Seller in the event Buyer receives notice or obtains knowledge of the filing or threat to file an action, claim or proceeding in any court or administrative agency against Buyer which may affect the Property. Buyer shall maintain insurance on the Property as required under any Leases and in accordance with its prior operating practices.

8.    **CONDITIONS TO CLOSING**

8.1    *Conditions to Buyer's Obligations to Close*

The obligation of Buyer to consummate the purchase of the Property as contemplated by this Agreement is subject to the fulfillment of each of the following conditions (in addition to such other items as are set forth elsewhere in this Agreement as conditions to Buyer's obligations to close), any or all of which may be waived in whole or in part by Buyer to the extent permitted by applicable law:

(a)    **Delivery of Documents.**  Seller shall have deposited into Escrow all instruments and documents to be delivered by Seller to Buyer at the Closing under the provisions of this Agreement.

(b)    **Title Policy.**  The Title Company shall be committed to issue at Closing an owner's title insurance policy, or an irrevocable binder to issue the same, dated as of the Closing Date, in the full amount of the Purchase Price, showing title to the Premises in the name of Buyer, the form of which shall be CLTA standard coverage; provided that if Buyer obtains an ALTA survey of the Property, in form sufficient to satisfy the requirements of the Title Company for the issuance of an ALTA owner's policy of title insurance, then the form shall be ALTA (2006) Standard Form, with extended coverage, (the **"Title Policy"**), which Title Policy shall be subject only to the standard exclusions from coverage contained in such policy and the Permitted Exceptions.

(c)    **Seller's Compliance/Representations and Warranties.**  Seller shall have performed and satisfied all material covenants and material obligations of Seller under this Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.  All of Seller's representations and warranties set forth in this Agreement shall be true and correct as of the Closing.

(d)    **Prospective Purchaser Agreement.**  Buyer shall have executed a Prospective Purchaser Agreement (PPA) with the State of Oregon, and approved the State's "Source Control Decision" regarding outflows from the Property into the Willamette River.

(e)    **Solid Waste Letter of Authorization.**  Buyer shall have obtained Solid Waste Letter(s) of Authorization (SWLA) from applicable agency(ies), providing permissions for the off-site disposal of soils and sediments from the Property as anticipated for Buyer's Restoration Project.  Buyer agrees to use commercially reasonable efforts to meet the aforementioned timelines in obtaining this SWLA.

(f)    **Termination/Disposition of DSL Lease.**  Seller shall have terminated the DSL Lease and satisfied any obligations that the DSL and/or any other Environmental Agency may impose on Seller in conjunction with such termination, and Buyer shall have obtained either a new lease from the DSL or a DSL easement in conjunction with the entitlement of Buyer's Restoration Project.  With respect to any restoration obligations under the DSL lease, Buyer and Seller agree to collaborate in resolving any such obligations through Buyer's Post-Closing Restoration Project; as to the incremental cost of any such required

16

restoration for which Seller is responsible, but which Buyer performs, Seller agrees that Buyer shall have a reasonable credit against the Deferred Purchase Price.

(g) **Seller's NRD and CERCLA Liability.** Seller shall have settled its potential liabilities associated with the Property regarding CERCLA (EPA) and Natural Resource Damages (NRDA Trustees) in a manner which, in Buyer's sole discretion, does not result in a diminution of value of the Property, negatively effect title to the Property or Buyer's negatively impact the proposed Restoration Project, and, to the extent of any money damages, is paid in full by Seller at Closing. The Parties agree that Seller's paid in full Ability to Pay Settlement (coupled with customary and generally prevailing regulatory access covenants) with EPA and the NRDA Trustees will satisfy this condition.

(h) **BP/Arco Property**. Buyer shall have addressed, in its sole and unreviewable discretion, issues related to the presence of the BP/Arco facility adjacent to the Property, including but not limited to issues regarding potential environmental contamination originating from the BP/Arco facility, lateral support of structures on the BP/Arco facility, and a potential buffer area between such structures and Buyer's Restoration Project.

The conditions set forth in this Section 8.1 are solely for the benefit of Buyer and may be waived only by Buyer. Buyer shall at all times have the right to waive any condition. Any such waiver or waivers shall be in writing and shall be delivered to Seller and Escrow Holder. If any of the conditions in this Section 8.1 is not satisfied or has not been so waived by Buyer prior to the Closing Date, Buyer shall deliver written notice to Seller describing the condition that has not been satisfied or waived, and if such condition remains unsatisfied as of the Closing Date in 2013, or if extended and not otherwise accelerated, in 2014, and so long as the failure to satisfy the condition is not the direct result of Buyer's failure to exercise commercially reasonable efforts as required under Section 5 above, then Buyer shall have the right to extend the Closing Date until such condition is satisfied or waived, whichever first occurs, or to terminate this Agreement and the Escrow by written notice to Seller and Escrow Holder. If Buyer terminates this Agreement in accordance with the foregoing, all documents deposited into Escrow shall be returned to the party depositing such documents, and neither party shall have any further rights or obligations under this Agreement, except for those rights or obligations which expressly survive the termination of this Agreement. Further, if the failure of such condition also constitutes a default of Seller under this Agreement, the Deposit shall be refunded to Buyer, and Buyer may elect to proceed under either of the options provided under clauses (i), (ii) or (iii) of Section 12(b).

8.2    *Conditions to Seller's Obligations to Close*

The obligation of Seller to consummate the sale of the Property as contemplated by this Agreement is subject to the fulfillment of each of the following conditions (in addition to such other items as are set forth elsewhere in this Agreement as conditions to Seller's obligations to close), any or all of which may be waived in whole or in part by Seller to the extent permitted by applicable law:

(a)    **Deposit of Funds**.  Buyer shall have deposited into Escrow the Purchase Price in immediately available funds, subject to adjustment for any prorations and credits provided hereunder, and all other monies required to be deposited by Buyer hereunder.

(b)    **Delivery of Closing Documents**.  Buyer shall have deposited into Escrow all instruments and documents to be delivered by Buyer to Seller at the Closing under the provisions of this Agreement.

(c)    **Buyer's Compliance**.  Buyer shall have performed and satisfied all material covenants and material obligations of Buyer under this Agreement to the extent such covenants and obligations are to be performed or satisfied as of the Closing Date.

The conditions set forth in this Section 8.2 are solely for the benefit of Seller and may be waived only by Seller.  Seller shall at all times have the right to waive any condition.  Any such waiver or waivers shall be in writing and shall be delivered to Buyer and Escrow Holder.  If any of the conditions in this Section 8.2 is not satisfied or has not been so waived by Seller prior to the Closing Date, Seller shall deliver written notice to Buyer describing the condition that has not been satisfied or waived, and if such condition remains unsatisfied as of the Closing Date, then Seller shall have the right to terminate this Agreement and the Escrow by written notice to Buyer and Escrow Holder.  If Seller terminates this Agreement in accordance with the foregoing, the Deposit shall be returned to Buyer or paid over to Seller, as required by the terms of this Agreement, all documents deposited into Escrow shall be returned to the party depositing such documents, and neither party shall have any further rights or obligations under this Agreement, except for those rights or obligations which expressly survive the termination of this Agreement; provided, however, if the failure of such condition also constitutes a default of Buyer under this Agreement, then the provisions of Section 11(a) shall apply, and the Deposit shall be paid to Seller as liquidated damages, rather than being returned to Buyer.  Without limiting the foregoing, in the event of Buyer's default, Seller's termination of this Agreement pursuant to this Section 8.2 shall not constitute a waiver of Seller's right to recover liquidated damages from Buyer pursuant to Section 11(a).

9.    **CLOSING AND TRANSFER OF TITLE**

9.1    ***Closing Date***

Provided that all of the conditions precedent to the Closing have been satisfied or waived, the Closing shall be held, and delivery of all items to be made at the Closing under the terms of this Agreement shall be made, at the offices of the Escrow Holder on August 12, 2013, or, if extended as set forth below, August 11, 2014, subject to the Section 2(f)(A) accelerating events (the "**Closing Date**").  Notwithstanding anything herein to the contrary, if Buyer has exercised commercially reasonable efforts to fulfill its conditions to Closing on or before the Closing Date, and if Buyer has satisfied the conditions set forth in Section 5.3, Seller agrees that the Buyer may extend the Closing Date to August 11, 2014, effective upon delivery on or before August 12, 2013 of the following: (i) written notice thereof to Seller and Escrow Holder; and (ii) delivery to Escrow Holder of an additional deposit in the amount of the delinquent 2009 property taxes for the Property (currently estimated to be $133,000.00), which amount shall become part of the Deposit; *provided* that any such extended Closing Date shall be subject to acceleration as

18

set forth in Section 2(f)(iii)(A).  During any period of extension, the monthly Periodic Deposits shall continue to be paid by Buyer and will be applicable to the Purchase Price unless the extensions are required due to Buyer's failure to meet the timelines or to exercise its commercially reasonable efforts to fulfill its conditions to close.  In that event, the monthly progress payments shall not be applicable to the Purchase Price.

9.2    ***Seller's Deliveries***

At the Closing, or at such later date as may be indicated below for any specific item, Seller shall deliver or cause to be delivered to Buyer through the Escrow or otherwise, each of the following instruments and documents, duly executed and acknowledged by Seller, as appropriate:

(a)    Warranty Deed in the form attached hereto as **Exhibit C** (the "**Deed**"), subject only to the Permitted Exceptions.

(b)    Fully executed originals (or copies thereof in the event the originals are not available) of all Leases (which may delivered within five (5) days after the Closing), and an Assignment and Assumption of Leases in the form attached hereto as **Exhibit D**.

(c)    Fully executed originals (or copies thereof in the event the originals are not available) of all Miscellaneous Agreements (which may be delivered within five (5) days after the Closing), and an Assignment and Assumption of Miscellaneous Agreements with respect thereto in the form attached hereto as **Exhibit E**.

(d)    Any required real estate transfer tax declarations or any other similar documentation required to evidence the payment of any tax imposed by the state, county and city on the transaction contemplated hereby.

(e)    An affidavit pursuant to Section 1445(b)(2) of the United States Internal Revenue Code (the "**Federal Code**"), and on which Buyer is entitled to rely, from Seller that it is not a "foreign person" within the meaning of Section 1445(f)(3) of the Federal Code, in the form attached hereto as **Exhibit F** attached hereto (the "**FIRPTA Affidavit**").

(f)    Bill of Sale in the form attached hereto as **Exhibit G**.

(g)    To the extent in Seller's possession or reasonable control, all keys and combinations to all locks on the Improvements (all of which may be delivered within five (5) days after the Closing).

(h)    Such other customary documents and instruments as may be required by any other provision of this Agreement or as may reasonably be required to carry out the terms and intent of this Agreement; provided that Seller shall not be obligated to cause the delivery of any such instrument or document that would increase or expand Seller's obligations or liability under this Agreement.

19

### 9.3  *Buyer's Deliveries*

At the Closing, Buyer shall deliver or cause to be delivered to Seller each of the following instruments and documents, duly executed and acknowledged by Buyer, as appropriate:

(a)     Counterparts of the Assignment and Assumption of Leases, as referenced in Section 8.2 above.

(b)     Counterparts the Assignment and Assumption of Miscellaneous Agreements, as referenced in Section 8.2 above

(c)     Such other documents and instruments as may be required by any other provision of this Agreement or as may reasonably be required to carry out the terms and intent of this Agreement; provided that Buyer shall not be obligated to cause the delivery of any such instrument or document that would increase or expand Buyer's obligations or liability under this Agreement.

### 9.4  *Possession of the Property*

At the Closing, possession of the Property shall be delivered to Buyer, subject to the Permitted Exceptions.

### 10.    PRORATIONS AND ADJUSTMENTS

### 10.1  *General*

The following adjustments shall be made with respect to the Property, and the following procedures shall be followed:

(a)     **Preparation of Prorations**.  At least five (5) days before the Closing Date, Seller shall prepare and deliver, or cause Escrow Holder to prepare and deliver, to Buyer an unaudited statement for the Property (the "**Preliminary Proration Statement**") showing prorations for the items set forth below, calculated as of 12:01 a.m. on the Closing Date, on the basis of a 365 day year.  Buyer and Seller shall agree upon any adjustments to be made to the Preliminary Proration Statement before the Closing, and at the Closing, Buyer or Seller, as applicable, shall receive a credit equal to the net amount due Buyer or Seller, as applicable, pursuant to the Preliminary Proration Statement as finally agreed upon by Buyer and Seller.  The items to be covered by the Preliminary Proration Statement are as follows:

(i)     rents and expenses payable under the Leases (but only to the extent collected before the Closing Date); provided that if any of the foregoing are not finally adjusted between the landlord and tenant under any Lease until after the preparation of the Preliminary Proration Statement, then the parties shall make the appropriate correction promptly when accurate information becomes available and any corrected adjustment or proration shall be paid in cash to the party entitled thereto;

20

(ii)    non-delinquent real property taxes and assessments; provided that if the real property tax assessment for the fiscal year in which the Closing occurs has not been issued as of the Closing Date, real property taxes shall be prorated based on the most recent assessed value of the Property, multiplied by the current tax rate, and such tax proration shall be subject to adjustment pursuant to subparagraph (d) of this Section 8.1;

(iii)    the current installment (only) on any improvement bonds which are a lien on the Property; Buyer shall take the Property subject to all future installments of any improvement bonds;

(iv)    amounts payable under the Miscellaneous Agreements; and

(v)    any other expenses normal to the operation and maintenance of the Property.

(b)    **Principles of Prorations; Collections and Payments**.  Subject to the prorations to be made pursuant to this Section 8, after the Closing Buyer shall collect all revenues and pay all expenses with respect to the Property, even if such revenues and expenses relate to periods before the Closing. Seller agrees to cooperate with Buyer by endorsing (without recourse) in favor of Buyer any checks which may be received after the Closing, but which are made payable to Seller (or its affiliates). In addition, in calculating the prorations pursuant to this Section 8, Seller shall receive a credit in the amount of any utility, municipality or other deposits relating to the Property made by Seller and which are assigned to Buyer at the Closing. Seller shall be entitled to a refund of any deposits not assigned to Buyer.

(c)    **Security Deposits**.  At the Closing, Seller shall assign and deliver to Buyer all prepaid rent, security deposits, cleaning deposits and other collateral received by Seller pursuant to any of the Leases, less any portions thereof applied in accordance with the respective Lease (together with a statement regarding such applications).

(d)    **Post-Closing Adjustments**.    Notwithstanding anything to the contrary contained in this Section 9, if the amount of the real property taxes and assessments payable with respect to the Property for any period before Closing is determined to be more than the amount of such real property taxes and assessments that is prorated herein (in the case of the current year) or that was paid by Seller (in the case of any prior year), due to a reassessment of the value of the Property or otherwise, Seller and Buyer shall promptly adjust the proration of such real property taxes and assessments after the determination of such amounts, and Seller shall pay to Buyer any increase in the amount of such real property taxes and assessments applicable to any period before Closing.

10.2    *Survival*

The obligations of Seller and Buyer under this Section 9 shall survive the Closing.

## 11.    RISK OF LOSS AND INSURANCE PROCEEDS

11.1    Seller shall promptly notify Buyer of any casualty to the Property or any condemnation or eminent domain proceeding considered or commenced prior to the Closing Date.

093907.0008/5409724.18

If any such damage or proceeding relates to or may result in the loss of any "material portion" (as defined herein) of the Property, Buyer may, at its option, elect either to (i) terminate this Agreement, in which event the Deposit, including all accrued interest, shall be returned to Buyer and neither party shall have any further rights or obligations hereunder, or (ii) continue the Agreement in effect, in which event upon the Closing, Seller shall assign to Buyer, as of the Closing Date, any insurance proceeds collected by Seller (or, if not collected prior to Closing, any interest of the Seller in the applicable insurance proceeds, and to the extent necessary, Seller shall cooperate with Buyer after the Closing Date, at no cost to Seller, to obtain any such insurance proceeds), compensation, award, or other payments or relief resulting from such casualty or condemnation proceedings. The term "material portion" shall mean damages greater than One Hundred Thousand and No/100ths Dollars ($100,000.00).

11.2    Seller shall promptly notify Buyer of any casualty to the Property or any condemnation proceeding commenced prior to the Close of Escrow. If any such damage or proceeding relates to or may result in the loss of any material portion of the Property as reasonably determined by Buyer and Seller, Buyer may, at its option, elect either to (a) terminate this Agreement, in which event all funds deposited into Escrow and interest accrued thereon by Buyer which are held by Escrow Holder or have been released from Escrow shall be returned to Buyer and neither Party shall have any further rights or obligations hereunder, or (b) continue the Agreement in effect, in which event, upon the Close of Escrow, Buyer shall be entitled to any compensation, award, or other payments or relief resulting from such casualty or condemnation proceedings and Seller shall assign such proceeds to Buyer at Close of Escrow.

## 12.    DEFAULT

(a)    **Buyer's Default**.  After the expiration of the Investigation Period, if the Closing does not occur as a result of Buyer's default hereunder which is not cured within three (3) business days of Seller's written notice to Buyer of such Buyer default, Seller's sole and exclusive remedy shall be to terminate this Agreement by giving written notice thereof to Buyer, whereupon the Deposit including Periodic Deposits remitted as of such date shall be paid to Seller as liquidated damages, as Seller's sole and exclusive remedy on account of such default hereunder by Buyer; provided, however, that this provision will not limit Seller's right to receive reimbursement for attorneys' fees pursuant to Section 16.1 below, nor waive or affect any provisions of this Agreement which expressly state that they shall survive the termination of this Agreement, and neither party shall have any further liability or obligation to the other hereunder, except for provisions of this Agreement which expressly state that they shall survive the termination of this Agreement. The parties acknowledge and agree that Seller's actual damages in the event of Buyer's default would be extremely difficult or impracticable to determine. After negotiation, the parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in such event. The payment of the Deposit to Seller as liquidated damages under the circumstances provided for herein is not intended as a forfeiture or penalty within the meaning of applicable law, but is intended to constitute liquidated damages to Seller pursuant to applicable law. By placing their initials below, each party specifically confirms the accuracy of the statements made above, the reasonableness of the amount of liquidated damages agreed upon, and the fact that each party was represented by counsel who explained, at the time this agreement was made, the consequences of this liquidated damages provision.

093907.0008/5409724.18

INITIALS: _____ _____

Seller    Buyer

(b)    **Seller's Default.**  If the Closing does not occur as a result of Seller's default hereunder, then, Buyer may, at its sole election, proceed with one of the following mutually exclusive alternatives:

(i)    waive such default and proceed with the Closing with no reduction in the Purchase Price; provided, however, that this provision will not waive or affect any of Seller's other obligations under this Agreement to be performed after the Closing with respect to any matter other than such default;

(ii)    terminate this Agreement, whereupon the Deposit shall be returned and paid to Buyer, and Seller shall reimburse Buyer for any actual out-of-pocket expenses incurred by Buyer in connection with this Agreement and its investigation of the Property pursuant to Section 3 above, and otherwise neither party shall have any further liability or obligation to the other hereunder, except for provisions of this Agreement which expressly state that they shall survive the termination of this Agreement; or

(iii)    file in any court of competent jurisdiction an action for specific performance to cause Seller to convey the Property to Buyer pursuant to the terms and conditions of this Agreement; but Buyer shall not be entitled to recover monetary damages from Seller in connection with such default; provided, however, that this provision will not limit Buyer's right to receive reimbursement for attorneys' fees pursuant to Section 15.1 below, nor waive or affect any of Seller's other obligations under this Agreement to be performed after the Closing with respect to any matter other than such default.

13.    **EXPENSES**

(a)    All documentary stamp taxes, and all county and city transfer taxes shall be borne and paid by Seller, and all recording fees shall be borne and paid by Buyer.

(b)    All Escrow and Closing costs charged by the Escrow Holder, and any escrow fees incurred with respect to the Escrow shall be borne and paid by Buyer.

(c)    The cost of a standard CLTA Title Policy shall be paid by Seller. If Buyer elects to have Escrow Holder issue its American Land Title Association Extended Coverage Owner's Policy of Title Insurance ("ALTA") or any title endorsements, Buyer shall pay for the expense of such ALTA premium increment, any survey costs associated with such ALTA policy and the title endorsements.

(d)    Buyer shall pay its due diligence expenses, and each party shall pay its own attorneys' fees in connection with the negotiation, documentation and consummation of the transactions contemplated hereunder.  The provisions of this Section 11(d) shall survive any termination of this Agreement.

23

(e)    Buyer shall pay of the cost of any sales, transfer, or similar taxes payable in connection with the sale, assignment, and transfer of the Personal Property.

(f)    Other costs, charges, and expenses shall be borne and paid as provided in this Agreement, or in the absence of such provision, in accordance with the custom in the County.

14.    **BROKERS**

(a)    Seller represents to Buyer, and Buyer represents to Seller that there is no broker, finder, or intermediary of any kind with whom such party has dealt in connection with this transaction.

(b)    Seller agrees to indemnify and hold harmless Buyer, the partners, members, trustees, shareholders, directors and officers of Buyer, any party owning a direct or indirect interest in Buyer, the affiliates of Buyer, and the partners, members, trustees, shareholders, directors, officers, employees and agents of each of the foregoing parties (the "**Buyer-Related Parties**"), from and against all claims, demands, causes of action, judgments, and liabilities which may be asserted or recovered for brokerage or finders' fees, commissions, or other compensation in connection with the transaction contemplated under this Agreement claimed by any party other than Seller's Broker or Buyer's Broker to be owing to such party due to any dealings between Seller and the party claiming such fee, commission or compensation, including costs and reasonable attorneys' fees incident thereto.  Buyer agrees to indemnify and hold harmless the Seller-Related Parties, from and against all claims, demands, causes of action, judgments, and liabilities which may be asserted or recovered for brokerage or finders' fees, commissions, or other compensation in connection with the transaction contemplated under this Agreement claimed by any party other than Seller's Broker or Buyer's Broker to be owing to such party due to any dealings between Buyer and the party claiming such fee, commission or compensation, including costs and reasonable attorneys' fees incident thereto.  The parties hereto agree that the foregoing obligations of indemnification shall survive the Closing hereunder or the expiration or termination of this Agreement, however caused.

15.    **ASSIGNMENT**

After expiration of the Investigation Period, the party originally identified in this Agreement as the Buyer (the "**Original Buyer**") may, upon written notice to Seller given before the Closing, assign its right to purchase the Property hereunder to any other entity in which it or its affiliate has a voting or managerial interest.  Except in compliance with the preceding sentence, Buyer may not assign this Agreement to any other party without Seller's prior written consent, which consent may be granted, conditioned or denied in Seller's reasonable discretion. Notwithstanding anything herein to the contrary, Buyer shall not in any event be released from any of its obligations or liabilities hereunder in the event of any assignment by Buyer, including, but not limited to, any obligations which survive the Closing, whether contained in this Agreement or any document to be delivered by Buyer at the Closing, even if such document is signed by the assignee of Buyer only.  Subject to the limitations described herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and assigns.

24

16.    **NOTICES**

Any and all notices or other communications required or permitted to be given under this Agreement shall be in writing and either (i) personally delivered, in which case notice shall be deemed delivered upon receipt, (ii) sent by any nationally recognized overnight courier service with provisions for proof of delivery, in which case notice shall be deemed delivered on the next business day after the sender deposits the same with such delivery service, (iii) sent by United States Mail, postage prepaid, certified mail, return receipt requested, in which case notice shall be deemed delivered on the date of delivery as shown on the return receipt or the date of the addressee's refusal to accept delivery as indicated by the United States Postal Service, (iv) by facsimile to the applicable telecopy number set forth in this Section 14, in which case notice shall be deemed delivered on the date delivery is shown on a facsimile transmission confirmation, or (v) by electronic mail to the applicable E-Mail address set forth in this Section 14, in which case notice shall be deemed delivered on the date such notice is shown as transferred by electronic mail (and in any case such notices or other communication shall be addressed to the following addresses:

| | |
|---|---|
| *Buyer:* | SN Barnes Management, LLC |
| | 201 California Street, Suite 1240 |
| | San Francisco, California 94111 |
| | Attention: Mr. Kevin Corbett |
| | General Counsel and Development Manager |
| | Telephone: (415) 268-9461 |
| | Telecopy: (415 268-9460 |
| | Email Address: kcorbett@snbarnes.com |
| | |
| *Seller:* | LINNTON PLYWOOD ASSOCIATION |
| | 10504 NW St. Helens Road |
| | Portland OR 97231-1049 |
| | Attention: Mr. Jimmy Stahly, General Manager |
| | Telephone: (503) 286-3672 |
| | Telecopy: (503) 286-6489 |
| | Email Address: jimmystahly@hotmail.com |
| | |
| *With copy to:* | LANE POWELL PC |
| | 601 SW Second Avenue, Suite 2100 |
| | Portland, Oregon 97204 |
| | Attention: Mr. William P. Hutchison |
| | Telephone: (503) 778-2100 |
| | Telecopy: (503) 778-2200 |
| | Email Address: hutchisonw@lanepowell.com |

Either party may change its address for notice from time to time by notice to the other party in writing to the other in the manner aforesaid; provided that any such notice of change of address shall only be effective upon actual receipt by the other party.

25

## 17.    MISCELLANEOUS

### 17.1    *Attorneys' Fees*

In the event of any litigation (including court action or arbitration) between the parties with respect to the Property, this Agreement, the Escrow, the performance of their obligations hereunder or the effect of a termination under this Agreement, the losing party shall pay all costs and expenses incurred by the prevailing party in connection with such litigation including, without limitation, reasonable attorneys' fees and disbursements. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment. Notwithstanding any provisions of this Agreement to the contrary, the obligations of the parties under this Section 15.1 shall survive any termination of this Agreement and the Closing.

### 17.2    *Gender*

Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

### 17.3    *Captions*

The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope or intent of this Agreement or any part hereof.

### 17.4    *Construction*

(a)    No provision of this Agreement shall be construed by any Court or other judicial authority against any party hereto by reason of such party's being deemed to have drafted or structured such provisions.

(b)    As used herein, the terms "include", "including" and similar terms shall be construed as if followed by the phrase "but not limited to". The terms "hereof", "herein" and "hereunder", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular article or provision, except as expressly so stated.

### 17.5    *Business Days; Deadlines*

As used in this Agreement and any document executed by any party hereto to another party hereto at the Closing, the term "business days" means all days of the year except Saturdays, Sundays, and holidays recognized by the Federal Reserve Bank of San Francisco. If a deadline provided in this Agreement or any document executed by any party hereto to another party hereto at the Closing falls on a day other than a business day, such deadline shall be extended until the first business day thereafter.

26

### 17.6    *Entire Agreement*

This written Agreement, including all Schedules and Exhibits attached hereto (including, but not limited to, the Access Agreement) and documents to be delivered pursuant hereto, shall constitute the entire agreement and understanding of the parties, and there are no other prior or contemporaneous written or oral agreements, undertakings, promises, warranties, or covenants not contained or merged herein.    The Exhibits attached hereto are hereby incorporated in and made part of this Agreement.

### 17.7    *Recording*

The parties agree that this Agreement shall not be recorded. If Buyer causes this Agreement or any notice or memorandum thereof to be recorded, this Agreement shall be null and void at the option of Seller.

### 17.8    *No Continuance*

Buyer acknowledges that there shall be no assignment, transfer or continuance of Seller's insurance coverage after the Closing.

### 17.9    *Time of Essence*

Time is of the essence of this Agreement.    In the computation of any period of time provided for in this Agreement or by law, the day of the act or event from which said period of time runs shall be excluded, and the last day of such period shall be included, unless it is not a business day, in which case the period shall be deemed to run until the next day which is a business day.

### 17.10    *Original Document*

This Agreement may be executed by all parties in counterparts in which event each shall be deemed an original, and all of which shall constitute one and the same agreement.

### 17.11    *Governing Law*

This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon.

### 17.12    *Confidentiality*

Buyer and Seller shall each maintain as confidential the terms of this Agreement (including the Purchase Price) and any and all material or information about the other, and, in the case of Buyer and its agents, employees, consultants and contractors, about the Property, and shall not disclose such terms or information to any third party, except, in the case of information about the Property, to Buyer's lender or prospective lenders, equity investors or prospective equity investors, insurance and reinsurance firms, attorneys, brokers, consultants, surveyors, contractors and environmental assessment firms, as may be reasonably required for the consummation of the transaction contemplated hereunder, as deemed necessary in connection

27

with Buyer's pursuit of SWLA, PPA, DSAYs and the Restoration Project and/or as required by law; provided that Buyer shall inform such parties as to the confidentiality of such materials and information.  Buyer shall notify Seller, by facsimile, with a copy by regular mail, at least three (3) business days before Buyer or Buyer's agents, employees or contractors make any disclosure that such party believes is required by law and is not permitted above; provided that, if a court order of a court of law with appropriate jurisdiction requires disclosure within a period of less than three (3) business days, Buyer shall notify Seller by facsimile immediately upon receipt of such order.  This provision shall survive the Closing or any termination of this Agreement for a period of six (6) months, provided that Buyer shall not be obligated to maintain as confidential any material about the Property after the Closing.  If the purchase and sale of the Property pursuant hereto does not close for any reason, Buyer shall return to Seller all agreements, documents, studies, reports and other materials pertaining to the Property either delivered by Seller or Seller's agents to Buyer pursuant hereto.  Notwithstanding anything herein to the contrary, each party shall have the right to disclose information relating to the Property to its partners and their direct and indirect owners, and their respective officers, employees, directors and representatives, and the provisions of this Section 15.12 shall in no event apply to information which is or becomes generally available to the public other than as a result of disclosure by such party.

### 17.13  *Amendment*

This Agreement may be amended or modified only by a written agreement subsequently executed by Buyer and Seller.

### 17.14  *Waiver*

No waiver of any provision or condition of this Agreement by any party shall be valid unless in writing signed by such party.  No such waiver shall be taken as a waiver of any other or similar provision or of any future event, act, or default.

### 17.15  *Exchange*

In the event either Buyer or Seller desires to effectuate the transaction contemplated by this Agreement as a tax-free exchange, then upon request made by Buyer or Seller, as applicable, the other party shall cooperate fully with the request in effectuating such tax-free exchange, such cooperation to include, without limitation, executing and delivering all documents and instruments necessary for such purpose, provided, however, that the requesting party shall reimburse the other party for any reasonable, out-of-pocket costs or expenses incurred by such other party in connection with such cooperation, and if the requesting party is Buyer, Seller shall not be required to accept any consideration for the sale of the Property from Buyer other than the Purchase Price and provided, further, however, the Closing Date shall not be extended by reason of such tax-free exchange.

### 17.16  *No Obligations to Third Parties*

Except as otherwise expressly provided herein, the execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate any of the parties thereto, to any person or entity other than the parties hereto.  Without limiting the generality of this

28

Section, the parties agree that any real estate brokers (whether identified in this Agreement or not) representing Buyer or Seller are not parties to this Agreement, nor are such brokers intended beneficiaries of any provision of this Agreement.

### 17.17  *Common Interest Agreement*

The Parties agree to comply with the terms and conditions of a Common Interest and Confidentiality Agreement ("Common Interest Agreement") in conventional form and reasonably approved by Counsel for the Parties.

### 17.18  *Communications with Neighbors and Linnton Community*

Buyer and Seller shall coordinate with each other in their communications with neighboring landowners, tenants and the Linnton community in an effort to gain community support for Buyer's Restoration Project.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

093907.0008/5409724.18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BUYER:    SN BARNES MANAGEMENT, LLC,
          a California limited liability company

          By: _____

          Name: _Norm Barnes_____

          Title: _Manager_____

          Date Signed: _Sept 11, 2012_____

SELLER:   LINNTON PLYWOOD ASSOCIATION,
          an Oregon cooperative corporation

          By: _Jimmy Stahly_____

          Name: _Jimmy Stahly_____

          Title: _General Manager_____

          Date Signed: _9-11-12_____

30

## Exhibit A

## Legal Description of Property

PARCEL I:

The following tract of land situated in Sections 2 and 3, Township 1 North, Range 1 West of the Willamette Meridian, in the City of Portland, County of Multnomah and State of Oregon, described as follows:

BEGINNING at the Southeast corner of the Donation Land Claim of Solomon Richards No. 47 which is the Northeast corner of the George G. Watts Donation Land Claim No. 46, in said Section 2; thence Northeasterly along the Northeasterly extension of the division line between said Donation Land Claim of Solomon Richards and George G. Watts to a point on the harbor line, as now established, of the Willamette River, which point is the true point of beginning of the tract herein described; thence Northwesterly along said harbor line, to the point of intersection with the center line of "C" Street in the TOWN OF LINNTON if extended in a straight line Easterly;
thence Westerly, along said extended center line of "C" Street, to the Easterly line of the  Burlington Northern Inc. right of way; thence Southerly along the East line of said right of way, 190 feet to a point of intersection with the Northerly line of the Southerly 15 feet of Lot 2, Block 65, TOWN OF LINNTON, if said line were extended Eastward; thence Westerly along said extended Northerly line, parallel with the Southerly line of said Block 65 to the East line of N.W. St. Helens Road; thence Southerly along the Easterly line of said N.W. St. Helens Road to an iron pipe on said Easterly line, which is 549.24 feet South and 292.52 feet East from the intersection of the Center line of N.W. St. Helens Road with the Northerly line of N.W. 107th Avenue, formerly "C" Street, in the TOWN OF LINNTON; thence North 60°42' East, 226.45 feet to a point of intersection with the Easterly line of the Burlington Northern Inc. right of way; thence Southerly along the Easterly line of said right of way to the point of intersection with the Northerly line of that tract of land conveyed to Linnton Realty Company, an Oregon corporation, to Signal Oil Company, a California corporation, by Deed recorded July 8, 1936 in Book 345, Page 154, Deed Records; thence Northeasterly along the Northerly line of said Signal Oil Company Tract to the
harbor line of the Willamette River; thence Northerly along said harbor line to the true point of beginning.

EXCEPTING THEREFROM the right of way of the Burlington Northern Inc.

ALSO EXCEPTING THEREFROM that portion West of the Burlington Northern Inc. right of way conveyed to the State of Oregon, by and through its State Highway Commission, by Deed recorded July 23, 1963 in Book 2178, Page 262, Deed Records.

AND FURTHER EXCEPTING THEREFROM the ownership of the State of Oregon in that portion lying below the line of mean high water of the Willamette River.

PARCEL II:

A tract of land in the Solomon Richards, et ux, Donation Land Claim in Section 2, Township 1 North, Range 1 West, of the Willamette Meridian in the City of Portland, County of Multnomah and State of Oregon, said tract of land lying between the Easterly line of 1st Street (now known as Northwest Front Avenue) in the Town of Linnton, and the Harbor Line, as now established, of the Willamette River, and between the Easterly extension of the centerline of "C" Street (now known as Northwest 107th Avenue) in the Town of Linnton and a line drawn parallel to and 100 feet Northerly of when measured at right angles to the said Easterly extension of the centerline of said "C" Street.

EXCEPTING THEREFROM the reservation of all of the coal, oil, gas, casinghead gas and all ores and minerals of every kind and nature underlying the surface of the premises as reserved by the Spokane, Portland and Seattle Railway Company, a Washington corporation in Deed recorded February 28, 1975 in Book 1029, Page 1716, Multnomah County Deed Records.

A-1

ALSO EXCEPTING THEREFROM the ownership of the State of Oregon in that portion lying below the line of mean high water of the Willamette River.

093907.0008/5409724.18

**Exhibit B**

**MEMORANDUM OF PURCHASE AGREEMENT**

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:**

SN Barnes Management, LLC
201 California Street, Suite 1240
San Francisco, CA 94111
Attention: Norman Barnes

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## MEMORANDUM OF PURCHASE AGREEMENT
### (Linnton Plywood)

    This Memorandum of Purchase Agreement is made and entered into as of September 10, 2012, by and between **LINNTON PLYWOOD ASSOCIATION**, an Oregon cooperative corporation ("**Seller**"), and **SN BARNES MANAGEMENT, LLC**, a California limited liability company ("**Buyer**").

    Seller is the owner of certain real property, consisting of approximately 24.74± acres, located at 10504 NW Saint Helens Road in the City of Portland, County of Multnomah, State of Oregon, commonly known as Tax Lot Numbers 1N1W02B-00800, 1N1W02C-00100 and 1N1W02C-00200 (the "**Property**"). The Property is more particularly described in the legal description attached hereto as <u>Exhibit A</u> and incorporated herein by this reference

    Buyer agrees to purchase the Property, and Seller agrees to sell the Property to Buyer, upon all the terms and conditions set forth in that certain Purchase and Sale Agreement dated as of September 5, 2012, entered into by and between Seller and Buyer, as amended from time to time (the "**Purchase Agreement**"). The close of escrow for Buyer's purchase of the Property shall occur on or before August 12, 2014.

**BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, AND SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009. THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS**

1

DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, AND SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009.

IN WITNESS WHEREOF, Seller and Buyer have executed this Memorandum of Purchase Agreement as of the dates set forth next to their signatures below.

**BUYER:**

**SN BARNES MANAGEMENT, LLC,**
a California limited liability company

By:  S.N. Barnes, Inc.,
      a California Corporation,
Its:  General Partner

By:_____

Its:_____

Date:_____

**SELLER:**

**LINNTON PLYWOOD ASSOCIATION,**
an Oregon cooperative corporation

By:_____

Its:_____

Date:_____

2

STATE OF OREGON
COUNTY OF MULTNOMAH

      This instrument was acknowledged before me on_____, 2012 by
_____ as _____ of Linnton
Plywood Association, an Oregon cooperative corporation.


                              _____
                              Notary Public for Oregon



STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO

On this date, _____, 2012 before me, _____, a
Notary Public, State of California, duly licensed and sworn, personally appeared _____
_____
_____, proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Notary Public, State of California

My Commission Expires _____

**Exhibit A**

**Legal Description of Property**

PARCEL I:

The following tract of land situated in Sections 2 and 3, Township 1 North, Range 1 West of the Willamette Meridian, in the City of Portland, County of Multnomah and State of Oregon, described as follows:

BEGINNING at the Southeast corner of the Donation Land Claim of Solomon Richards No. 47 which is the Northeast corner of the George G. Watts Donation Land Claim No. 46, in said Section 2; thence Northeasterly along the Northeasterly extension of the division line between said Donation Land Claim of Solomon Richards and George G. Watts to a point on the harbor line, as now established, of the Willamette River, which point is the true point of beginning of the tract herein described; thence Northwesterly along said harbor line, to the point of intersection with the center line of "C" Street in the TOWN OF LINNTON if extended in a straight line Easterly;
thence Westerly, along said extended center line of "C" Street, to the Easterly line of the  Burlington Northern Inc. right of way; thence Southerly along the East line of said right of way, 190 feet to a point of intersection with the Northerly line of the Southerly 15 feet of Lot 2, Block 65, TOWN OF LINNTON, if said line were extended Eastward; thence Westerly along said extended Northerly line, parallel with the Southerly line of said Block 65 to the East line of N.W. St. Helens Road; thence Southerly along the Easterly line of said N.W. St. Helens Road to an iron pipe on said Easterly line, which is 549.24 feet South and 292.52 feet East from the intersection of the Center line of N.W. St. Helens Road with the Northerly line of N.W. 107th Avenue, formerly "C" Street, in the TOWN OF LINNTON; thence North 60°42' East, 226.45 feet to a point of intersection with the Easterly line of the Burlington Northern Inc. right of way; thence Southerly along the Easterly line of said right of way to the point of intersection with the Northerly line of that tract of land conveyed to Linnton Realty Company, an Oregon corporation, to Signal Oil Company, a California corporation, by Deed recorded July 8, 1936 in Book 345, Page 154, Deed Records; thence Northeasterly along the Northerly line of said Signal Oil Company Tract to the
harbor line of the Willamette River; thence Northerly along said harbor line to the true point of beginning.

EXCEPTING THEREFROM the right of way of the Burlington Northern Inc.

ALSO EXCEPTING THEREFROM that portion West of the Burlington Northern Inc. right of way conveyed to the State of Oregon, by and through its State Highway Commission, by Deed recorded July 23, 1963 in Book 2178, Page 262, Deed Records.

AND FURTHER EXCEPTING THEREFROM the ownership of the State of Oregon in that portion lying below the line of mean high water of the Willamette River.

PARCEL II:

A tract of land in the Solomon Richards, et ux, Donation Land Claim in Section 2, Township 1 North, Range 1 West, of the Willamette Meridian in the City of Portland, County of Multnomah and State of Oregon, said tract of land lying between the Easterly line of 1st Street (now known as Northwest Front Avenue) in the Town of Linnton, and the Harbor Line, as now established, of the Willamette River, and between the Easterly extension of the centerline of "C" Street (now known as Northwest 107th Avenue) in the Town of Linnton and a line drawn parallel to and 100 feet Northerly of when measured at right angles to the said Easterly extension of the centerline of said "C" Street.

EXCEPTING THEREFROM the reservation of all of the coal, oil, gas, casinghead gas and all ores and minerals of every kind and nature underlying the surface of the premises as reserved by the Spokane, Portland and Seattle Railway Company, a Washington corporation in Deed recorded February 28, 1975 in Book 1029, Page 1716, Multnomah County Deed Records.

A-1

093907.0008/5409724.18

ALSO EXCEPTING THEREFROM the ownership of the State of Oregon in that portion lying below the line of mean high water of the Willamette River.

093907.0008/5409724.18

**Exhibit C**

093907.0008/5409724.18

# FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT
## (Linnton Plywood Site—Portland Harbor)

This First Amendment ("**First Amendment**") to the Purchase and Sale Agreement ("**Agreement**") dated effective December 11, 2012 ("**Effective Date**"), is entered into by and between LINNTON PLYWOOD ASSOCIATION, an Oregon cooperative corporation ("Seller"), and SN BARNES MANAGEMENT, LLC, a California limited liability company ("**Buyer**").

## RECITALS

A.     Effective September 11, 2012, Buyer and Seller entered into the Agreement concerning the purchase and sale of certain real property located in the County of Multnomah, State of Oregon (the "**Property**").  The Property is more particularly described in the Agreement.

B.     Pursuant to the terms of the Agreement, Buyer agreed to make an initial Cash Deposit of Twenty-Five Thousand and No/100ths Dollars ($25,000.00), and an initial Deposit of One Hundred Sixty-Six Thousand Fifty-Nine and No/100ths Dollars ($166,059.00).  Thereafter, commencing October 1, 2012, Buyer agreed to make monthly Periodic Deposits in the amount of Twelve Thousand Three Hundred Ninety-Five and No/100ths Dollars ($12,395).  Buyer has not yet made the Cash Deposit or the ensuing Period Deposit scheduled for December 1, 2012.  Buyer now proposes to make a combined Cash Deposit and Periodic Deposits totaling Thirty-Seven Thousand Five Hundred and No/100ths Dollars ($37,500), on or before December 14, 2012.  Buyer further agrees that the next monthly Periodic Deposit shall be scheduled for on or before January 11, 2013.  The combined Cash Deposit and aforementioned Periodic Deposits shall promptly be released to Buyer subject to the terms of the Agreement, but shall remain fully refundable to Buyer in the event that Buyer does not approve of the Investigation Matters during the Investigation Period, as extended.

C.     Pursuant to the terms and conditions of this First Amendment, Buyer and Seller desire to extend the Investigation Period specified in the Agreement to January 15, 2013, subject to the terms and conditions set forth in this Amendment.  Buyer intends to request a further extension of the Investigation Period as to certain Investigation Matters, the terms of which extension would be reflected in a subsequent agreement between Buyer and Seller on or before January 15, 2013.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual covenants contained herein, the parties agree as follows:

## AGREEMENT

1.     **Definitions**.  Except as otherwise provided herein, all capitalized terms set forth in this First Amendment shall be defined as provided in the Agreement.

**2.    Effective Date**.   The Effective Date of this First Amendment is December 11, 2013.

**3.    Schedule for Making and Releasing the Cash Deposit and Periodic Deposits**. The schedule for the release of these deposits is set forth as follows:

| Amount | Deposit and Release Dates |
|---|---|
| $166,059.00 | Already released |
| $37,500.00 | December 14, 2012 |
| $12,395.00 | January 11, 2013 |

**4.    Inspection Period**.  The Agreement Section 4.1 Investigation Period is extended and now shall end at 5:00 p.m. on January 15, 2013.

**5.    Refundability**.  Notwithstanding anything in this Amendment to the contrary, in the event that Borrower fails timely to make and release any such Deposit as required by this First Amendment, then such failure shall constitute Buyer's disapproval of the Investigation Matters within the Investigation Period, and Seller shall therefore be bound immediately to return to Buyer the full amount of the Deposits which Buyer has made as of the date of such deemed disapproval.  The provisions of the Agreement applicable to the refundability of deposits shall remain in full force and effect.

**6.    Recitals**.   The Recitals herein are hereby incorporated by reference into this First Amendment.  The parties warrant that the Recitals are true and correct.

**7.    Ratification**.  Buyer and Seller hereby agree that, except as provided in this First Amendment, the Agreement is ratified, affirmed and remains in full force and effect and is incorporated herein by this reference.

**8.    Counterparts**.  This First Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

**9.    Electronic Transmittals**.  The Parties agree that if this First Amendment is transmitted electronically, the electronic transmittal of the original execution signatures shall be treated as original signatures and given the same legal effect as an original signature.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the dates set forth below.

**BUYER:**                                      **SELLER:**

**SN BARNES MANAGEMENT, LLC,**          **LINNTON PLYWOOD ASSOCIATION,**
a California limited liability company       an Oregon cooperative corporation

By:  S.N. Barnes, Inc.,
     a California Corporation,                By:_____
Its:  General Partner
                                   Its:_____

By:_____              Date:_____

Its:_____

Date:_____

-3-

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the dates set forth below.

**BUYER:**

**SN BARNES MANAGEMENT, LLC,**
a California limited liability company

By:  S.N. Barnes, Inc.,
     a California Corporation,
Its:  General Partner

By:_____

Its:_____

Date:_____

**SELLER:**

**LINNTON PLYWOOD ASSOCIATION,**
an Oregon cooperative corporation

By:_Jim Stahly_____

Its:_General Manager_____

Date:_12-11-12_____

-3-

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT
### (Linnton Plywood Site—Portland Harbor)

This Second Amendment ("**Second Amendment**") to the Purchase and Sale Agreement ("**Agreement**") is dated effective December 28, 2012 ("**Effective Date**"), and is entered into by and between LINNTON PLYWOOD ASSOCIATION, an Oregon cooperative corporation ("**Seller**"), and SN BARNES MANAGEMENT, LLC, a California limited liability company ("**Buyer**").

### RECITALS

A.    Effective September 11, 2012, Buyer and Seller entered into the Agreement concerning the purchase and sale of certain real property located in the County of Multnomah, State of Oregon (the "**Property**").    The Property is more particularly described in the Agreement.  The Agreement was amended by that certain First Amendment to Purchase and Sale Agreement dated effective December 11, 2012.

B.    Pursuant to the terms of the Agreement, Buyer agreed to make an initial Cash Deposit of Twenty-Five Thousand and No/100ths Dollars ($25,000.00), and an initial Deposit of One Hundred Sixty-Six Thousand Fifty-Nine and No/100ths Dollars ($166,059.00).  Thereafter, commencing October 1, 2012, Buyer agreed to make monthly Periodic Deposits in the amount of Twelve Thousand Three Hundred Ninety-Five and No/100ths Dollars ($12,395).  Buyer has not yet made the Cash Deposit or the ensuing Periodic Deposit scheduled for December 1, 2012. Buyer now proposes to make a combined Cash Deposit and Periodic Deposits totaling Thirty-Seven Thousand One Hundred Eighty-Five and No/100ths Dollars ($37,185), on or before December 28, 2012.  Buyer further agrees that the next monthly Periodic Deposit shall be scheduled for on or before January 11, 2013.  The combined Cash Deposit and aforementioned Periodic Deposits shall promptly be released to Seller subject to the terms of the Agreement, but shall remain fully refundable to Buyer in the event that Buyer does not approve of the Investigation Matters during the Investigation Period, as extended.

C.    Pursuant to the terms and conditions of this Second Amendment, Buyer and Seller desire to extend the Investigation Period specified in the Agreement to January 31, 2013, subject to the terms and conditions set forth in this Amendment.  Buyer intends to request a further extension of the Investigation Period as to certain Investigation Matters, the terms of which extension would be reflected in a subsequent agreement between Buyer and Seller on or before January 31, 2013.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual covenants contained herein, the parties agree as follows:

### AGREEMENT

1.    **Definitions**.  Except as otherwise provided herein, all capitalized terms set forth in this Second Amendment shall be defined as provided in the Agreement.

2.     **Effective Date**.   The Effective Date of this Second Amendment is December 28, 2013.

3.     **Schedule for Making and Releasing the Cash Deposit and Periodic Deposits**. The schedule for the release of these deposits is set forth as follows:

| Amount | Deposit and Release Dates |
|---|---|
| $166,059.00 | Already released |
| $37,185.00 | December 28, 2012 |
| $12,395.00 | January 11, 2013 |

4.     **Inspection Period**.   The Agreement Section 4.1 Investigation Period is extended and now shall end at 5:00 p.m. on January 31, 2013.

5.     **Refundability**.   Notwithstanding anything in this Amendment to the contrary, in the event that Borrower fails timely to make and release any such Deposit as required by this Second Amendment, then such failure shall constitute Buyer's disapproval of the Investigation Matters within the Investigation Period, and Seller shall therefore be bound immediately to return to Buyer the full amount of the Deposits which Buyer has made as of the date of such deemed disapproval.  The provisions of the Agreement applicable to the refundability of deposits shall remain in full force and effect.

6.     **Recitals**.    The Recitals herein are hereby incorporated by reference into this Second Amendment.  The parties warrant that the Recitals are true and correct.

7.     **Ratification**.   Buyer and Seller hereby agree that, except as provided in this Second Amendment, the Agreement is ratified, affirmed and remains in full force and effect and is incorporated herein by this reference.

8.     **Counterparts**.    This Second Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

9.     **Electronic Transmittals**.  The Parties agree that if this Second Amendment is transmitted electronically, the electronic transmittal of the original execution signatures shall be treated as original signatures and given the same legal effect as an original signature.

*[Signature page follows]*

-2-

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the dates set forth below.

**BUYER:**                                          **SELLER:**

**SN BARNES MANAGEMENT, LLC,**        **LINNTON PLYWOOD ASSOCIATION,**
a California limited liability company        an Oregon cooperative corporation

By: S.N. Barnes, Inc.,
    a California Corporation,                    By:_____
Its:  General Partner
                                                    Its:_____

By:_____          Date:_____

Its:_____  Manager

Date: 12/27/12

-3-

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the dates set forth below.

**BUYER:**

**SELLER:**

**SN BARNES MANAGEMENT, LLC,**
a California limited liability company

**LINNTON PLYWOOD ASSOCIATION,**
an Oregon cooperative corporation

By: S.N. Barnes, Inc.,
     a California Corporation,
Its: General Partner

By: _Jim Stahly_____

Its: _General Manager_____

By:_____

Date: _12-26-12_____

Its:_____

Date:_____

-3-

## THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT
### (Linnton Plywood Site—Portland Harbor)

This Third Amendment ("**Third Amendment**") to the Purchase and Sale Agreement ("**Agreement**") is dated effective February 1, 2013 ("**Effective Date**"), and is entered into by and between LINNTON PLYWOOD ASSOCIATION, an Oregon cooperative corporation ("**Seller**"), and SN BARNES MANAGEMENT, LLC, a California limited liability company ("**Buyer**").

### RECITALS

A.     Effective September 11, 2012, Buyer and Seller entered into the Agreement concerning the purchase and sale of certain real property located in the County of Multnomah, State of Oregon (the "**Property**").   The Property is more particularly described in the Agreement.  The Agreement was amended by that certain First Amendment to Purchase and Sale Agreement dated effective December 11, 2012.

B.     Pursuant to the terms of the Agreement, Buyer agrees to timely pay the next monthly Periodic Deposit scheduled for on or before February 1, 2013, which shall promptly be released to Seller subject to the terms of the Agreement, but shall remain fully refundable to Buyer in the event that Buyer does not approve of the Investigation Matters during the Investigation Period, as extended.

C.     Pursuant to the terms and conditions of this Third Amendment, Buyer and Seller desire to extend the Investigation Period specified in the Agreement to April 30, 2013, subject to the terms and conditions set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual covenants contained herein, the parties agree as follows:

### AGREEMENT

1.     **Definitions**.  Except as otherwise provided herein, all capitalized terms set forth in this Third Amendment shall be defined as provided in the Agreement.

2.     **Effective Date**.    The Effective Date of this Third Amendment is February 1, 2013.

3.     **Investigation Period**.   The Agreement Section 4.1 Investigation Period is extended and now shall end at 5:00 p.m. on April 30, 2013.

4.     **Investigation Period; Extension Terms**.  In furtherance of the purposes of the defined Investigation Period to permit Buyer to determine the feasibility of its intended project/purchase, the parties agree as follows:

1

a.    Buyer has resolved all issues of feasibility except those specified herein;

b.    Those resolved feasibility issues include, but are not limited to, the Section 4.6 Title Matters and, except as set forth below, the matters specified in Section 4.1. With respect to the matters described in Section 4.1, Buyer has resolved to its satisfaction all matters relating to the feasibility of Buyer's proposed ownership of the Property except the following:

(1)    The impact of the BP/Arco terminal on Seller's contiguous property and on the intended project of Buyer;

(2)    The feasibility of adapting Buyer's proposed restoration project to BP's ultimate response to its Feasibility Study results and the conclusions of DEQ;

(3)    The results of the characterization of hazardous materials, including asbestos, lead-based paints, polychlorinated biphenyls (PCBs), and sumps, if any, associated with structure(s) on the Property; and,

(4)    Though not specified in Section 4.1, Buyer's evaluation of the current status of Seller's negotiations with the EPA and the trustees regarding Seller's resolution of its regulatory liability CERCLA and NRDA liability.

c.    In consideration of Seller's Agreement to Buyer's Requested Extension of the Investigation Period, Buyer agrees to exercise commercially reasonable efforts to complete the following actions by the respective dates specified below, provided that such dates set forth below in Subsections c(1), (2) and (3) shall be tolled on a day for day basis for any delays arising out of or attributable to force majeure, delays by any third party or governmental agency or official, or other delays outside the reasonable sole control of Buyer:

(1)    By February 28, 2013, to furnish to Buyer and DEQ Seller's conceptual depiction and description of its restoration project;

(2)    By March 15, 2013, to furnish said conceptual restoration project to BP and to initiate negotiations to achieve a mutually-agreed resolution of any contiguous property issues; Buyer shall also submit said conceptual restoration project depiction to DEQ and to Seller at the same time;

(3)    If BP's groundwater modeling results are furnished to DEQ as projected by March 31, 2013, then by April 30, 2013, to furnish to Seller Buyer's proposed response in the form of comments to DEQ on BP's Feasibility Study and the conclusions drawn therefrom as they relate to Buyer's restoration project;

(4)    With regard to Section b(3) above, the Investigation Period shall be extended to February 28, 2013; and,

-2-

(5)    With regard to Section b(4) above, the Investigation Period shall be extended to March 15, 2013.

d.    Notwithstanding the foregoing, and if not earlier terminated by its terms, this Investigation Period Extension will terminate not later than May 15, 2013.

e.    Buyer reaffirms its agreement to timely remit its monthly deposits on the first of each month.

5.    **Refundability**.  Notwithstanding anything in this Amendment to the contrary, in the event that Buyer fails timely to make and release any such Deposit as required by this Third Amendment, then such failure shall constitute Buyer's disapproval of the Investigation Matters within the Investigation Period, and Seller shall therefore be bound immediately to return to Buyer the full amount of the Deposits which Buyer has made as of the date of such deemed disapproval.  The provisions of the Agreement applicable to the refundability of deposits shall remain in full force and effect.

6.    **Recitals**.  The Recitals herein are hereby incorporated by reference into this Third Amendment.  The parties warrant that the Recitals are true and correct.

7.    **Ratification**.  Buyer and Seller hereby agree that, except as provided in this Third Amendment, the Agreement is ratified, affirmed and remains in full force and effect and is incorporated herein by this reference.

8.    **Counterparts**.  This Third Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

9.    **Electronic Transmittals**.  The Parties agree that if this Third Amendment is transmitted electronically, the electronic transmittal of the original execution signatures shall be treated as original signatures and given the same legal effect as an original signature.

*[Signature page follows]*

-3-

IN WITNESS WHEREOF, the parties hereto have executed this Third Amendment as of the dates set forth below.

BUYER:                                      SELLER:

SN BARNES MANAGEMENT, LLC,         LINNTON PLYWOOD ASSOCIATION,
a California limited liability company       an Oregon cooperative corporation

By: _____          By: _____
    Norman Barnes                            
    Its:  Manager                        Its: _____

Date: ___2/1/13___                    Date: ___2-1-13___

-4-