# Exhibit 21

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Case No. 09-10235 (BLS) |
| **SMURFIT-STONE CONTAINER** ) | |
| **CORPORATION, et al.,** ) | (Jointly Administered) |
| ) | |
| Debtor. ) | Chapter 11 |

## UNITED STATES' MEMORANDUM IN SUPPORT OF DEBTORS' 9019 MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT AND RESPONSE TO PUBLIC COMMENTS

The United States submits this memorandum in support of Debtor and certain debtors-in-possession (collectively, "Debtors")[1] Rule 9019(a) motion to approve the proposed Settlement Agreement in this matter, lodged with this Court on October 28, 2010. Pursuant to Section XIV of the Settlement Agreement, the United States Department of Justice gave the public notice of the lodging of the decree and provided an opportunity for the public to comment on it for a period of thirty (30) days. "Settlement Agreement," Section XIV at 31-33, (Case No. 09-10235 (BLS), lodged October 28, 2010); 75 Fed. Reg. 67767-67768 (November 3, 2010). The comment period has expired and the United States has received three adverse comments and one objection to the proposed Settlement Agreement. After due consideration, the United States has determined that the proposed settlement is in the public interest. See "Settlement Agreement," Section XIV at Paragraph 29 (October 28 2010). Accordingly, the United States supports Debtors' 9019 motion for approval of the Settlement Agreement, filed on November 19, 2010.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, LLC (8169), SLP Finance II, LLC (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is: 222 North LaSalle Street, Chicago, Illinois 60601.

I.  **THE PROPOSED SETTLEMENT AGREEMENT**

The proposed Settlement Agreement resolves federal claims under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a), for:

(1) response costs incurred and to be incurred by the Environmental Protection Agency ("EPA") in connection with response actions performed by EPA at the following sites: Sauer Dump Site in Dundalk, Maryland; 68th Street Dump Site in Baltimore, Maryland; Casmalia Disposal Site near Santa Maria, California; BCX Tank Superfund Site in Jacksonville, Florida; Ward Transformer Site, Raleigh, North Carolina; and the Portland Harbor Superfund Site in Portland, Oregon;

(2) removal costs pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701-2762, in connection with the discharge of oil from Debtor's Portland Harbor Superfund Site; and

(3) natural resource damages and assessment costs, incurred and to be incurred by the Department of Interior and National Oceanic and Atmospheric Administration (collectively, "natural resource trustees"), at and near Debtor's Portland Harbor facility.

Pursuant to the Settlement Agreement, Smurfit will distribute stock on account of allowed bankruptcy claims in the total amount of $15,358,174.00 for federal environmental claims - $12,358,174.00 for EPA claims and $3,000,000.00 for natural resource trustees' claims.

II.  **CERCLA STATUTORY FRAMEWORK**

Congress enacted CERCLA in response to widespread concern over the severe environmental and public health effects resulting from improper disposal of hazardous wastes

and other hazardous substances.  See generally United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1500 (6th Cir. 1989), cert. denied, 494 U.S. 105 (1990); United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1416-18 (6th Cir. 1991); Eagle-Picher v. EPA, 759 F.2d 922, 925 (D.C. Cir. 1985); United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983). CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (Oct. 17, 1986) (SARA), grants broad authority to the United States in connection with the cleanup of waste sites.

CERCLA provides EPA with several options when EPA determines that response action is needed at a particular hazardous waste site.  For example, EPA may undertake the response action on its own, utilizing funds from the Superfund, and then sue the responsible parties for reimbursement of the Superfund.  42 U.S.C. §§ 9604, 9607.  Responsible parties under CERCLA are liable for both response costs and injuries to the natural resources affected by the release of hazardous substances.  42 U.S.C. § 9607(a)(4)(c).  EPA may also issue administrative orders under CERCLA Section 106 directing responsible parties to implement response actions.  42 U.S.C. § 9606.  Responsible parties include the owners and operators of hazardous substance facilities as well as those who arranged for the disposal, treatment, or transport of the hazardous substances.  42 U.S.C. § 9607.

Having created the liability system and enforcement tools to allow EPA to pursue responsible parties for Superfund cleanups, Congress expressed a strong preference that the United States settle with responsible parties in order to avoid spending resources on litigation rather than on cleanup.  See United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1436 (6th Cir. 1991) ("presumption in favor of voluntary settlement"); In re Cuyahoga

Equipment Corporation, 980 F.2d 110 (2d Cir. 1992) (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); United States v. Cannons Engineering Corp., 899 F.2d 79, 92 (1st Cir. 1990); United States v. DiBiase, 45 F.3d 541, 545-46 (1st Cir. 1995); Kelley v. Thomas Solvent Company, 717 F. Supp. 507 (W.D. Mich. 1989); H.R. Rep. No. 253, pt. 1, 99th Cong., 1st Sess. 80 (1985), reprinted in 1986 U.S. Code Cong. & Ad. News 2862.  CERCLA encourages settlements by providing protection from contribution claims for matters addressed to parties who settle with the United States.  Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2). This provision provides settling parties with a measure of finality in return for their willingness to settle.  United States v. Pretty Products, Inc., 780 F. Supp. 1488 (S.D. Ohio 1991); see Cannons Engineering, 899 F.2d at 92; O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989), cert. denied, 493 U.S. 1071 (1990); United Technologies Corp. v. Browning-Ferris Industries, Inc., 33 F.3d 96 (1st Cir. 1994), cert. denied, 115 S. Ct. 1176 (1995); H.R. Rep. No. 253, pt. 1, 99th Cong., 1st Sess. 80 (1985), reprinted in 1986 U.S. Code Cong. & Ad. News 2862.  In addition, a party that has settled its CERCLA liability may bring actions for contribution against other non-settling responsible parties.  42 U.S.C. § 9613(f)(1).  See United States v. R.W. Meyer, Inc., 932 F.2d 568 (6th Cir. 1991); Chem-Dyne, 572 F. Supp. 802.

### III.  JUDICIAL REVIEW OF SETTLEMENT AGREEMENTS

The well settled standard applied to review of the United States' proposed settlements under CERCLA is whether a settlement is fair, reasonable and consistent with CERCLA. United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1424, 1426 (6th Cir. 1991); United States v. Cannons Engineering, 899 F.2d 79, 84 (1st Cir. 1990); United States v. Hercules, Inc., 961 F.2d 796, 800 (8th Cir. 1992).  Review of such settlements is committed to

the discretion of the reviewing court, see United States v. Hooker Chemical & Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985), which is to exercise this discretion in a limited and deferential manner, Akzo Coatings, 949 F.2d at 1424; Cannons Engineering, 889 F.2d at 84; In re Cuyahoga Equipment Corp., 980 F.2d 110, 118 (2d Cir. 1992).

The judicial deference to settlements reached by the parties to litigation is "particularly strong" when that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." Akzo Coatings, 949 F.2d at 1436. The balance of competing interests affected by a settlement with the federal government "'must be left, in the first instance, to the discretion of the Attorney General,'" Kelley v. Thomas Solvent Company, 717 F. Supp. 507, 514-515 (W.D. Mich. 1989) (citation omitted), since the Attorney General retains "considerable discretion in controlling government litigation and in determining what is in the public interest." United States v. Associated Milk Producers, Inc., 534 F.2d 113, 117 (8th Cir.), cert. denied, 429 U.S. 940 (1976). "Indeed, where a settlement is the product of informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental laws, in conjunction with the Department of Justice, one court has indicated that a presumption of validity attaches to that agreement." United States v. Rohm & Haas Co., 721 F. Supp. 666, 681 (D.N.J. 1989) (citing City of New York, 697 F. Supp. at 692) (emphasis added).

Fairness in the CERCLA settlement context has both procedural and substantive components. Cannons, 899 F.2d at 86. To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance. Cannons, 899 F.2d at 86. A determination that a settlement is procedurally

5

fair "may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." United States v. Davis, 261 F.3d 1, 23 (1st Cir. 2001).

In reviewing substantive fairness, the court need only determine whether a proposed settlement reflects a reasonable compromise of the litigation. U.S. v. Rohm & Haas Co., 721 F.Supp. 666, 685 (D.N.J. 1989). In order to be fair to other non-settling responsible parties, a settlement should recover at least an amount "roughly correlated with some acceptable measure of comparative fault," apportioning liability "according to rational (if necessarily imprecise) estimates" of fair shares of liability for a given Facility. Cannons Engineering, 899 F.2d at 87.[7] Factors considered by courts reviewing CERCLA settlements for fairness include "'the strength of the plaintiffs' case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved.'" Kelley v. Thomas Solvent Co., 717 F.Supp. 507, 517 (W.D.Mich.1989) (citing United States v. Hooker Chemical & Plastic Corp., 607 F. Supp. 1052, 1057 (W.D.N.Y.), affirmed, 776 F.2d 410 (2d Cir. 1985)).

Whether a settlement is "reasonable" for purposes of judicial review of CERCLA settlements sometimes involves review of the technical effectiveness of cleanup requirements in settlements obligating settling parties to perform remediation. None of the proposed settlements require Debtors to perform remediation. Rather, they generally provide money either to a special account or a trustee for use in cleanup of the Site pursuant to response or corrective action measures that are or have been selected separately. Courts typically find such monetary settlements reasonable. See, e.g., Kelley, 717 F. Supp. at 518 (settlement providing monetary

---

[7] Accord, In re Energy Cooperative, Inc., 173 B.R. 363, 367 (N.D. Ill. 1994); In re Eagle-Picher Industries, Inc., 197 B.R. 260 (Bankr. S.D. Ohio 1996), aff'd, 1997 U.S. Dist. LEXIS 15436 (July 14, 1997 S.D. Ohio).

6

recovery was reasonable because it "functions exactly as the CERCLA cost recovery action was intended").

Finally, a CERCLA settlement must be consistent with the statutory goals of CERCLA: (1) Congress' desire to equip the federal government with tools necessary for prompt and effective responses to hazardous waste disposal problems of national magnitude; and (2) Congress' desire that those responsible for causing the problems thus identified bear the costs and responsibility for remedying the harmful conditions they created. United States v. Wallace, 893 F. Supp. 627, 636 (N.D. Tex.1995). CERCLA authorizes the cleanup of hazardous waste sites using money from the Superfund, but the Superfund is limited and cannot finance cleanup of all of the many hazardous waste sites across the nation. Congress knew when it enacted CERCLA that the costs of response activities would greatly exceed the Superfund. Kelley, 717 F. Supp. at 518. Thus, settlements of CERCLA cases in which the defendants agree to reimburse the Superfund for past expenditures are in the public interest. Cost-effective settlement practices also preserve resources of the Government in its efforts to clean up hazardous waste sites as quickly as possible. See Kelley, 717 F. Supp. at 518; See, e.g., In re Bell Petroleum, 3 F.3d at 897.

### IV. THE COMMENTS

Three public comments and one objection were received on the Settlement Agreement.

A. Comment of Jill Mosteller noting the disparity between a recommended "reserve amount" and the settlement amount for the Portland Harbor Superfund Site.

One adverse comment was received by the Department of Justice by email on November 5, 2010. (Attachment A). Jill Mosteller, the commentor, stated that "[the proposed settlement] falls well short of the $50 million reserve the federal government requested in May to cover

7

Smurfit's liability for past water pollution from its North Portland corrugated cardboard box plant, 9930 N. Burgard Way." She objected that the proposed settlement, with regard to the allowed claim for the Portland Harbor Superfund Site, is inadequate in the face of such a potential liability.

The $50 million "reserve" amount described in the article was an amount that the United States contemplated, in lieu of settlement, to fully protect the federal environmental claims[2], if they had to be adjudicated and new evidence established that Debtor's equitable share exceeded the amounts that had been sought to settle the claims. See "The United States' Objection to SSCE Distribution Reserve Amounts," at 9-10, (Docket No. 7520, May 7, 2010)(Attachment B). In Paragraph 36 of the Objection, the United States stated that "[a]ny reserve should be conservatively set at a high level so as to preserve the Government's ability to recover any amounts the Court may find should be allowed." In the Objection the United States proposed a reserve amount of $50 million for the claims relating to the Portland Harbor Superfund Site. Thus, the comment is predicated upon a misunderstanding of the purpose of a reserve amount. The reserve amount described in the comment did not reflect an estimate of the Debtor's equitable share based upon current information. It was a protective amount to ensure that adequate reserves would be available to pay the Government's claims, when a judgment was reached. In light of the settlement, however, the reserve amount is no longer relevant.

Otherwise, the comment does not reflect any case-specific concerns about the United States' estimation of the Debtors' equitable fair share of the total liability for the Portland Harbor Superfund Site (or the costs and difficulties of litigating the claims).

---

[2] See the United States' Proofs of Claim Nos. 11430 and 11431, as amended by Claim No. 13789, which re-estimates future response costs for the Portland Harbor Superfund Site.

8

B. <u>Comment on behalf of American Premier Underwriters, Inc., concerning disposition of funds available as a result of the Sauer Dump Site settlement amount</u>.

Another comment was received on December 3, 2010 from attorney Benjamin G. Stonelake, Jr., BlankRome, LLP, on behalf of American Premier Underwriters, Inc. ("APU"), relating to the disbursement of settlement proceeds for the Sauer Dump Site. (Attachment C). The comment specifically objects to Paragraph 17(a)(i)(b) of the proposed Settlement Agreement, which provides:

> The cash distribution for EPA's Allowed Claim for the Sauer Dump Site shall be deposited in a Site-wide Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

The comment asserts that the transfer of settlement proceeds from a Site-wide Special Account for the Sauer Dump Site to the general Superfund would be a "[g]ross injustice to the parties implementing future remedial activities . . . because the parties may be unable to recover any additional costs from Smurfit." (Attachment C at 2). In its comment, APU notes that it has already been given assurance in an email from EPA-Region 3 that "any proceeds from the Smurfit bankruptcy will be put into a Site Specific Special Account to be used for future actions in connection with the Sauer Dump Site."[3] Id. Nothing in the settlement negates this commitment.

The language in the Settlement Agreement is identical to the model language provided in EPA's "Consolidated Guidance on the Establishment, Management and Use of CERCLA Special Accounts" ("2002 Guidance") and simply reflects that "special accounts are subaccounts within

---

[3] The use of the term "Site-specific" is used interchangeably from the term "Site-wide.".

9

the EPA Hazardous Substance Superfund (Trust Fund)." (Attachment D at 1,3). The 2002 Guidance makes it clear that "[t]here are two critical components of the model language: use of the funds for a *response* action; and use *at that site*." Id. at 6. This is consistent with the desires expressed in APU's comment. There is no agency action yet – no record of decision -- selecting remedial response actions for the Sauer Dump Site. Thus, the settlement proceeds cannot be locked into a Site-wide Special Account for use only at the Sauer Dump Site, since EPA later may determine that future actions at the Site will not use all the funds in the special account. See "Guidance on the Planning and Use of Special Account Funds," OSWER Directive # 9275.1-20 ("2010 Guidance") (September 28, 2010).[4] Under these circumstances, the language proposed in APU's comment is not appropriate. (See Attachment C at 3).

The proposed Settlement Agreement achieves the result sought by APU, within the scope of the relevant statutory provision, CERCLA Section 122(b)(3), 42 U.S.C. § 9622(b)(3)[5], and EPA's guidances on special accounts. The provision in Paragraph 17(a)(i)(b) is standard settlement language, as established by EPA's 2002 Guidance, for creating a Special Account. On the basis of that guidance and the proposed Settlement Agreement, the Smurfit cash distribution for the Sauer Dump Site will be deposited in a Site-wide Special Account for use at the Sauer Dump Site. In the event, however, that the special account balances exceed the estimated known and potential future response costs at the Site, the funds will be transferred to

---

[4] EPA's 2010 guidance regarding the use of Special Accounts states: "Special Account balances that exceed the estimated known and potential future response costs should be transferred to the general portion of the Trust Fund after resources have been considered for reclassification in accordance with the 'Superfund Special Account Guidance' issued July 16, 2002. These resources will be made available for future appropriation by Congress." Guidance at 6.

[5] Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), provides: "If, as part of any agreement, the President will be carrying out any action and the parties will be paying amounts to the President, the President may, notwithstanding any other provision of law, retain and use such amounts for purposes of carrying out the agreement."

the general Trust Fund. 2010 Guidance at 6. Of course, if the proposed Settlement Agreement is not approved, there is no authority to establish a Special Account for this site and thereby achieve a result that APU seeks. 42 U.S.C. 9622(b)(3).

    C.    <u>Objection and comment on behalf of Schnitzer Steel Industries, Inc., and Schnitzer Investment Corp. seeking dedication of the cash distributions for the Portland Harbor Site to AOPC 3.</u>

On December 3, 2010, an objection and a comment were filed on behalf of Schnitzer Steel Industries, Inc., and Schnitzer Investment Corp. (together referred to as "Schnitzer"). (Attachments D and E). The content of these documents is identical. Schnitzer is a potentially responsible party at the Portland Harbor Superfund Site with joint and several liability for the site-wide harm found there. On the basis of an agreement with Schnitzer on language in the proposed Order (Attachment F), Schnitzer is withdrawing its objection and comment. Section V, Paragraph 4(a)(5) of the Settlement Agreement is clarified that, subject to all appropriate legal authorities, EPA Region 10 shall place the proceeds received from this settlement into a Portland Harbor Superfund Site-wide Special Account within the EPA Hazardous Substance Superfund. EPA Region 10 intends to dedicate the proceeds received from this settlement to conduct or finance response actions after the Record of Decision for the Portland Harbor Superfund Site is issued. If EPA is able to enter into a settlement with one or more parties who agree to implement the Record of Decision, EPA intends to make such disbursements as agreed to by EPA and such parties from the settlement proceeds to perform work required under the settlement.

No other comments have been received through the date of this response.

V. **THE PROPOSED SETTLEMENT AGREEMENT IS FAIR, REASONABLE AND CONSISTENT WITH ENVIRONMENTAL LAW AND THE PUBLIC COMMENTS RECEIVED DO NOT PROVIDE A BASIS TO DISAPPROVE THE SETTLEMENT AGREEMENT**

For the reasons set forth below, the United States, having considered the public comments received, believes that the proposed Settlement Agreement is fair, reasonable, and lawful, notwithstanding the public comments submitted.

A. The proposed Settlement Agreement is fair, reasonable, and consistent with environmental law.

The proposed Settlement Agreement represents a reasonable and fair compromise after arm's length negotiations by experienced bankruptcy and environmental counsel. The allowed general unsecured claims totaling $15,358,174.00 provide a substantial environmental benefit. The settlement avoids the need for protracted and expensive litigation and adjudication of the factual and legal issues that would otherwise further deplete the limited funds of the Debtors.

The Settlement Agreement is fair because it results from arm's length negotiations lasting over a year among the settling parties. Numerous drafts were exchanged and negotiated. Moreover, the public comment process has ensured that the procedural fairness requirement is satisfied. Cf. Davis, 261 F.3d at 23 (noting lodging and publication as factors bearing on procedural fairness).

Also, the Settlement Agreement is a substantively fair compromise of the Debtors' liabilities that considered the litigation risks and possible outcomes of proceeding to estimation hearings or other litigation. See Akzo, 949 F.2d at 1436 (among the factors determinative of substantive fairness are "the possible risks involved in the litigation if the settlement is not

12

approved."). The compromise at any given site, therefore, generally reflects the litigation risk associated with the inherent difficulty of proving future cleanup costs on the basis of incomplete site investigation and cleanup action selection. The settlement amounts therefore fairly account for the fact that the Government has incomplete information and/or has not concluded the administrative process to decide on a cleanup approach at certain sites. See id. at 88 (noting that among the "frequently encountered reasons for departing from strict formulaic comparability are the uncertainty of future events and the timing of particular settlement decisions."); cf. Sun Co., Inc. (R&M) v. Browning-Ferris, Inc., 124 F.3d 1187, 1193 (10th Cir. 1997) (noting that in performing equitable allocation in the context of a contribution action between PRPs, "the total cleanup costs – including responsibility for "orphan shares" – will be equitably apportioned among all the PRPs, with the court being able to consider any factors it deems relevant."); Morrison Enterprises v. McShares, Inc., 302 F.3d 1127, 1135 (10th Cir. 2002); Pinal Creek v. Newmont Mining Corp. 118 F.3d 1298, 1303 (9th Cir. 1997) *overruled on other grounds by* United States v. Atlantic Research Corp., 551 U.S. 128 (2007); Centerior Service Co. v. ACME Scrap Iron & Metal Corp., 153 F.3d 344, 354 n.12 (6th Cir. 1998), *overruled on other grounds by* Atlantic Research Corp., 551 U.S. 128; Vine Street LLC v. Keeling, 460 F.Supp.2d 728, 761 n.129 (E.D. Tex. 2006). Thus, the proposed settlement amounts reflect compromises by the United States that are substantively fair because they are roughly correlated with the Debtor's comparable fault, taking into account the litigation risks and additional factors described above.

The proposed Settlement Agreement is likewise reasonable because it obtains an appropriate amount of recovery to perform future cleanup work at the sites and/or replenish the Superfund by recovering significant past costs. See, e.g., Kelley, 717 F. Supp. at 518.

13

Moreover, it avoids the cost and risks of litigation with the Debtors that would otherwise eat up the estate's limited assets. See United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045, 1053 (N.D. Ind. 2001); United States v. Kramer, 19 F. Supp. 2d 273, 286-87 (D.N.J. 1998).

Lastly, the proposed Settlement Agreement is consistent with CERCLA because it conserves resources for cleanup rather than for litigation and appropriately places the fair burden of the cleanup costs on the party that contributed to the hazardous waste problem rather than on the tax-paying public. See Wallace, 893 F. Supp. at 636; Kelley, 717 F. Supp. at 518; Bell Petroleum, 3 F.3d at 897; See also In re Eagle-Picher Industries, Inc., 197 B.R. 260, 272 (Bankr. S.D. Ohio 1996) (noting that bankruptcy settlements are beneficial to all concerned because they provide for recoveries and thereby reduce the liability of other parties in a manner that might not otherwise be achieved). 42 U.S.C. 9613(f)(2).

B. The Settlement Agreement is in the public interest and the comments and objection have not provided any reason for disapproval.

The proposed Settlement Agreement is consistent with the goals and purposes of CERCLA and it secures environmental benefits that are in the public interest. The Debtors will pay to the United States a total of $15,358,174.00 in stock on our allowed claim for environmental liabilities that are alleged in the Proof of Claim.

Three public comments and an objection were received on the Settlement Agreement. The Schnitzer objection to and public comment on the proposed settlement have been withdrawn. The comment from Jill Mosteller concerning a former "recommended reserve amount" is no longer relevant in light of the settlement. Finally, APU provides no justification for limiting EPA's discretion in distributing settlement proceeds to "PRPs or EPA to conduct or finance future response actions at or in connection with the Site." See Attachment D at 3. The

settlement proceeds will be deposited in a Site-wide Special Account for use at the Sauer Dump Site. This is consistent with CERCLA Section 122(b)(3), 42 U.S.C. 9622(b)(3), and EPA Guidances on the retention of settlement proceeds in special accounts.

The United States has not received any other comments or objections to the Settlement Agreement. The settlement clearly achieves public benefits while avoiding extensive litigation. It saves substantial time and resources for the parties as well as the Court. After due consideration of the comments, nothing about the proposed settlement can be construed to suggest that this settlement is not in accordance with the goals of CERCLA nor the public's interest. Accordingly, the Court should enter the Settlement Agreement.

## VI.    CONCLUSION

After due consideration, the United States continues to believe that the proposed Settlement Agreement, which has been signed by all of the parties[6], is fair, reasonable and in the public interest. For the foregoing reasons, the plaintiff United States respectfully requests that the proposed Settlement Agreement be approved and that the Court enter the revised proposed order attached to this memorandum.

---

[6] The settling parties are: Debtors; the United States; the Operating Industries Steering Committee (listed in Exhibit A to the Settlement Agreement); the JIS Performing Party Group (listed in Exhibit B to the Settlement Agreement); Carolina Power & Light Company d/b/a Project Energy Carolinas, Inc.; PCS Phosphate Company, Inc.; and Consolidation Coal Company.

15

                Respectfully submitted,

                Robert G. Dreher
                Acting Assistant Attorney General
                Environment and Natural Resources
                 Division

                Bruce S. Gelber, Chief
                Environmental Enforcement Section
                Environment and Natural Resources
                 Division

                /S/ Elliot M. Rockler
                Elliot M. Rockler
                Stacy D. Coleman
                Environmental Enforcement Section
                U.S. Department of Justice
                P.O. Box 7611
                Ben Franklin Station
                Washington, D.C. 20044
                (202) 514-2653


                David C. Weiss
                United States Attorney
                District of Delaware

                Ellen W. Slights
                Assistant United States Attorney
                1201 Market Street
                Chemical Bank Plaza
                Suite 1100
                P.O. Box 2046
                Wilmington, DE 19899-2046
                (302) 573-6277

OF COUNSEL:
DAVID SMITH-WATTS
Attorney-Advisor
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460